JUDGE VARGAS

25 CV 10463

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x

EVERSPAN INDEMNITY INSURANCE
COMPANY,

        Plaintiff,

       -v-

CARDIGAN GENERAL INSURANCE SERVICES,
LLC and VENBROOK GROUP, LLC

        Defendants.
------------------------------------------------------------------ x

Case No.: _____

**COMPLAINT**

Plaintiff Everspan Indemnity Insurance Company ("Everspan" or "Plaintiff"), by and

through its attorneys Troutman Pepper Locke LLP, for its Complaint against Defendants Cardigan

General Insurance Services, LLC ("Cardigan") and Venbrook Group, LLC ("Venbrook" and with

Cardigan, "Defendants") alleges the following:

## I.    NATURE OF THE ACTION

1.    In May of 2021, Cardigan entered into a Program Administrator Agreement (the

"Program Agreement") with Everspan, whereby Cardigan agreed to produce and administer a

Non-Emergency Medical Transportation and Commercial Auto insurance program which would

be underwritten by Everspan. A true and correct copy of the Program Agreement, with all

Schedules and Exhibits, is attached here as **Exhibit 1**. Pursuant to that Program Agreement,

Cardigan was to be compensated ███████████████████████████████████████

███████████████████████████████ the terms of which are contained in the Program

Agreement and a related reinsurance agreement that is clearly and repeatedly incorporated by

reference into the Program Agreement.

2.    Cardigan understood that ███████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████

3.    At the same time as Cardigan signed the Program Agreement, Venbrook, its parent

corporation, executed a Parental Guaranty, guaranteeing Cardigan's obligations—███████████

████████████████—under the Program Agreement. Venbrook also agreed to

pay Everspan's attorney's fees if Everspan was forced to bring an action to enforce the Guaranty,

regardless of whether Everspan ultimately prevailed in such an action.

4.    Now, both Cardigan and Venbrook are refusing to live up to their bargains. ██████

████████████████████████████████████████████████

███████████████████████████████████. However, both Cardigan

and Venbrook have refused to pay Everspan.

5.    In response to Everspan's multiple demands for payment and utmost patience in

attempting to work out an acceptable solution to avoid litigation, Cardigan and Venbrook have

ultimately chosen to ignore their obligations and refuse to pay what they owe pursuant to the

████████████. As a result, Everspan now has no choice but to commence this lawsuit to enforce the

terms of its agreements.

## II.    PARTIES

6.    Everspan is an Arizona corporation with its principal place of business in New

York, New York.

7.    Upon information and belief, Cardigan is a Delaware LLC with its principal place

of business in Woodland Hills, California.

2

8.    Upon information and belief, Venbrook is a Delaware LLC with its principal place of business in Woodland Hills, California.

### III.    JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and there is complete diversity between Everspan and Defendants.

10.    This Court has personal jurisdiction over Cardigan because Everspan and Cardigan agreed in the Program Agreement that "any controversies resulting from and/or related to [the] Agreement" would be subject to the "exclusive jurisdiction of the federal and state courts located in the Borough of Manhattan in New York City …." Ex. 1 (Program Agreement), § 15.11.

11.    The Court has personal jurisdiction over Venbrook because Venbrook agreed in the May 1, 2021 Parental Guaranty (the "Guaranty"), which is attached as Exhibit B to the Program Agreement, "that any legal action or proceeding based hereon, or arising out of, under, or in connection with this Guaranty shall be brought and maintained exclusively in the courts of the State of New York, New York County, or in the United States District Court for the Southern District of New York …." Ex. 1 (Program Agreement), Ex. B (Guaranty), ¶ 14(a).

12.    This Court is an appropriate venue because of the Program Agreement and the Guaranty.

### IV.    FACTUAL ALLEGATIONS

#### A. The Relevant Agreements.

13.    On April 30, 2021, Everspan and Cardigan signed the Program Agreement, with an Effective Date of May 1, 2021, whereby Cardigan agreed to act as producer and administrator of a Non-Emergency Medical Transportation and Commercial Trucking Insurance Program (the "Program") underwritten by Everspan.

3

14.    Under the Program Agreement, Cardigan agreed to act as administrator for the Program on Everspan's behalf and undertake certain responsibilities in accordance with administering the Program.

15.    In exchange, the parties agreed that Cardigan would receive ████████ ████████████████████████████████████████████████████ ██████████████████████ included as part of the Program Agreement. *See* Ex. 1 (Program Agreement), § 6.1, Schedule B. The parties also agreed that ███████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████. *Id.*

16.    ████████████████████████████████████████ ████████████. Schedule B refers to a Quota Share Reinsurance Agreement which covered the Program (the "Reinsurance Agreement") which, like the Program Agreement, was effective May 1, 2021. All material terms of the Reinsurance Agreement, including any relevant to the sliding scale commission, were finalized and communicated to Cardigan by May 1, 2021, and it was fully bound by that date. As is customary in the reinsurance marketplace, the Reinsurance Agreement was not formally executed until after it was effective. A true and correct copy of the Reinsurance Agreement, which was signed on June 28, 2021, is attached here as **Exhibit 2**.

17.    The Reinsurance Agreement is incorporated into the Program Agreement as "Exhibit A." It is also repeatedly incorporated and referenced throughout the Program Agreement:

a.    Section 1.2 of the Program Agreement provides that "Cardigan shall be responsible for reviewing all such Reinsurance Agreement(s) ...." Ex. 1 (Program Agreement), § 1.2.

b. Further, Cardigan acknowledged in the Program Agreement "that Everspan *will* enter into one or more reinsurance agreements with a Reinsurer providing for a cession of a certain portion of the underwriting risk assumed by Everspan pursuant to this Agreement," and agreed "to perform obligations pursuant to this Agreement as reasonably necessary for Everspan to comply with such terms of a Reinsurance Agreement that specifically refer to this Agreement and Cardigan's obligations thereunder." *Id.* at § 2.3 (emphasis added).

c. In addition, Schedule B explicitly states that ███████████████ ██████ "in accordance with Section 6.4 of the Reinsurance Agreement ...." *Id.* at Schedule B.

d. Finally, Section A of the ███████████████████ ██████████████████████████████████████ refers explicitly to Section 6.4 of the Reinsurance Agreement. *Id.*

18.    Cardigan was also aware of the relevant terms of the Reinsurance Agreement prior to signing the Program Agreement and, in fact, authorized inclusion of those terms. Cardigan had a preexisting relationship with the reinsurance broker that assisted with the placement of the Reinsurance Agreement and was in constant contact with both Everspan and the broker in connection with the terms of the Reinsurance Agreement.

19.    As early as April 20, 2021, Brenda Sherman ("Sherman"), Cardigan's President who signed the Program Agreement on Cardigan's behalf, was sent a draft copy of the Reinsurance Agreement. The relevant terms in that draft were virtually identical to what was eventually signed.

20.    Later, on April 29, 2021, Sherman was sent the following terms by the reinsurance broker:

5

[REDACTED]

21.     Sherman was asked to "confirm [her] agreement" to these terms and responded affirmatively later that day saying, "you are authorized to go forward and finalize the capacity."

22.     ***These are the same terms that ended up in the Reinsurance Agreement*** [REDACTED]
[REDACTED].

23.     Finally, also on May 1, 2021, Venbrook executed the Guaranty on behalf of Cardigan. Ex. 1 (Program Agreement), Ex. B.

24.     Under the Guaranty, Venbrook guaranteed Cardigan's "performance of the terms, conditions, and obligations … under the Program Agreement, including all amounts due and owing to Everspan under the Program Agreement," and unconditionally guaranteed "to Everspan the full and prompt payment of Funds, as defined in the Program Agreement, when due to Everspan under the Program Agreement." Ex. 1 (Program Agreement), Ex. B, § 2.

25.     Venbrook also agreed to pay "all attorney's fees and costs related to collection of any and all amounts guaranteed hereunder in the event that Everspan initiates legal proceedings to enforce this agreement …." Ex. 1 (Program Agreement), Ex. B, § 14(b). Notably, this provision does not require that Everspan prevail in a proceeding to enforce the Guaranty in order to recover its fees. In contrast, Venbrook is only entitled to its attorney's fees if it is determined to be the prevailing party in any proceeding brought by Everspan. *Compare with* Ex. 1 (Program Agreement), Ex. B, § 14(c) ("[Venbrook] shall be entitled to all attorney's fees and costs in the event that [Venbrook] has to defend legal proceedings pursuant to this Agreement *and is declared*

*the prevailing party in such legal proceedings, as determined by the trier of fact subject to Everspan exhausting any rights to appeal.*") (emphasis added).

**B. The Reinsurance Agreement and Program Agreement Terminate, And Everspan Is Owed a Deficit.**

26.     Beginning in early 2022, Everspan began to receive a number of "provisional notices of cancellation" (each a "PNOC"), each effective April 30, 2022, from reinsurers participating in the Reinsurance Agreement, notifying Everspan that the Reinsurance Agreement would be terminated unless the PNOCs were withdrawn before the April 30 effective cancellation date.

27.     As a result, on or around February 15, 2022, Everspan notified Cardigan by letter that the PNOCs triggered its right to terminate the Program Agreement pursuant to Section 7.3, which allows Everspan to ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████ Ex. 1 (Program Agreement), § 7.3(D)(1).

28.     On April 12, 2022, ████████████████████████████████████████ ██████████████████████████████████ Cardigan emailed Everspan acknowledging that the parties had agreed to terminate the Program Agreement and that "Cardigan is not authorized to write any [P]olicies on Everspan paper after 4-30-22."

29.     Everspan responded by letter on April 13, 2022, notifying Cardigan that, in addition to terminating under Section 7.3, the Program Agreement was now also terminated pursuant to Section 7.2, by "mutual consent." Ex. 1 (Program Agreement), § 7.2.

30.     On April 30, 2022, the Reinsurance Agreement terminated pursuant to Section 3.2 thereof, and the Program Agreement terminated pursuant to Sections 7.2 and 7.3 thereof.

31.     The Program Agreement lasted for only one "Contract Year" (i.e., May 1, 2021

through April 30, 2022) as defined therein, which is a construct used ████████████████

████████████████████████████████████████████████████████████████████

████████████████████████.[1]

32.     Schedule B to the Program Agreement provides that ██████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████

33.     Section 6.4.3 of the Reinsurance Agreement—which is incorporated as an Exhibit

and referred to throughout the Program Agreement—states that:

> Everspan will calculate and report the Loss Ratio and any
> adjustments to the Provisional Commission in accordance with the
> provisions of this Section 6.4, for the first time with respect to each
> Contract Year, within sixty (60) days after the end of the period that
> is 24-months following the last day of each Contract Year ....

34.     Because the Agreements were terminated contemporaneous to the last day of the

first (and only) Contract Year—April 30, 2022—any Credit Everspan may owe to Cardigan or

Deficit Cardigan owed to Everspan was to be calculated as of April 30, 2024, i.e., 24-months

following the last day of the only Contract Year.

35.     Section 6.4 of the Reinsurance Agreement provides that any Credit or Deficit is to

be determined based on the "Loss Ratio," which is defined in Section 6.4.1(A) as "the ratio of

Losses Incurred to Premiums Earned."[2] The Losses Incurred is comprised of the three components:

---

[1] "Contract Years" is defined as "consecutive annual terms … unless terminated" earlier than one consecutive term. Ex. 2 (Reinsurance Agreement), § 3.1.

[2] "Losses Incurred" is defined as "with respect to Policies incepting during each Contract Year: (i) Ceded losses and Loss Adjustment Expenses paid as of the effective date of calculation; plus (ii) The ceded reserves for losses and Loss Adjustment Expenses outstanding as of the effective date of calculation; plus (iii) IBNR." *Id.* at § 6.4.1(B).

(i) payments made by Everspan with respect to claims that have been reported on policies administered by Cardigan; (ii) reserves established for future payments to be made with respect to such reported claims ("Reserves"); and (iii) a provision for future payments with respect to claims that have not yet been reported ("IBNR").

36.    Claims on policies administered by Cardigan were originally adjusted by a third-party administrator, which primarily has responsibility to handle claims, set Reserves, issue payments, and generally oversee the administration of claims.

37.    Initially, Carl Warren & Company ("Carl Warren"), an entity affiliated with Cardigan and under common control of Venbrook, was appointed to serve as the Third Party Administrator (the "TPA") for the Program. During the course of Carl Warren's handling of the claims, ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ following the conclusion of the Contract Year, Everspan terminated its contract with Carl Warren and appointed Rockville Risk Management Associates ("Rockville") to serve as its TPA.[3]

38.    Cardigan was intimately involved with the claims administration process throughout the life of the Program—including while Carl Warren was the TPA and now that Rockville is the TPA—and still remains involved even after termination. Thus, Cardigan was and still is aware (or, at the very least, should have been aware) of ███████████████████ ████████████████████████████████████████████████████████████████████

---

"Premiums Earned" is defined as "the earned portion of the Net Premiums on Policies incepted during the Contract Year." *Id.* at § 6.4.1(C).

"IBNR" which stands for "incurred but not reported," is defined as "Everspan's determination of losses and Loss Adjustment Expenses incurred but not yet reported ...." *Id.* at § 6.4.1(D).

[3] Although the Program was terminated, a TPA was still needed to handle the resolution of pending claims.

39.     Venbrook was similarly involved and aware. In February 2024, employees of Venbrook and its affiliates were invited by Everspan to, and did, perform a claims review of open claims handled by Rockville. Venbrook never objected to any settlement or reserve decision in connection with that review or otherwise.

40.     On June 20, 2024, Everspan sent a letter to Sherman with an exhibit providing

████████████████████████████████████████████████████████████████

██████████████████. A true and correct copy of the June 20, 2024 letter sent to Sherman is attached as **Exhibit 3**.

41.     ██████████████████████████████████████████████

████████████ ⁴ ███████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████.

42.     According to Section 6.4.2(A) of the Reinsurance Agreement, if "the Loss Ratio is 59.5% or greater," the commission "for such Contract Year will be decreased by 1.0947% for every 1.0% of Loss Ratio above 59.5%, subject to a minimum adjusted [commission] of 15.2%."

43.     So, ████████████████████████████████████████████

███████████████████████████████████.

44.     ████████████████████████████████████████████████

████████████████████.

45.     ████████████████████████████████████████████████

████████.

---

⁴ "Incurred Losses" is defined as . . . (i) Ceded losses and Loss Adjustment Expenses paid as of the effective date of calculation, plus (ii) the ceded reserves for losses and Loss Adjustment Expenses outstanding as of the effective date of calculation.

46.    ████████████████████████████████████████████

████████████████████████████████

47.    Accordingly, pursuant to Schedule B of the Program Agreement and Section 6.4.2(A) of the Reinsurance Agreement, ██████████████████████████████

████████████████████████████

**C. Cardigan and Venbrook Fail to Pay the Deficit to Everspan.**

48.    As stated above, on June 20, 2024, Everspan's Chief Financial Officer sent Cardigan a letter notifying it that it "owes Everspan ███████████████████████████

███████████████████████████████████████████████████████

█████████

49.    Subsequently, on August 1, 2024, Everspan sent another letter to Cardigan, requesting payment of the ████████████████ and formally notifying Cardigan that it was:

> [N]ow in default of its obligations under the Agreements and that Cardigan's default constitutes a Dispute under Section 15.11 of the Program Agreement. Pursuant to Section 15.11, should the parties fail to settle the dispute through direct and good-faith efforts within 30 days, Everspan will exercise all remedies available to it, including initiating suit and seeking enforcement of the Parental Guaranty with Venbrook Group, LLC.

50.    Section 15.11 of the Program Agreement requires that:

> [A]ny controversies resulting from and/or related to this Agreement (each, a 'Dispute') shall be notified by one Party to the other Party, and the Parties shall undertake to use their best efforts to settle such Disputes amicably, through direct and good-faith negotiations, within thirty (30) days from the date of receipt of such notice.

51.    Prior to the initiation of this action, and during the 30-day time period referenced in Section 15.11 of the Program Agreement, Everspan reached out numerous times to Cardigan and Venbrook to try to resolve the dispute through direct and good-faith efforts, but did not receive a substantive response during those 30 days.

52.    Despite being on notice since as early as August 2022 that a Deficit would be owed to Everspan, Cardigan and Venbrook have failed to pay any of the amounts they owe.[5]

53.    Nor has Cardigan or Venbrook presented any defense or justification supported by the Program Agreement, the Reinsurance Agreement, the Guaranty, or relevant law for why they are not required to pay Everspan the Deficit.

54.    Accordingly, Everspan is left with no choice but to initiate this action to recover the Deficit it is owed.

## COUNT I

### Breach of Contract – Payment of Deficit
### (Against Cardigan)

55.    Everspan re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

56.    Everspan and Cardigan entered the Program Agreement wherein they agreed that ██████████████████████████████████████████████████████████ ████████████████████ which the parties agreed was incorporated by reference into the Program Agreement.

57.    Everspan performed its obligations under the Program Agreement.

58.    Cardigan breached the Program Agreement by failing to pay ████████████ ████████████████████████████

59.    Accordingly, Everspan has been damaged in an amount to be determined at trial, but in no event less than ██████████████.

---

[5] In addition, and despite being put on notice in August 2023 that a Deficit would be owed and ████████ ████████████████████████████ pursuant to Schedule B of the Program Agreement, Cardigan failed ████████████████.

## COUNT II

### Breach of Contract – Payment of Guaranty
### (Against Venbrook)

60.    Everspan re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

61.    Venbrook executed the Guaranty wherein it guaranteed Cardigan's performance of "the terms, conditions, and obligations … under the Program Agreement, including all amounts due and owing to Everspan under the Program Agreement," and unconditionally guaranteed "to Everspan the full and prompt payment of Funds, as defined in the Program Agreement, when due to Everspan under the Program Agreement."

62.    Everspan performed its obligations under the Guaranty.

63.    Venbrook breached the Guaranty by failing to guarantee the ███████████ ██████████████████████████████████████████ Cardigan owes under the Program Agreement.

64.    Accordingly, Everspan has been damaged in an amount to be determined at trial, but in no event less than ███████████

## COUNT III

### Declaratory Judgment – Attorney's Fees and Costs
### (Against Venbrook)

65.    Everspan re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

66.    In Section 14(b) of the Program Agreement's Guaranty, Venbrook and Everspan agreed that "Everspan shall be entitled to all attorney's fees and costs related to collection of any and all amounts guaranteed hereunder *in the event that Everspan initiates legal proceedings to enforce this Agreement* …." (emphasis added).

13

67.    In Section 14(c) of the Program Agreement's Guaranty, the parties agreed that "[Venbrook] shall be entitled to all attorney's fees and costs in the event that [Venbrook] has to defend legal proceedings pursuant to this Agreement ***and*** *is declared the prevailing party in such legal proceedings*, as determined by the trier of fact subject to Everspan exhausting any rights to appeal." (emphasis added).

68.    Because Everspan was forced to "initiate legal proceedings," Everspan is entitled to all of the attorney's fees and costs it incurs in association with its efforts to enforce Venbrook's guaranty to pay the Deficit owed by Cardigan, and regardless of the ultimate outcome of this litigation.

69.    Venbrook has denied that Cardigan is responsible for any Deficit and therefore that Venbrook is responsible for any payment to Everspan under the Guaranty. Accordingly, Venbrook also presumably denies that it is responsible for paying any of Everspan's attorney's fees or costs.

70.    Accordingly, an actual case and justiciable controversy exists as to whether Everspan is entitled to its attorney's fees and costs and when Venbrook is required to begin paying them.

71.    The dispute is a substantial controversy between adverse legal interests of sufficient immediacy and reality to warrant issuance of a declaratory judgment.

72.    Everspan's interest in the dispute is direct, substantial, and present.

73.    Declaratory relief to determine the parties' respective rights and interests is an appropriate remedy under the circumstances.

74.    Accordingly, Everspan is entitled to a judicial declaration that it is entitled to all of its attorney's fees and costs as they are incurred.

## **REQUEST FOR RELIEF**

WHEREFORE, Everspan respectfully requests that this Court enter judgment in its favor, and against Defendants, on the claims for relief set forth above, and award relief to Everspan as follows:

1.      Enter judgment in Everspan's favor against Cardigan and Venbrook;

2.      Award Everspan damages in at least the amount of ▮▮▮▮▮▮▮;

3.      Award Everspan its attorney's fees and costs pursuant to Section 14(b) of the Guaranty, as they are incurred;

4.      Award Everspan pre-judgment and post-judgment interest to the extent permitted by law; and

5.      Award Everspan such other and further relief as this Court deems just and proper.


Dated: New York, New York
       December 17, 2025

                                                 William D. Foley, Jr.
                                                 Andrew Braunstein
                                                 Elizabeth A. Loizides
                                                 TROUTMAN PEPPER LOCKE LLP
                                                 875 Third Avenue
                                                 New York, NY 10022
                                                 (212) 704-6000
                                                 *Attorneys for Plaintiff Everspan Indemnity*
                                                 *Insurance Company*

JUDGE VARGAS

25 CV 10463

# EXHIBIT 1

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

EXECUTION VERSION

# PROGRAM ADMINISTRATOR AGREEMENT

**by and between**

## Everspan Indemnity Insurance Company

**and**

## Cardigan General Insurance Services, LLC

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

# TABLE OF CONTENTS

**Page**

ARTICLE I        AUTHORITY AND OBLIGATIONS OF CARDIGAN ......................... 1
   1.1    Authority ................................................................ 1
   1.2    Underwriting Instructions .......................................... 1
   1.3    Forms and Rates ..................................................... 1
   1.4    Underwriting and Policy Services .................................. 1
   1.5    Fees and Assessments ............................................... 2
   1.6    Cancelations and Non-Renewals ..................................... 2
   1.7    Performance Standard ............................................... 2
   1.8    Cooperation; Complaints ............................................ 2
   1.9    Disclosures and Information Integrity ............................. 3
   1.10   Payment Processing ................................................. 3
   1.11   Assigned Risks ..................................................... 3
ARTICLE II       LIMITATIONS AND RESTRICTIONS ON AUTHORITY ................ 3
   2.1    Restrictions ....................................................... 3
   2.2    Retention of Authority ............................................. 4
   2.3    Reinsurance ........................................................ 4
ARTICLE III      COMPLIANCE ...................................................... 5
   3.1    General ............................................................ 5
   3.2    Good Standing ...................................................... 5
   3.3    Oversight .......................................................... 5
   3.4    Licensed Products .................................................. 6
   3.5    Sanctions Rules .................................................... 6
   3.6    Marketing .......................................................... 6
ARTICLE IV       PRODUCERS ....................................................... 6
   4.1    Referrals from Producers ........................................... 7
   4.2    Appointment and Authority of Producers ............................ 7
   4.3    Producer Disqualification .......................................... 7
   4.4    Agreements with Producers .......................................... 7
   4.5    Producer Compensation .............................................. 7
   4.6    No Waiver of Rights ................................................ 7

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

**TABLE OF CONTENTS**
(continued)

**Page**

ARTICLE V        BANKING; ACCOUNTING; FINANCIAL REPORTING ...................... 7

5.1    Premium and Funds ................................................................................ 7

5.2    Premium Account and Remittance .......................................................... 8

5.3    Transaction Reporting and Enforcement. ............................................... 9

5.4    Interest Penalty ..................................................................................... 10

5.5    Financial Statements ............................................................................ 10

5.6    Internal Controls .................................................................................. 10

ARTICLE VI       COMMISSION ..................................................................... 10

6.1    Commission .......................................................................................... 10

6.2    Uncollected Premium ........................................................................... 10

6.3    Sole Compensation ............................................................................... 10

6.4    Return Commission .............................................................................. 10

6.5    Overpayment of Commission ............................................................... 11

6.6    Expenses .............................................................................................. 11

ARTICLE VII      TERM; TERMINATION; SUSPENSION OF AUTHORITY .............................. 11

7.1    Term ..................................................................................................... 11

7.2    Termination by Mutual Consent; Termination Without Cause ...................................... 11

7.3    Immediate Termination with Cause by Everspan ...................................... 11

7.4    Termination for Cause by Either Party ................................................. 12

7.5    Termination Following Uncured Breaches ............................................ 13

7.6    Scope of Termination. .......................................................................... 13

7.7    Post-Termination Obligations .............................................................. 13

7.8    Security For Post-Termination Performance. ........................................ 14

7.9    Expirations ........................................................................................... 14

7.10   Supplies ............................................................................................... 14

7.11   Suspension of Authority ....................................................................... 14

7.12   Waiver of Statutory Termination Rights ............................................... 15

ARTICLE VIII     EXCLUSIVITY ..................................................................... 15

8.1    Exclusivity ........................................................................................... 15

ARTICLE IX       ACCESS TO RECORDS; DATA REQUIREMENTS ........................................... 15

9.1    Records ................................................................................................ 15

-ii-

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 9.2 | Access to Records | 15 |
| 9.3 | Data Requirements | 16 |
| ARTICLE X | CONFIDENTIALITY; DATA SECURITY | 16 |
| 10.1 | Confidential Information | 16 |
| 10.2 | Confidentiality | 16 |
| 10.3 | Privacy Policies | 17 |
| 10.4 | No Disclosure | 17 |
| 10.5 | Data Security, Breach Reporting, and Mitigation | 17 |
| 10.6 | Disaster Recovery | 18 |
| 10.7 | Disclosure to Subcontractors | 18 |
| ARTICLE XI | CLAIMS AUTHORITY; REPORTING | 18 |
| 11.1 | Authority | 18 |
| 11.2 | Reporting | 18 |
| 11.3 | Cooperation | 18 |
| ARTICLE XII | REQUIRED INSURANCE | 18 |
| 12.1 | Required Insurance | 18 |
| 12.2 | Required Terms | 19 |
| 12.3 | Notice of Changes | 19 |
| 12.4 | Primary Nature of Cardigan's Insurance | 19 |
| ARTICLE XIII | INDEMNIFICATION | 19 |
| 13.1 | Cardigan Indemnification | 19 |
| 13.2 | Everspan Indemnification | 20 |
| 13.3 | Procedure for Indemnification | 20 |
| 13.4 | Direct Claims | 21 |
| ARTICLE XIV | INTELLECTUAL PROPERTY | 21 |
| 14.1 | Ownership of Marks | 21 |
| 14.2 | Background IP | 22 |
| 14.3 | License of Marks | 22 |
| 14.4 | Reservation of Rights | 22 |
| 14.5 | Disclaimer | 22 |
| ARTICLE XV | GENERAL | 23 |

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

# TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|
| 15.1 | Notice | 23 |
| 15.2 | Entire Agreement | 23 |
| 15.3 | Modifications | 23 |
| 15.4 | No Third-Party Beneficiaries | 23 |
| 15.5 | No Assignment or Delegation; Use of Affiliates | 23 |
| 15.6 | Authority | 24 |
| 15.7 | Offset | 24 |
| 15.8 | No Waiver | 24 |
| 15.9 | Severability | 24 |
| 15.10 | Governing Law | 24 |
| 15.11 | Dispute Resolution; Consent to Jurisdiction; Waiver of Jury Trial | 24 |
| 15.12 | Specific Performance | 25 |
| 15.13 | Waiver of Certain Defenses | 26 |
| 15.14 | Independent Contractor | 26 |
| 15.15 | Counterparts | 26 |
| 15.16 | Jointly Drafted | 26 |
| 15.17 | Interpretation | 26 |
| 15.18 | Change in Control | 26 |
| 15.19 | Managing General Agent Status | 27 |
| 15.20 | Conflicts of Interest | 27 |
| 15.21 | Definitions | 27 |

<u>Schedules</u>

| | |
|---|---|
| Schedule A | Authorized Business |
| Schedule B | Compensation |

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

# PROGRAM ADMINISTRATOR AGREEMENT

This PROGRAM ADMINISTRATOR AGREEMENT and all exhibits and schedules attached hereto (the "*Agreement*") is entered into by and between **Cardigan General Insurance Services, LLC** ("*Cardigan*") and **Everspan Indemnity Insurance Company** ("*Everspan*"), effective **May 1, 2021** (the "*Effective Date*").    Everspan and Cardigan will be referred to hereunder each as a "*Party*" and, collectively, the "*Parties*."  Unless otherwise noted, capitalized terms shall have the meanings set forth or referenced in Section 15.21.

## ARTICLE I
## AUTHORITY AND OBLIGATIONS OF CARDIGAN

1.1    Authority.  Subject to this Agreement's terms and conditions, as of the Effective Date, Cardigan is hereby authorized and agrees to perform all functions necessary to produce, service, administer, and manage all policies, certificates, contracts, binders, agreements, insurance bonds, or other proposals or evidences of insurance, new and renewal, made or issued in accordance with this Agreement (collectively, "*Policies*").  Subject to the terms and conditions of this Agreement, Everspan hereby agrees to appoint Cardigan to perform all functions contemplated in this Agreement in any jurisdiction that requires such appointment prior to the issuance of any Policies in such jurisdiction.

1.2    Underwriting Instructions.  Cardigan will comply with (i) the underwriting guidelines and instructions approved in writing or provided in writing by Everspan, including the attached Schedule of Authorized Business, (ii) Forms and Rates (as defined below), and (iii) all other rules, instructions, and specifications provided in writing by Everspan (collectively, "*Underwriting Instructions*").  Cardigan will not quote, authorize, bind, or issue any Policy that is not within the territories, lines, limits, and classes of business authorized by the Underwriting Instructions.  The Underwriting Instructions are incorporated into this Agreement by reference and may be revised by Everspan upon prior written notice to Cardigan and such revisions will be effective immediately.  Notwithstanding the foregoing or anything to the contrary in this Agreement, in no event shall the authority of Cardigan under this Agreement (including pursuant to the Underwriting Instructions) be more extensive than the coverage provided to Everspan pursuant to the relevant Reinsurance Agreement(s) ("*Reinsurance*") and Cardigan shall be responsible for reviewing all such Reinsurance Agreement(s) to confirm that the Subject Business thereunder includes the Policies to be produced by Cardigan.  The initial Reinsurance Agreement with respect to the Policies is attached as Exhibit A.

1.3    Forms and Rates.  In issuing Policies, Cardigan shall only utilize forms and rates approved prior to such use by Everspan, including policies, endorsements, applications, notices, and rules which have been filed by or on Everspan's behalf and, when required by Law, approved by the appropriate Regulators ("*Forms and Rates*").  In filing any Forms and Rates, Cardigan may only use Everspan's account(s) for electronic filing systems (e.g., SERFF) and will reimburse Everspan for all costs associated with such access.  During and after the Term, Everspan will retain the right to access and use all filings and supporting materials associated therewith.

1.4    Underwriting and Policy Services.  Cardigan will perform all services necessary or customary, or as otherwise requested by Everspan, as would be performed by a direct insurance carrier to underwrite a risk, including performing or obtaining inspections; obtaining location, motor vehicle, inspection, or other reports; performing loss control services and analysis; and performing premium audits when applicable (the "*Services*").  Cardigan will not utilize a third party to perform any Services without Everspan's prior written approval.

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

    1.5    <u>Fees and Assessments</u>. Cardigan will be responsible for timely determining, collecting, and reporting all fees, charges, and assessments relating to the Policies; and will promptly remit to Everspan such fees, charges, and assessments. Cardigan shall undertake reasonable actions to procure that Producers comply with applicable law respecting disclosure to and written authorization of insureds under Policies ("**_Policyholders_**") concerning any policy issuance (or similar) fees (which will be approved by Everspan) permitted by Law. Cardigan will not be entitled to Commission on such policy issuance (or similar) fees even if such fees are reported by Everspan to Regulators as premium. The Parties agree that CGRPG fees referenced in Schedule A, Section C will be disclosed in a compliant manner to Policyholders and may be retained by Cardigan.

    1.6    <u>Cancelations and Non-Renewals</u>. A Policy may be lawfully non-renewed or canceled by Cardigan; provided, that Cardigan will send any notices required to effect such non-renewal or cancelation as soon as reasonably possible and, in any event, within the timeframes and in the manner proscribed by that Policy and required by Law. For clarity, if a Policy is not timely non-renewed or canceled due to a delay, error, or failure by Cardigan, Everspan will not be held responsible for any claim, cost, or Policy-related exposure which relate in any way to such delay, error, or failure.

    1.7    <u>Performance Standard</u>. Cardigan shall perform its obligations under this Agreement, including performance of the Services, in good faith and by employing a professional standard of care. Cardigan will maintain sufficient staff of licensed, competent, and trained personnel and will maintain the supplies and equipment as necessary to perform its obligations under this Agreement. Cardigan will maintain written procedures to ensure sufficient operational and financial controls, including controls for Policy issuance, premium collection, notices to insureds, record retention, compliance with Law, systems and data, and security.

    1.8    <u>Cooperation; Complaints</u>.

        A.    Cardigan will assist Everspan in (i) communicating with Policyholders and any applicable state and federal governmental authorities with jurisdiction over any of this Agreement's subject matter including state insurance departments or other relevant agencies (collectively, "**_Regulators_**"); (ii) collecting premiums, deductibles, and other amounts due from Policyholders; (iii) producing disclosures, notices, or other filings required by Law; (iv) the investigation, adjustment, settlement, and timely payment of Claims; and (v) providing all information, reports and assistance reasonably necessary for Everspan to respond timely to inquiries from Regulators, including financial and market conduct examinations, data calls (scheduled and ad-hoc), and consumer complaints.

        B.    Cardigan shall promptly notify and cooperate with Everspan, and Everspan shall promptly notify and cooperate with Cardigan, if Cardigan or Everspan and its affiliates, as the case may be, receives any Customer complaint, written or verbal, related to underwriting by forwarding a copy of any written materials received in connection with such Customer complaint and such additional information as may be necessary to furnish a complete understanding of same (i.e., transcripts, written summaries, or call recordings). Cardigan shall be responsible for attempting in a reasonable and good faith manner to resolve Customer complaints; <u>provided</u>, that each Party and its affiliates shall cooperate with the responsible responding Party and provide information to that related to such Customer complaints that is reasonably required by the responding Party to facilitate the resolution of such

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

C.   Customer complaint.  Cardigan shall further be required to provide cumulative reporting of Customer complaints to Everspan monthly.

D.   Nothing contained in this <u>Section 1.8</u> shall limit a Party's or any of its affiliates' right to settle a third-party claim as provided in <u>Section 13.3</u>.

1.9    <u>Disclosures and Information Integrity</u>.  Cardigan represents and warrants that it has disclosed and, during the Term, will disclose to Everspan any facts, events, or circumstances relevant to its performance of this Agreement or which may impact its solvency, cash flows, ability to perform this Agreement, and operations, including claims or suits made against Cardigan or its directors or officers; regulatory proceedings or developments impacting Cardigan's obligations hereunder; or any imminent or actual Change in Control.  Cardigan will not provide data or information, regardless of the source, which Cardigan either knows, or through the exercise of reasonable diligence should know, is inaccurate, misleading, or contains errors.

1.10    <u>Payment Processing</u>.  Cardigan shall arrange and be responsible for the due processing of Customer payments (including through debit and credit card transactions) made in connection with its performance of the Cardigan Services.  For clarity, any related debit and credit card transaction fees shall solely be an expense of Cardigan.  Cardigan shall, to the extent applicable, remain in compliance with the Payment Card Industry Data Security Standard requirements, including any changes to such requirements.

1.11    <u>Assigned Risks</u>.  Cardigan will administer all Policies that Everspan is required to issue due to any assigned risk pool, joint underwriting association, or any other facility in which Everspan is required to participate ("***Assigned Risks***") and which shall be deemed to be "Policies" hereunder.  Cardigan will administer Assigned Risks under the same terms and conditions of this Agreement applicable to all Policies.  Cardigan will also enroll Everspan, when required, in all such groups at Cardigan's cost; pay all assessments related thereto; and provide Everspan with the information in the format required to timely satisfy Assigned Risks reporting obligations.

**ARTICLE II**
**LIMITATIONS AND RESTRICTIONS ON AUTHORITY**

2.1    <u>Restrictions</u>.  Cardigan has no authority to act on Everspan's behalf except as expressly stated in this Agreement.  Further, without prejudice to the generality of the foregoing, Cardigan will not, without Everspan's express prior written approval:

A.   Delegate any of its authority or obligations under this Agreement to a third party, including by appointing a sub-program administrator or sub-managing general agent;

B.   Transact with, or otherwise accept business from, a Producer without first (i) coordinating with the Company respecting the appointment of such Producer, when required; and (ii) confirming the Producer is licensed to solicit, negotiate, and sell Policies;

C.   Permit a Producer (or an employee thereof), other than an officer or employee of an affiliated company, to serve on Cardigan's board of directors;

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

D.   Jointly employ an individual who is employed by Everspan other than an officer or employee of an affiliated company.;

E.   Bind coverage with a retroactive effective date except for legitimate business reasons and in no event more than thirty (30) days before the binding date;

F.   Communicate with a Regulator for or on Everspan's behalf except for incidental or minor communications required for Cardigan to perform its obligations hereunder;

G.   Cancel or terminate a Policy before its stated expiration date and offer to issue a Policy to the same insured, with policy effective dates beyond the stated term of the original Policy;

H.   Incur any liability on behalf of Everspan, other than as permitted herein;

I.   Accept a promissory note or other debt instrument in lieu of any payment (with the exception of letters of credit or cash collateral for deductibles); or

J.   Institute, defend, or maintain any legal proceeding on behalf of Everspan.

2.2   <u>Retention of Authority</u>.  Although Cardigan has been granted certain authorities under this Agreement, Everspan retains its authority to unilaterally cancel, non-renew, renew, or otherwise process any individual Policy.  Cardigan will not take any action inconsistent with any such action by Everspan.

2.3   <u>Reinsurance</u>.

A.   Cardigan hereby acknowledges that Everspan will enter into one or more reinsurance agreements with a Reinsurer (each, a "***Reinsurer***") providing for the cession of a certain portion of the underwriting risk assumed by Everspan pursuant to this Agreement (each, a "***Reinsurance Agreement***"). Notwithstanding any other provision of this Agreement, and regardless of the Effective Date, Cardigan will have no authority to quote, bind, or issue any Policies until Everspan has provided written notice to Cardigan that Everspan has obtained Reinsurance.  Everspan shall be the sole judge as to whether it has obtained Reinsurance.

B.   Cardigan shall have no authority to: (a) bind, assume or cede reinsurance or retrocessions on behalf of Everspan or any of its affiliates; (b) commit Everspan or any of its affiliates to participate as a co-insurer or co-Reinsurer in insurance or reinsurance syndicates or pools; (c) collect any payment from a Reinsurer or commit Everspan or any of its affiliates to any claim settlement with a Reinsurer; (d) make any commitments on behalf of Everspan with a Reinsurer other than as agreed to or requested in writing by Everspan; (e) prescribe the reinsurance quote Everspan accepts; or (f) prescribe the terms of any Reinsurance Agreement. The duties and responsibilities for reporting to and paying Reinsurers (including pursuant to any Reinsurance Agreement) remains with Everspan.

C.   Notwithstanding any other provision herein, Cardigan agrees to perform its obligations pursuant to this Agreement as reasonably necessary for Everspan to

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

comply with such terms of a Reinsurance Agreement that specifically refer to this Agreement and Cardigan's obligations hereunder. As is more fully set forth herein, Cardigan will provide to the Company such information that it reasonably requires to report to Reinsurers pursuant to the Reinsurance Agreement.

# ARTICLE III
# COMPLIANCE

3.1    <u>General</u>. Cardigan will at all times comply with all applicable all laws, common law, rules, regulations, ordinances, codes, statutes, judgments, injunctions, governmental orders, and decrees of all governmental authorities applicable to the Person, place and situation in question (collectively, "**_Laws_**") as well as Everspan's Policies and Procedures Manual, which is incorporated herein and may be revised by Everspan from time-to-time, at its discretion, upon notice to Cardigan. Cardigan will promptly notify Everspan of any non-compliance with or violation of any Law or this Agreement by any entity other than Everspan, including Cardigan or a Producer. In the event of any such violation, whether intentional or not, Cardigan will immediately take all lawful actions it deems reasonably necessary with the objective of curing any such violation or minimizing Everspan's legal exposure or reputational harm.

3.2    <u>Good Standing</u>. Cardigan represents and warrants that it is in good standing in the state under whose Laws it is organized (as well as those in which it transacts business) and covenants that it, and its personnel, shall maintain all permits, licenses, and regulatory approvals necessary to lawfully conduct its obligations. Cardigan shall promptly notify Everspan if Cardigan or its personnel no longer has such permits, licenses, or regulatory approvals, in which case Cardigan's authority hereunder will be automatically suspended and limited to acts necessary for Cardigan to operate lawfully. Cardigan shall thereafter promptly take all commercially reasonable action to fully restore its license in that jurisdiction(s), whereupon Everspan may, in its discretion, reinstate Cardigan's authority to bind or issue further insurance coverage under this Agreement in the affected jurisdiction.

3.3    <u>Oversight</u>. Cardigan shall maintain an oversight program whereby Cardigan shall demonstrate to Everspan its compliance with the Underwriting Instructions, the service standards specified in Section 1.7 and Law. Without prejudice to the generality of the foregoing:

   A.    Cardigan shall establish and implement a loss control program to support underwriting/risk selection, monitor the risk profile of the portfolio, and provide feedback and corrective actions to Producers and Policyholders.

   B.    Cardigan shall comply with Law regarding the prevention of insurance fraud. Cardigan shall provide notice to Everspan, to the attention of Everspan's Special Investigative Unit (SIU) Officer, with a copy to the Legal Department, all potential fraudulent claims, applications, or potentially fraudulent activity received or detected by Cardigan. On an annual basis, Cardigan will provide antifraud training to its integral antifraud personnel. Cardigan will also train all newly hired integral antifraud personnel within ninety (90) days of commencing their duties. Cardigan will provide an annual certification to Everspan of the completion of such training promptly following its completion.

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

3.4     <u>Licensed Products</u>.  If Everspan permits Cardigan to use products or materials that are licensed to Everspan by third parties, including ISO products ("***Licensed Products***"):

      A.    The Licensed Products will be used solely for Everspan's benefit of and not for any other business of Cardigan or any other insurer;

      B.    Cardigan will use the Licensed Products in compliance with Everspan's license agreements with the third parties;

      C.    Cardigan will sign all contracts or other documentation required by Everspan or such third before using the Licensed Products; and

      D.    Cardigan will not sell, (re)distribute, donate, license, or transfer by any other means the Licensed Products to any person other than Cardigan or Everspan, and then only as necessary to transact the business of this Agreement.

3.5     <u>Sanctions Rules</u>.  Without prejudice to the generality of <u>Section 3.1</u>, Cardigan is authorized to and shall investigate every Person and entity that is or may be party to a transaction entered into by Cardigan on behalf of Everspan, including all prospective insureds, to ensure that such person or entity is not on the list of Specially Designated Nationals and Blocked Persons issued by the Office of Foreign Assets Control ("***OFAC***"), a division of the U.S. Treasury Department, as such list may be amended by OFAC from time to time as well as the sanctions lists maintained by the United Nations and European Union.  (The OFAC, United Nations, and European Union sanctions lists, and Laws and regulations are collectively referred to herein as "***Sanctions Rules***.").  Cardigan shall conduct OFAC checks and comply with (a) all applicable Sanctions Rules, and (b) any written instruction from Everspan to Cardigan related to Sanctions Rules.  Cardigan will not bind any Policies that result in a match during the OFAC review and will immediately notify Everspan of the same.

3.6     <u>Marketing</u>.  Cardigan will not refer to Everspan, or its employees and affiliates, or use any of their respective Marks in any website, social media, publication, press release, advertisement, or marketing materials (whether electronic or paper) ("***Marketing Materials***") without Everspan's prior written approval and annual re-authorization.  Use by Cardigan of Everspan's Marks in conjunction with Marketing Materials or any other materials connected with the Policy shall not be construed to mean that Cardigan has acquired any ownership interest in any of Everspan's logos, trademarks, trade names, or service marks.  Cardigan will maintain specimen copies of all Marketing Materials, with a notation attached to each such advertisement indicating the manner and extent of distribution, and provide originals to Everspan upon request; <u>however</u>, Cardigan; shall not be required to maintain records of the names and addresses of recipients of any direct mailing or advertising but shall only record the geographical area in which such mailing or advertising was used except to the extent retention of such information is required under Law.  Cardigan will ensure all Marketing Materials published or distributed comply with Law, including with regard to content, review, and approval of advertising and maintenance of Records.

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

## ARTICLE IV
## PRODUCERS

4.1    <u>Referrals from Producers</u>.  Cardigan may accept insurance business referred from duly licensed third parties, whether directly or indirectly, including agents, brokers, producers, sub-agents, distributors, retailers (traditional and non-traditional), wholesalers, affinity groups, websites, aggregators, corporations, and individuals (collectively "***Producers***").  Cardigan will administer all Policies produced through Producers.  Cardigan will ensure Producers are appropriately licensed and in good standing, will maintain a list and current copies of the licenses held by such Producer and will promptly notify Everspan if it learns that any Producer no longer has the permits, licenses, or other approvals necessary to lawfully conduct business, in which case Cardigan may no longer accept submissions from such Producer until: (a) Producer regains appropriate licensing; and (b) Everspan provides its express consent in writing.  Cardigan will also promptly notify Everspan if it learns that a Producer has violated any Law, misappropriated funds, or engaged in fraud, gross negligence, or willful misconduct.  Cardigan will maintain a list and current copies of Producers' licenses and provide the list upon request.  Cardigan will be responsible for requiring that Producers perform in compliance with Law and that Producers maintain in-force E& O insurance with no less than $1,000,000 per claim limit of liability.

4.2    <u>Appointment and Authority of Producers</u>.    Cardigan is responsible for appointing Producers on Everspan's behalf with Regulators when required by Law or directed by Everspan.  As Producers are not agents of Everspan, Producers have no authority to quote, underwrite, bind, or issue Policies or to otherwise act on Everspan's behalf. Prior to the first sale of a Policy in a jurisdiction, Everspan shall deliver to Cardigan a copy of the applicable rules, procedures, and requirements with respect to policy applications and delivery and appointment of Producers.  Everspan may provide Cardigan with changes to such rules, procedures, and requirements from time-to-time. Subject to requirements of Law, Cardigan will be responsible for paying all appointment fees, including transfer fees and termination fees, necessary for Cardigan or any Producer to sell Policies.  For clarity, Cardigan shall bear all cost and liability associated with any failure to comply with this <u>Section 4.2</u>.

4.3    <u>Producer Disqualification</u>.  Everspan may direct Cardigan to not transact with any individual Producer and may revoke any Producer's appointment at any time.

4.4    <u>Agreements with Producers</u>.  Any contracts or other agreements regarding the transaction of insurance business will be made directly between Cardigan and its Producers.  Such agreements will be available to Everspan upon Everspan's request and will deemed to contain the following provisions: Producers (i) have no authority to act on behalf of Everspan; (ii) will not have any claim against Everspan and must look solely to Cardigan to recover any costs, expenses or damages incurred by Producers as a result of any act or omission of Cardigan; (iii) will receive no commission on uncollected premium; and (iv) will maintain adequate errors and omissions insurance.

4.5    <u>Producer Compensation</u>.  Cardigan is solely responsible and liable for any compensation due to Producers and payment by Everspan to Cardigan of any compensation due in connection with Policies will fully satisfy Everspan's obligation or liability, if any, to Producers or other parties.  When required, Cardigan will prepare IRS Form 1099 for any Producer that places business through Cardigan.

4.6    <u>No Waiver of Rights</u>.  With respect to the provisions of this <u>Article IV</u>, Cardigan will take no action contrary to Everspan's best interests or waive any rights that Everspan or Cardigan have against any Producer.

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

**ARTICLE V**
**BANKING; ACCOUNTING; FINANCIAL REPORTING**

5.1     Premium and Funds.

    A.    Premium Collection.   Cardigan will be responsible for, and hereby unconditionally guarantees the collection and remittance to Everspan of, all premiums, deposits, return commissions, fees, and other funds due Everspan (“**Funds**”), whether or not such Funds are collected.

    B.    Installment Plans.   With Everspan’s prior approval, Cardigan may offer to Policyholders installment plans compliant with Law and the filed Rates and Forms.   Cardigan may retain Commission only on premium actually collected pursuant to any approved installment plan.

    C.    Premium Finance and Other Arrangements.   Cardigan may not accept financed premiums unless the arrangement is approved by Everspan and compliant with Law and the filed Rates and Forms.   If approved, Cardigan will be solely responsible for all aspects of such financing, including, Producers’ acts or omissions, notices, cancellation, and proper remittance of return premiums. The provisions of this Agreement governing return commission and uncollected premium apply to all Policies for which premiums are financed, including those cancelled.   Cardigan will not enter into any lending or similar premium financing arrangements with Policyholders.   Cardigan has no authority to waive, rebate, or extend the time for payment of premiums or other Funds.

    D.    Cancellation for Non-Payment.   Cardigan will provide Policyholders with adequate and compliant notifications regarding premium payment deadlines.  If premium is not timely received, Cardigan will, before the end of the first business day following the deadline, send a Notice of Cancellation for Non-Payment, effective on the earliest possible date.   If payment is received by Cardigan or Everspan after the deadline (or cancellation date, as applicable), Cardigan may elect one of the following options: (i) bind the policy, effective from the date on which the full outstanding payment was received; (ii) reinstate the policy, effective on the date upon which the payment was due but only if a legally enforceable statement is received from the Policyholder which confirms there have been no covered loss events or occurrences following the reinstated Policy’s effective date; (iii) maintain the cancellation (unless required to reinstate by Law or the insurance policy).   Cardigan may request approval from Everspan to offer a “grace periods” or other exceptions for good cause.

5.2     Premium Account and Remittance.

    A.    Fiduciary Account.  All Funds collected by Cardigan, or other monies relating to business subject to this Agreement, including all interests generated thereon, are Everspan’s exclusive property.   Cardigan will hold such Funds in a fiduciary capacity for Everspan’s sole benefit.

    B.    Bank Accounts.  After receipt, Cardigan will immediately deposit all Funds received into either (i) a general premium trust account (“**General Premium Bank**

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

*Account*"); or (ii) a premium account dedicated exclusively to the fiduciary funds of Everspan ("***Everspan Premium Bank Account***"). If funds are first deposited into a General Premium Bank Account, Cardigan will have five (5) business days to transfer to a Everspan Premium Bank Account. Funds held in the Everspan Premium Bank Account will not be comingled with any other funds of Cardigan or any third party. Everspan may withdraw Funds from the Everspan Premium Bank Account at any time. All banks in which Funds are held must be federally or state chartered and a member of the FDIC.

C.    <u>Banking Policy</u>. Cardigan is subject to and will remain in compliance with Everspan's Banking Policy, which is incorporated by reference herein and which may be modified by Everspan upon advance written notice to Cardigan.

D.    <u>Remittance</u>. With respect to all transactions in the preceding month, Cardigan will pay all Funds due to Everspan by electronic funds transfer from the Everspan Premium Bank Account on or before the tenth (10th) business day of each month in accordance with instructions provided by Everspan. For clarity, any late remittances shall be subject to the "interest penalty" described in <u>Section 5.4</u>.

5.3    <u>Transaction Reporting and Enforcement</u>.

A.    <u>Reporting Deadline</u>. Within ten (10) business days following the end of each month, Cardigan will furnish to Everspan reports that provide timely, complete, and accurate details of all Policy transactions for each calendar month ("***Monthly Bordereaux***").

B.    <u>Format</u>. The Monthly Bordereaux will be provided in a format and with the information as directed by Everspan and will include transactions for all Policies, whether or not premium is collected, and all payments received, whether or not due. The detail will include, at a minimum: written premium, less returns and cancellations; collected premium; gross policy fees; billing fees and filing fees; and Commissions.

C.    <u>Other Reports</u>. Cardigan will provide, upon request and at its own expense, all other reports and data reasonably required as respects premiums, losses, and other transactions to facilitate Everspan's reporting and other obligations. To facilitate such reporting, Cardigan will format and code data in a manner reasonably required; with respect to statistical reporting, such reports will include stat-ready policy, claim, and transaction level data as defined by the Independent Statistical Service, Inc. Statistical Plan for the relevant line of business and in the relevant jurisdiction(s) (which is available from Everspan upon request).

5.4    [SECTION LEFT INTENTIONALLY BLANK]

5.5    <u>Financial Statements</u>. As soon as reasonably practical after (A) the end of each of the first three fiscal quarters of each fiscal year, Cardigan will furnish Everspan with unaudited financial statements prepared in accordance with generally accepted accounting principles ("***GAAP***") and (B) the end of each fiscal year, Cardigan will furnish Everspan with audited financial statements prepared in accordance with GAAP and certified by Cardigan's President and Venbrook's Chief Financial Officer (or their respective equivalent), and accompanied by an independent auditor report. If Cardigan cannot

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

furnish GAAP-audited financial statements, Cardigan will provide its annual tax returns upon filing for each fiscal year. If requested by Everspan, Cardigan will provide a current organizational chart of all affiliates under common control.

# ARTICLE VI
# COMMISSION

6.1     Commission.  Cardigan's commission under this Agreement will be as stated in the Commission Schedule attached hereto ("***Commission***").  Cardigan will only be entitled to Commission, including any adjustable commission or profit sharing, if it is in substantial compliance with the terms of this Agreement.

6.2     Uncollected Premium.  No Commission is payable to Cardigan on premiums that Cardigan fails or is unable to collect (or which Everspan independently collects, regardless of the amount collected by Everspan).  Cardigan will be responsible for collecting all Funds and will document all attempts to collect such Funds.  Any attempt by Everspan to directly collect, as well as any forbearance by Everspan with respect to, Funds due but not remitted pursuant to this Article VI will not be construed as a waiver of any right Everspan has under this Agreement, in equity, or by Law.

6.3     Sole Compensation.  With the exception of CGRPG fees as referenced in Schedule A, Section C, Commission will be Cardigan's sole compensation for all services provided by Cardigan, its affiliates, employees, Producers, and representatives under this Agreement.  Commission will include all sales or other tax, if any, due from Everspan relating to the Services or any classes of expenses under Section 6.6; no additional tax will be charged to Everspan for these services.

6.4     Return Commission.  During and after the Term, Cardigan will refund Commission to Everspan or other funds paid on return premiums at the same rate as the original premium.  If any return premiums are due to a Policyholder as a result of any Law or order of a Regulator, including "rate rollbacks" or similar mechanism, whether or not such action requires insurance brokers, producers, or agents to return commissions or fees, Cardigan will return to Everspan funds equal to the Commission and fees previously received by Cardigan with regard to such return premiums.

6.5     Overpayment of Commission.  If Cardigan receives an overpayment of Commission, including if Cardigan receives or retains a Commission based on written but not yet collected premium, Cardigan will refund such overpayment within ten (10) business days of receiving written notice thereof from Everspan.

6.6     Expenses.  Cardigan will be responsible for all expenses incurred in performing this Agreement or in conducting its business, including all expenses associated with:

    A.     The Services;

    B.     The development, analysis, and filing of Forms and Rates, including any expenses incurred by approved third parties in connection therewith;

    C.     Everspan's participation in any Assigned Risks;

    D.     Licensing of Cardigan, Producers, and their respective employees;

    E.     All expenses relating to Producer appointments, where permitted by Law;

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

F.    Cardigan's information technology and Systems;

G.    Cardigan's allocated share of any costs incurred by Everspan for Cardigan's use of Licensed Products; and

H.    Advertising expenses, bank charges, bureaus and license expenses, transportation, and all overhead and other expenses of any nature.

In addition to Everspan's other rights, remedies, and entitlements, Everspan will be entitled to immediate payment from Cardigan for all expenses, losses, costs, charges, fines, or penalties incurred by Everspan (i) due to Cardigan's material breach or non-performance of any part of this Agreement; or (ii) related to any audit, market conduct examination, or other investigation by a Regulator regarding the Policies or this Agreement.

**ARTICLE VII**
**TERM; TERMINATION; SUSPENSION OF AUTHORITY**

7.1    Term.  This Agreement will commence on the Effective Date and continue until the effective date of termination of this Agreement in accordance with this Article VII ("**Term**").

7.2    Termination by Mutual Consent; Termination Without Cause.

A.    This Agreement may be terminated by mutual written agreement of the Parties at any time.



7.3    Immediate Termination with Cause by Everspan.  Everspan may immediately, unless otherwise indicated, terminate this Agreement in whole or in part, for cause, which means the following:



DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233



7.4   <u>Termination for Cause by Either Party</u>.  Upon notice to the other Party, either Party may immediately, unless otherwise indicated, terminate this Agreement in whole or in part, if:



DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233



7.5    <u>Termination Following Uncured Breaches</u>.  Except for circumstances outlined in <u>Section 7.3</u> and <u>Section 7.4</u>, if Cardigan otherwise breaches this Agreement ("***Curable Breach***"), Everspan may notify Cardigan in writing and provide no less than ten (10) business days to cure such Curable Breach. If the Curable Breach is not cured within the notice period, Everspan may thereafter immediately terminate this Agreement.  Curable Breaches include when Cardigan:



7.6    <u>Scope of Termination</u>. Termination of this Agreement by Everspan relates to Cardigan's authority to quote, produce, and write business on Everspan's behalf; all terms, covenants, agreements, obligations, representations, and warranties made by Cardigan in this Agreement will survive termination of this Agreement and continue in full force and effect until all contractual obligations relating to the Policies, Claims, and this Agreement have been fully and finally satisfied to Everspan's satisfaction (the "***Run-Off Period***").  Article VII, VIII, IX, XI, XII, and XIII express obligations which will indefinitely survive termination of this Agreement.

7.7    <u>Post-Termination Obligations</u>.

A.    Cardigan's authority to issue new or renewal quotes, binders, or Policies with effective dates on or after the effective date of termination of this Agreement will cease on receipt of notice of termination except as otherwise required by Law.

B.    Unless Everspan elects otherwise, Cardigan will handle the run-off of all Policies during the Run-Off Period at its sole expense in accordance with the same practices, procedures, and standards under this Agreement at the date of termination.  The run-off obligations of Cardigan include handling and servicing

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

all Policies through their natural expiration, together with any policy renewals, required to be made by provisions of applicable law. All costs and expenses associated with the handling of such run-off business will be borne solely by Cardigan.

C.    If Everspan or its third party designee is required to handle the run-off due to Cardigan's improper administration of, or refusal to administer, Policies then: (i) Everspan will be entitled to indemnification pursuant to Article XII for all expenses incurred to run-off of the Policies; (ii) no Commission will be due to Cardigan relating to any such Policies; and (iii) Cardigan will take such actions and provide such assistance including to access and utilize its Records, premises, furniture, equipment, personnel, data, systems, software, and other resources, including accounts in financial institutions for the purpose of performing the Run-Off at the expense of Cardigan. Upon the delivery of any resources to Everspan pursuant to this Section 7.7C Cardigan shall be deemed, so far as is necessary, to have granted a limited license to Everspan or its designee to use such resources in connection with the conduct of the Run-Off. If any such resources are licensed by Cardigan from a third-party vendor, Cardigan shall use its best efforts to ensure that the associated license agreement provides for Everspan or its designee to have the limited right to use the relevant resource during the Run-Off Period, and Cardigan shall continue to pay all license fees to the third-party vendor during the pendency of the Run-Off. Everspan hereby acknowledges and agrees that such license is a limited right to use the relevant resources solely as herein provided and shall not be construed to convey title to such resources, or any part thereof, to Everspan or as conferring on Everspan any right to sell, lease, transfer or dispose of all or any portion of such resources. For clarity, Cardigan shall fully cooperate with Everspan to effect any assumption of rights with respect to the Run-Off in accordance with this Section 7.7C.

D.    In the event of a Termination of Cardigan for cause, if directed by Everspan, Cardigan will develop a plan to accelerate the run-off of Policies in a manner that complies with Law and the rights of Everspan's Policyholders, which may include some of the following: specific cancellation or non-renewal procedures, novation, portfolio transfer, assumption reinsurance, or a block non-renewal or withdrawal plan. If termination of this Agreement requires notice to or approval by any Regulator, Cardigan will be primarily responsible for the process associated therewith, subject to Everspan's oversight and involvement with any communications with a Regulator. If Cardigan terminates this Agreement, and the effect of such termination is or is deemed by a Regulator to be that Everspan is initiating a "withdrawal" (or similar terminology) from a state or a line of business, Cardigan shall reasonably cooperate with Everspan to (i) develop and implement a plan to ensure ongoing compliance with Laws; or (ii) continue underwriting of business hereunder until such time as a compliant plan is developed and, if required, approved by a Regulator.

7.8    Security For Post-Termination Performance. Cardigan shall procure the execution of a financial guarantee by its parent, Venbrook Group LLC in the form attached hereto as Exhibit "B".

7.9    Expirations. ████████████████████████████████████████

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233



7.10    Supplies. Any supplies furnished by Everspan to Cardigan, including Policies, jackets, or Marketing Materials, will remain the property of Everspan and will be returned to Everspan upon termination of this Agreement.

7.11    Suspension of Authority. In the event that Everspan terminates Cardigan for cause as set forth hereinabove, Everspan may unilaterally suspend Cardigan's authority (including its authority to issue quotes or bind quoted risks) hereunder during any termination notice period. Upon receipt of such a notice of suspension, Cardigan will immediately cease to exercise such authority in accordance with such notice, including issuing any quotes or binding Policies unless unequivocally required by Law. Everspan's suspension of any authority of Cardigan will continue during the pendency of any Dispute, including Disputes (i) regarding termination or suspension, (ii) that have been referred to dispute resolution proceedings pursuant to Section 15.10, (iii) for which Everspan has sought injunctive or other civil relief, or (iv) regarding default under or breach of this Agreement.

7.12    Waiver of Statutory Termination Rights. Cardigan hereby agrees to waive statutory termination requirements imposed on Everspan by Law and will instead be bound by the termination provisions in this Agreement.

**ARTICLE VIII**
**EXCLUSIVITY**

8.1    Exclusivity.



**ARTICLE IX**
**ACCESS TO RECORDS; DATA REQUIREMENTS**

9.1    Records. During the Term and for at least the seven (7) year period following the termination of the relevant Policy (or such longer period as would comply with (a) the record retention policies of Cardigan, as applicable to its own business; (b) Law; or (c) the completion of any examination of Everspan by a Regulator), Cardigan will keep and maintain accurate and complete records of the business transacted under this Agreement, including Policy data, underwriting and Policy files, Forms and Rates, accounting and financial records, and correspondence with Policyholders, claimants, Producers, Regulators, and Everspan ("***Records***"). The Records will be maintained separately from all

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

other records of Cardigan and Cardigan shall be solely responsible for and shall keep the Records in such manner and form as is generally recognized as acceptable in the insurance industry or as may be reasonably required by Everspan. Except as specifically provided in this Agreement, the Records will be the joint property of Everspan and Cardigan. Cardigan will not destroy any Records without Everspan's prior written approval. All other records relating to this Agreement will be maintained in accordance with Everspan's Policies and Procedures Manual, or such longer period as may be required by Law.

9.2    Access to Records.   Everspan, its Reinsurer(s), its designated representative(s), and all Regulators will be afforded complete access to and the right to copy the Records, including for the purpose of auditing Cardigan, upon reasonable notice and during the regular business hours of Cardigan. Such access shall not disrupt the normal course of business of Cardigan. The rights of Everspan and its designated representatives under this subsection will include the access necessary to test Cardigan's obligations with respect to data security under Section 10.3. The Records will be accessible, organized and indexed to facilitate inspection and copying.   Any expenses incurred by Everspan for audits or examinations conducted by or on behalf of a Regulator that relate to Everspan in general, and not specifically to the business transacted or produced pursuant to this Agreement, shall be borne by Everspan.  Any expenses incurred by Everspan or Cardigan for audits or examinations conducted by or on behalf of a Regulator as it specifically relates to the business transacted or produced pursuant to this Agreement shall be borne by Cardigan.

9.3    Data Requirements.   Cardigan will develop and maintain an interface with its systems and Everspan's data warehouse to electronically transmit, in a compatible format, transaction level detail of the business of this Agreement.  All reports required under this Agreement or requested by Everspan will be made in accordance with Everspan's written specifications (the "**_Data Requirements_**") which are incorporated by reference herein and which may be modified by Everspan upon advance written notice to Cardigan.

## ARTICLE X
## CONFIDENTIALITY; DATA SECURITY

10.1    Confidential Information.   "**_Confidential Information_**" means all information, whether or not reduced to written or recorded form, which (i) pertains to Everspan or Cardigan, any negotiations or business pertaining thereto, or any of the transactions either contemplates, including all financial, Customer, and reinsurance information, and is not intended for general dissemination; (ii) is confidential or proprietary in nature, was provided to the Party or its representatives by Everspan or Cardigan, as applicable, and relates directly or indirectly to either Everspan or Cardigan or the business of either; (iii) pertains to confidential or proprietary information of Everspan or Cardigan which has been labeled in writing as confidential or proprietary, or (iv) qualifies as non-public personal information or personal health information that is protected under Law.   Confidential Information includes all information regarding applicants, Policyholders, beneficiaries, and claimants (collectively, "**_Customer Information_**").  For clarity, information which: (i) is available, or becomes available, to the public through no fault or action by such Party, its agents, representatives or employees; or (ii) becomes available on a non-confidential basis from any source other than Everspan or Cardigan, as applicable, and such source is not prohibited from disclosing such information, shall not be deemed Confidential Information.

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

10.2   Confidentiality.

    A.    During the Term, a Party ("**_Disclosing Party_**") may reveal to the Party ("**_Receiving Party_**") certain Confidential Information. Receiving Party agrees to use Confidential Information solely for the purpose of this Agreement, and any and all related Reinsurance Agreements, and shall keep Confidential Information confidential and not disclose Confidential Information to others, except as expressly permitted by this Agreement. Each Party shall each keep confidential and shall not disclose to others and shall use reasonable efforts to prevent its affiliates, successors, and assigns, employees and agents, if any, from disclosing to others, any Confidential Information other than to carry out the purposes set forth in this Agreement for which such Party disclosed such information. The Parties acknowledge that it is not practical, and shall not be necessary, to mark such information as "confidential," nor to transfer it by confidential envelope or communication, in order to preserve the confidential nature of the information.

    B.    Receiving Party may disclose Confidential Information to (1) its representatives who need to know Confidential Information solely for the purpose of Receiving Party's performance under this Agreement, provided that each representative shall be obligated to treat such Confidential Information in accordance with the terms of this Agreement as if such representative were the Receiving Party; and (2) to Reinsurers in connection with any existing or potential Reinsurance Agreement related to this Agreement. Receiving Party shall be responsible for any breach of this Agreement by its representatives.

    C.    Confidential Information, and all copies thereof, shall remain at all times the property of the Everspan or Cardigan, as applicable. Each Party will, upon request and at the cost of the Party owning the Confidential Information, promptly return to any Confidential Information received from the other. Everspan and Cardigan acknowledge and agree that Confidential Information is valuable information to Disclosing Party and unauthorized disclosure or use of Confidential Information by Receiving Party or its representatives may cause irreparable harm and damage to Disclosing Party, and in the event of any breach of the provisions of this Section 10.2, Disclosing Party shall be entitled to seek equitable relief, including injunctions and orders for specific performance, in addition to all other remedies available to it at law or in equity.

10.3   Privacy Policies. Cardigan shall provide to each new Policyholder, prior to or upon the issuance of any Policies written under this Agreement, and in accordance with Law, an initial notice of Everspan's privacy policies and practices. Not less than annually thereafter, Cardigan, upon the request of Everspan, shall distribute a copy of Everspan's annual privacy notice, as may be amended from time to time, to each existing Policyholder. In addition, Cardigan shall, upon the request of Everspan, distribute revised privacy notices and opt-in notices as applicable to each Policyholder to reflect any revisions which may be made to Everspan's privacy policies and practices. In each case, Everspan shall be responsible for providing Cardigan with a copy of the forms for its privacy policies and practices notice, which forms Cardigan shall use to create and deliver the notices described herein, at Cardigan's sole cost and expense. These notices shall be created and delivered independent of any separate legal obligation Cardigan may have to create and deliver its own such notices.

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

10.4    <u>No Disclosure</u>.  Cardigan shall not disclose or use any nonpublic personal financial information or nonpublic personal health information related to any Policyholder, or to any consumer or customer (as such terms are defined under applicable privacy Laws), except as necessary to carry out its duties and obligations under this Agreement, or as otherwise permitted under Law.

10.5    <u>Data Security, Breach Reporting, and Mitigation</u>.  Cardigan hereby covenants to:

A.    Implement and maintain adequate administrative, technical, and physical safeguards to protect against any anticipated threats or hazards to the security or integrity of Systems and Confidential Information and unauthorized access to or use of such information that could result in substantial harm or inconvenience to any consumer or Policyholder, in compliance with Law;

B.    Immediately give written notice to Everspan of any suspected or actual breach of any data or systems relating to its performance of this Agreement ("*Systems*"), including misuse or unauthorized disclosure of Confidential Information by a third party;

C.    With respect to the Systems and Confidential Information, (i) use multi-factor authentication; and (ii) encrypt data in transit and at rest;

D.    Immediately implement adequate measures to restore security when Confidential Information or the Systems are compromised, and provide assistance and information, at its sole cost, as Everspan may require in connection with such restoration as well as required notifications to relevant Regulators and affected individuals; and

E.    Fully assist Everspan to comply with Laws involving data privacy or protection.

10.6    <u>Disaster Recovery</u>.  Cardigan will implement a disaster recovery plan, maintain its Systems and Records in accordance with such plan, and test such plan from time to time.  Such disaster recovery plan will require an incremental system backup no less than daily, a full system backup no less than weekly, and a second full system backup no less than monthly.  The daily backups will be maintained by Cardigan for at least one week, the weekly backups will be maintained by Cardigan for at least one month, and the monthly backups will be maintained by Cardigan for at least one year.  The backups of the system will be maintained at an approved facility outside of Cardigan's facility.  In the event of damage to or malfunction of Cardigan's computer hardware or software or loss of data, Cardigan will use reasonable best efforts to obtain replacement computer hardware or software and recovery data to restore the services to an acceptable level as soon as possible.  Cardigan's disaster recovery plan will be deemed to provide Everspan direct access as necessary to independently service Policies and obtain Policy information.  Everspan may test such system(s) in its discretion.

10.7    <u>Disclosure to Subcontractors</u>.  Without prejudice to the generality of <u>Section 15.5</u>, when transferring or disclosing Customer Information to subcontractors in connection with meeting any obligations under this Agreement (a) Cardigan shall not transfer any Customer Information from one country to another, except with the prior written consent of Everspan and in accordance with any additional terms required by Law and/or which Everspan may impose on the transfer and (b) Cardigan shall require such subcontractors to enter into appropriate security and data protection terms, including confidentiality and privacy contract terms, and all such terms shall be consistent with this Agreement.

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

**ARTICLE XI**
**CLAIMS AUTHORITY; REPORTING**

11.1    <u>Authority</u>. Cardigan has no authority to adjust, reserve, settle or negotiate the settlement of Claims or Disputes or to make any statements regarding Claims or Disputes.

11.2    <u>Reporting</u>. Cardigan will immediately report in writing to Everspan or Everspan's third-party claims handling designee ("***TPA***") any claim, suit, notice of incident or loss, or threat of litigation ("***Claims***"), including Claims relating to actual or alleged acts, errors, omissions, or bad faith of Everspan, Cardigan, the TPA or any Producer.

11.3    <u>Cooperation</u>. Cardigan will cooperate with Everspan or its designee with respect to any Claim, including the preservation of all related documents and data, as required by Law or as directed by Everspan.

**ARTICLE XII**
**REQUIRED INSURANCE**

12.1    <u>Required Insurance</u>. Cardigan will maintain and provide evidence of coverage upon Everspan's written request:

A.    An errors and omissions policy with a limit, adjusted annually, equal to or greater than $10,000,000;

B.    A fidelity or surety bond in an amount not less than the greater of: (i) $500,000; and (ii) the largest balance of funds held in the Everspan Premium Bank Account at the end of any given month during the preceding twelve (12)-months (determined each January 1st);

C.    Adequate general liability insurance; and

D.    To the extent not covered by any of the insurances listed above, an insurance policy that covers breaches of and losses relating to the Systems and Confidential Information, with such policy to include both liability protection of no less than $1,000,000 as well as breach response services, including notifications and credit monitoring for affected Policyholders and consumers.

12.2    <u>Required Terms</u>.   The policies referenced in this <u>Article XII</u> ("***Required Insurance Policies***") will be issued by insurers rated no less than "A-" by A.M. Best Company.  If any Required Insurance Policy is written on a claims–made basis, Cardigan will purchase the maximum extended reporting period available upon termination of such coverage, unless the successor policy provides equivalent "prior acts" coverage dating back to at least the Effective Date.  The mandatory minimum limits of each Required Insurance Policy will be based on the per occurrence or per claim made basis, as appropriate.

12.3    <u>Notice of Changes</u>. Cardigan will provide prompt notice to Everspan of any changes to the Required Insurance Policies including notice of lapse, increased deductible, decreased coverage or cancellation.

12.4    <u>Primary Nature of Cardigan's Insurance</u>.   Any insurance coverage maintained by Everspan will be considered excess of any Required Insurance Policies.

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

## ARTICLE XIII
## INDEMNIFICATION

13.1     <u>Cardigan Indemnification</u>.  Cardigan will indemnify, defend, and hold harmless Everspan and its past, present, and future affiliates, successors, and assigns, and their respective shareholders, directors, officers, employees, agents, and representatives (each an "**_Everspan Indemnitee_**"), from and against any and all liabilities, losses, claims, proceedings, damages, costs, or expenses (including attorneys' fees and expenses) ("**_Indemnifiable Loss_**") incurred by any Everspan Indemnitee, including any Indemnifiable Loss arising out of a third-party claim including:

      A.    Any act, error, or omission of Cardigan, a Producer, or any of their respective officers, directors, employees, affiliates, agents, representatives, or business partners;

      B.    Cardigan's agreement(s) with or termination of any Producer;

      C.    Cardigan's breach or misuse of Licensed Products, including breach or misuse by Cardigan's representatives, agents or employees;

      D.    Everspan's failure or alleged failure to comply with any Law arising from or relating to Cardigan's acts, errors, omissions, or advice;

      E.    Any data security incident involving Cardigan's Systems; or

      F.    Cardigan's breach of this Agreement.

13.2     <u>Everspan Indemnification</u>.   Everspan will indemnify, defend, and hold harmless Venbrook Group, LLC and its direct and indirect subsidiaries including Cardigan and their collective past, present, and future successors, and assigns, and their respective shareholders, directors, officers, employees (each a "**_Cardigan Indemnitee_**"), from and against any and Indemnifiable Loss incurred by any Cardigan Indemnitee in connection with this Agreement, including any Indemnifiable Loss arising out of a third-party claim involving:

      A.    Any act, error, or omission of Everspan or any of its officers, directors, employees, affiliates, agents, representatives; or

      B.    Any violation of Law by Everspan unrelated to an act or omission of Cardigan or any Producer.

      C.    Everspan's breach of this Agreement.

13.3     <u>Procedure for Indemnification</u>. Where there is any claim against or involving either Party that may give rise to indemnification, both Parties shall give notice to all applicable insurers and seek coverage for such claim. Each Party will reasonably cooperate and do nothing to impair or prejudice the availability of such insurance coverage.  If any Everspan Indemnitee or Cardigan Indemnitee (each, an "**_Indemnified Party_**") receives notice of assertion or commencement of any third-party claim against such Indemnified Party in respect of which a Party liable for such indemnification (the "**_Indemnifying Party_**") may be obligated to provide indemnification under this Agreement, the Indemnified Party shall give such Indemnifying Party reasonably prompt written notice (but in no event later than fifteen (15) days after becoming aware of such third-party claim) thereof and such notice shall include a reasonable

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

description of the claim based on the facts known at the time and any documents relating to the claim and an estimate of the Indemnifiable Loss (to the extent reasonably quantifiable at that time) and shall reference the specific sections of this Agreement that form the basis of such claim to the extent reasonably ascertainable; provided, that no delay on the part of the Indemnified Party in notifying any Indemnifying Party shall relieve the Indemnifying Party from any obligation hereunder unless (and then solely to the extent that) the Indemnifying Party is actually prejudiced by such delay (except that the Indemnifying Party shall not be liable for any expenses incurred during the period in which the Indemnified Party failed to give such notice). Thereafter, the Indemnified Party shall deliver to the Indemnifying Party, within five (5) Business Days after the Indemnified Party's receipt thereof, copies of all notices and documents (including court papers) received by the Indemnified Party relating to the third-party claim. Each Party will promptly furnish to the other Party copies of all papers and official documents received in respect of any Indemnifiable Loss. The Indemnifying Party shall be entitled to participate in the defense of any third-party claim and, if it so chooses, to assume the defense thereof with counsel selected by the Indemnifying Party. Should the Indemnifying Party so elect to assume the defense of a third-party claim, the Indemnifying Party shall not as long as it conducts such defense be liable to the Indemnified Party for legal expenses incurred by the Indemnified Party in connection with the defense thereof subsequent to the Indemnifying Party notifying the Indemnified Party in writing of its election to assume such defense. If the Indemnifying Party assumes such defense, the Indemnified Party shall have the right to participate in the defense thereof and, in the Indemnified Party's discretion, to either consent to the Indemnifying Party's selection of counsel (which consent shall not be unreasonably withheld or delayed) or, at the Indemnified Party's own expense, employ counsel separate from the counsel employed by the Indemnifying Party, it being understood that the Indemnifying Party shall control such defense. The Indemnifying Party shall be liable for the reasonable fees and expenses of counsel employed by the Indemnified Party for any period during which the Indemnifying Party has not assumed the defense thereof (other than during any period in which the Indemnified Party shall have not yet given notice of the third-party claim as provided above). If the Indemnifying Party chooses to defend any third-party claim, the Indemnified Party shall cooperate in the defense thereof. Such cooperation shall include the retention and (upon the Indemnifying Party's request) the provision to the Indemnifying Party of records and information that are relevant to such third-party claim, and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder; provided, in each case, that such other Party shall not be obligated to provide such records, information or access to Indemnifying Party if doing so would violate Law or jeopardize the protection of an attorney-client privilege. Whether or not the Indemnifying Party shall have assumed the defense of a third-party claim, the Indemnified Party shall not admit any liability with respect to, or pay, settle, compromise or discharge, such third-party claim without the Indemnifying Party's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed). If the Indemnifying Party has assumed the defense of a third-party claim, the Indemnifying Party may only pay, settle, compromise or discharge a third-party claim with the Indemnified Party's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed); provided, that the Indemnifying Party may pay, settle, compromise or discharge such a third-party claim without the written consent of the Indemnified Party if such settlement (i) includes a release of the Indemnified Party from all liability in respect of such third-party claim, (ii) does not subject the Indemnified Party to any injunctive relief or other equitable remedy, (iii) does not include a statement or admission of fault, culpability or failure to act by or on behalf of the Indemnified Party and (iv) does not impose any financial cost or reputational harm on the Indemnified Party. If the Indemnifying Party submits to the Indemnified Party a bona fide settlement offer with respect to a third-party claim that has been accepted by all persons bringing such third-party claim and otherwise satisfies the requirements set forth in the proviso of the immediately preceding sentence and the Indemnified Party refuses to consent to such settlement, then thereafter the Indemnifying Party's liability to the Indemnified Party with respect to

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

such third-party claim shall not exceed the Indemnifying Party's portion of the settlement amount included in such settlement offer. The Indemnifying Party will pay or reimburse the Indemnified Party for any amounts due within ten (10) days of receipt of a written statement from such Indemnified Party reasonably setting forth the amount due. Any payments for indemnification hereunder that are not otherwise covered by insurance shall be paid by the Indemnifying Party on an after-tax basis.

13.4    <u>Direct Claims</u>. The provisions of this <u>Article XIII</u> will be not construed as limiting a Party's pursuit of a direct action against the Party.

## ARTICLE XIV
## INTELLECTUAL PROPERTY

14.1    <u>Ownership of Marks</u>. For purposes of this Agreement, each Party acknowledges that the trademarks, trade dress, service marks, trade names, logos, domain names, slogans, and any other identifiers of source, origin or goodwill (including brand names, product names, and logos), drawings or graphic content, sound, colors, shapes, and letters and characters which create trademarks, service marks, trade dress or other marks, in all cases whether or not registered (together with the goodwill of the business connected to the foregoing), including registrations and applications for registration thereof (collectively, "***Marks***") of the other Party are the sole and exclusive property of such Party or its affiliate from which such Party has obtained a license to use and sublicense the use of the same, and that such Party or its affiliate shall retain the sole and exclusive ownership of, and all rights in all goodwill associated with its existing Marks as of the Effective Date.

14.2    <u>Background IP</u>. Nothing in this Agreement shall be construed as conveying or transferring ownership of either Party's patents, copyrights, trade secrets or other intellectual property and proprietary rights (collectively, "***Intellectual Property***"), to the extent owned, developed or acquired by such Party or its affiliates prior to the Effective Date or outside the scope of this Agreement (collectively, "***Background IP***"). Each Party acknowledges and agrees that, as between the Parties, each Party shall retain all of its rights, title and interest in and to its Background IP perpetually (except for the right to use such Background IP as expressly permitted under this Agreement or any licenses expressly granted under this Agreement).

14.3    <u>License of Marks</u>. Each Party hereto grants to the other a non-exclusive, non-transferable and royalty-free license to use its Marks during the Term and subject to the terms and conditions hereinafter set forth, solely in connection with and as necessary for exercising its rights and performing its obligations hereunder. Each Party may use the Marks of the other Party only in the form, color, dimension, and manner as approved by the other Party. Each Party must also obtain the prior written consent of the other Party prior to any new use of the other Party's Marks, which approval shall not be unreasonably withheld or delayed. Use of a Party's Marks may be subject to such reasonable conditions as the other Party may impose including conditions affording each Party adequate protection of its Marks. Neither Party will impugn, challenge, or assist in any challenge to the validity of the other Party's Marks, any registrations thereof, or the ownership thereof. Each Party will be solely responsible for taking any actions as it deems appropriate to obtain trademark, service mark, or copyright registration for its respective Marks. All uses of or references to the Marks will inure to the benefit of the respective owner, and all rights with respect to the Marks not specifically granted in this Agreement will be and are hereby reserved to the respective owner.

14.4    <u>Reservation of Rights</u>. For clarity, the Intellectual Property rights of each Party and its affiliates remain the property of that Party (and its affiliates), which, as between the Parties and their respective affiliates, shall continue to be the sole owner thereof. Each Party's and its affiliates' rights

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

and licenses to use the Intellectual Property rights of the other Party and its affiliates are specifically provided for in this Article XIV and no other licenses or rights whatsoever are granted, expressly, or by implication or estoppel, by the provisions of this Agreement (including any rights to prosecute, maintain, enforce, defend, or settle). Any and all right, title, and interest in and to the Intellectual Property rights of each Party and its affiliates not expressly granted herein are hereby reserved and retained by such Party and its affiliates. Other than as set forth in Section 14.3, nothing in this Agreement may be construed to authorize one Party or any of its affiliates to use any Marks owned by the other Party or any of its affiliates, or any other mark, name, word, or sign of confusing similarity to one owned by the other Party (or any of its affiliates).

14.5     Disclaimer.    SUBJECT TO THE TERMS OF THIS AGREEMENT, ALL INTELLECTUAL PROPERTY IS PROVIDED PURSUANT TO THIS AGREEMENT ON AN AS-IS, WHERE-IS BASIS. EACH PARTY HEREBY EXPRESSLY DISCLAIMS ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, AS TO SUCH INTELLECTUAL PROPERTY.

## ARTICLE XV
## GENERAL

15.1     Notice.   All written notices required under this Agreement will be deemed given when received by the other Party via a recognized mail or courier service, provided delivery receipt has been confirmed, at the address set forth below:

To Everspan:        Everspan Indemnity Insurance Company
                    One World Trade Center, 41st Floor
                    New York, NY 10007
                    Attention:    General Counsel
                                  legal@everspangroup.com

            *with a copy to:*    Steve Dresner, Chief Underwriting Officer
                                 sdresner@everspangroup.com


To Cardigan:        Cardigan General Insurance Services, LLC
                    6320 Canoga Ave., 12th Floor
                    Woodland Hills, CA 91367
                    Attention:    Brenda Sherman
                                  bsherman@cardigangeneral.com

            with a copy to:
                                 Legal Department

All notices will also be provided, as courtesy, by e-mail to the individuals so designated above.

15.2     Entire Agreement.   This Agreement embodies the entire agreement and understanding between the Parties with respect to the transactions contemplated hereby and supersedes all prior agreements and understandings, whether or not written.

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

15.3    <u>Modifications</u>.    Except as specifically provided herein, this Agreement may not be modified, amended or supplemented, nor may any provision hereof be waived, except by written amendment signed by both Parties stating the effective date and extent of such amendment, modification, supplement or waiver.

15.4    <u>No Third-Party Beneficiaries</u>.    Except with respect to <u>Section 9.2</u> and <u>Article XIII</u>, this Agreement is not intended to confer upon any person other than the Parties any rights or remedies hereunder.

15.5    <u>No Assignment or Delegation; Use of Affiliates</u>.    Other than as expressly provided for in this Agreement, a Party may not assign, delegate or otherwise transfer any of its rights or obligations under this Agreement whether by agreement, operation of Law or otherwise, without the express prior written consent of the other Party (which consent shall not be unreasonably withheld or delayed) and any purported assignment, delegation or transfer in violation of this provision shall be void and of no force or effect, <u>provided,</u> that any obligations to be performed, or rights which may be exercised by a Party, pursuant to this Agreement may be performed or exercised, as the case may be, by any corporate affiliates of a Party, subject to Law and the licenses and authorities held by such corporate affiliates; <u>provided</u>, <u>further</u>, that such Party shall remain responsible for the full performance of all of its obligations under this Agreement until such obligations have been fully performed by it or such relevant corporate affiliate on its behalf. Each Party shall be solely responsible for its own personnel and shall be fully liable for the acts or omissions of its personnel as if such acts or omissions were committed by itself.

15.6    <u>Authority</u>.    Each Party represents and warrants that it has the full right, power, legal capacity and authority to enter into and perform its obligations under this Agreement and that those obligations will be binding and enforceable without approval of any other person or entity. Each person signing this Agreement on behalf of a Party represents and warrants that he or she has the full right, power, legal capacity and authority to sign this Agreement on behalf of that Party.

15.7    <u>Offset</u>.    The Parties may offset funds due to the other under this Agreement.

15.8    <u>No Waiver</u>.    The failure of a Party to enforce any provision of this Agreement or to assert a default or breach of any of the terms and conditions of this Agreement shall not be construed as a waiver of any of said terms and conditions, nor estop either that Party from thereafter demanding a full and complete compliance therewith. The past waiver of a provision by either Party will not constitute a course of conduct or a waiver in the future as to that same provision.

15.9    <u>Severability</u>.    If any portion of this Agreement is found to be invalid or unenforceable, the remainder of this Agreement will remain in full force and effect. Both Parties shall use best efforts to appropriately rewrite such illegal, invalid or unenforceable provision(s) in accordance with the original intent of such provision(s) and incorporate such rewritten provision(s) into the Agreement.

15.10    <u>Governing Law</u>.    The terms and conditions of this Agreement will be governed exclusively by the Law of the State of New York, without regard to conflicts of laws principles other than Section 5-1401 and 5-1402 of the General Obligations Law of the State of New York.

15.11    <u>Dispute Resolution; Consent to Jurisdiction; Waiver of Jury Trial</u>.    Subject to <u>Section 15.12</u>, any controversies resulting from and/or related to this Agreement (each, a "***Dispute***") shall be notified by one Party to the other Party, and the Parties shall undertake to use their best efforts to settle such Disputes amicably, through direct and good-faith negotiations, within thirty (30) days from the date

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

of receipt of such notice (the "**Settlement Period**").If, at the end of the Settlement Period, the Parties do not reach an amicable solution, notwithstanding the possibility of the aggrieved Party's filing any lawsuit seeking specific enforcement of the defaulting Party's obligations, the Parties irrevocably submit to the exclusive jurisdiction of the federal and state courts located in the Borough of Manhattan in New York City (the "**Chosen Courts**") and agree to be bound by any judgment rendered by any such court with respect to such Dispute. The Parties waive any objection they may now or hereafter have to the venue of any such proceeding in such Chosen Court and any claim that such proceeding has been brought in an inconvenient forum. Any order or judgment of a Chosen Court may be enforced in any court having jurisdiction over the Parties and/or the subject matter. Process in any proceeding in either of the Chosen Courts may be served by certified mail, which service will be sufficient to confer personal jurisdiction over the Party so served. The Parties agree that in any proceeding arising out of or relating to a Dispute, the Chosen Court is empowered to grant any legal or equitable relief which may be available, including specific performance, injunctive relief and any mandatory injunction it deems appropriate. Neither Cardigan nor any Cardigan Indemnitee will have or assert any claim against Everspan, its subsidiaries, successors, or assigns, or the shareholders, directors, officers, agents or employees of any of them, for loss of business, loss of profits, or damage to goodwill or reputation except in the event of Everspan's proven fraud or willful misconduct. Further, Cardigan will not have or assert any claim against Everspan relating in any manner to Everspan's termination of this Agreement. TO THE FULLEST EXTENT PERMITTED BY LAW, EACH PARTY WAIVES ITS RESPECTIVE RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING FROM OR RELATING TO THIS AGREEMENT OR ANY DEALINGS BETWEEN THEM ARISING FROM OR RELATING TO THE SUBJECT MATTER OF THE TRANSACTIONS CONTEMPLATED HEREUNDER. The scope of this waiver is intended to encompass any and all disputes that may be filed in any court and that arise from or relate to the subject matter of this Agreement, including contract claims, tort claims, breach of duty claims and all other common law and statutory claims. This waiver will apply to any subsequent amendments, renewals, supplements or modifications of or to this Agreement.

15.12   Notwithstanding Section 15.11, a Party may request a court to issue an order for the other Party to take an action or stop taking an action, but only if the requesting Party has a good faith reason to believe that the other Party would be irreparably damaged if a court did not take such action and, in any event, only with respect to actual or potential material breaches of the following Sections of this Agreement: Section 1.2 (Underwriting Instructions), 5.2(D) (Remittance), 5.3(A) (Reporting Deadline), 9.1 (Records), 9.2 (Access to Records), 10.2 (Confidentiality), or 10.5 (Data Security, Breach Reporting, and Mitigation). It is accordingly agreed that the Parties shall be entitled to seek an injunction or injunctions to prevent breaches of the sections expressly enumerated in this clause and to enforce specifically the terms and provisions of such Sections and Article, this being in addition to any other remedy to which such Party is entitled at law, in equity, in contract, in tort or otherwise.

15.13   Independent Contractor. Cardigan is an independent contractor and has full and exclusive control over its time, affairs, and operations. Cardigan may, from time to time, benefit from the recommendations, suggestions, answers to questions, or work product of Everspan's staff and vendors, including legal, actuarial, consulting, systems and financial support services. Everspan will have no liability or professional responsibility to, or create any professional relationship with, Cardigan other than as specifically set forth in this Agreement.

15.14   Counterparts. This Agreement may be executed simultaneously in several counterparts, each of which will constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by scanned pages shall be effective as delivery of a manually executed counterpart to this Agreement.

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

15.15  <u>Jointly Drafted</u>.  This Agreement will be deemed to have been drafted by both Parties and, in the event of a dispute, any perceived ambiguity will not be construed against either Party.

15.16  <u>Interpretation</u>.  The term "this Agreement" shall mean this Agreement together with the Schedules and exhibits hereto, as the same may from time to time be amended, modified, supplemented or restated in accordance with the terms hereof.  Any collective defined term and any defined term used in the plural will be taken to encompass individually and collectively all members of the relevant class.  Any defined term used in the singular preceded by "any" will be taken to indicate any number of the members of the relevant class.  Any defined term used in the singular and preceded by the word "each" will indicate all members of the relevant class, individually.  The use of the word "include" (and all derivations therefrom) in this Agreement is illustrative and not restrictive; any list or example preceded by "include" or "including" is not necessarily exhaustive or complete.  Unless otherwise stated, the absence of "include" or "including" preceding (or otherwise qualifying) any list or example will mean that such list or example is restricted to the items listed.  All references to articles, sections, subsections, clauses, paragraphs, schedules, and exhibits mean such provisions of this Agreement, except where otherwise stated.  The use herein of the masculine, feminine, or neuter forms shall also denote the other forms, as in each case the context may require.  The headings in this Agreement are for reference only and will not limit or otherwise affect the meaning or interpretation of this Agreement.  Unless otherwise stated, all timeframes in this Agreement refer to calendar days.  Deadlines falling on weekends or U.S. bank holidays are extended to the next business day.  References to "dollars" or "$" shall mean the lawful currency of the United States of America.

15.17  <u>Change in Control</u>.  Cardigan will notify Everspan in writing as soon as possible after it becomes aware of, but in no event more than thirty (30) days after, any of the following proposed or actual occurrences, each of which would be a "Change in Control:"

      A.    A sale, transfer or pledge, or the issuance to a new shareholder or member, of 10% or more of Cardigan's voting stock or membership interests;

      B.    A sale, transfer or pledge of a substantial portion of Cardigan's material assets;

      C.    Any merger or consolidation of Cardigan with another entity or entities with the exception of an affiliate of Venbrook Group, LLC or an affiliate Cardigan; or

      D.    A change in any executive, director, or principal of Cardigan.

15.18  <u>Managing General Agent Status</u>.  If at any time Everspan or a Regulator deems or determines that Cardigan is a "managing general agent" as defined in any Law, this Agreement will be automatically amended to comply with such Law and Cardigan will take all steps reasonably required to ensure compliance therewith or take such actions or refrain from taking actions that results in that determination.

15.19  <u>Conflicts of Interest</u>.  At any time during the Term or Run-Off Period, Cardigan believes, or reasonably should believe, that it has a conflict of interest because of differing interests of Everspan and any other entity for which Cardigan also provides services, it will immediately disclose the existence of such conflict to Everspan.  Cardigan must have adequate procedures for identifying and addressing such conflicts of interest.

15.20  <u>Definitions</u>.  The following terms shall have the meanings defined in the Section indicated:

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

*"Assigned Risks"* .......................................................... 1.11
*"Background IP"* .......................................................... 14.2
*"Chosen Courts"* .......................................................... 15.11
*"Claims"* .......................................................... 11.2
*"Commission"* .......................................................... 6.1
*"Confidential Information"* .......................................................... 10.1
*"Curable Breach"* .......................................................... 7.5
*"Customer Information"* .......................................................... 10.1
*"Data Requirements"* .......................................................... 9.3
*"Disclosing Party"* .......................................................... 10.2A
*"Dispute"* .......................................................... 15.11
*"Effective Date"* .......................................................... Preamble
*"Everspan"* .......................................................... Preamble
*"Everspan Indemnitee"* .......................................................... 13.1
*"Everspan Premium Bank Account"* .......................................................... 5.2B
*"Expirations"* .......................................................... 7.9
*"Financial Audit"* .......................................................... 5.6
*"Forms and Rates"* .......................................................... 1.3
*"Funds"* .......................................................... 5.1A
*"GAAP"* .......................................................... 5.5
*"General Premium Bank Account"* .......................................................... 5.2B
*"GWP"* .......................................................... 12.1A
*"Indemnifiable Loss"* .......................................................... 13.1
*"Indemnified Party"* .......................................................... 13.3
*"Indemnifying Party"* .......................................................... 13.3
*"Intellectual Property"* .......................................................... 14.2
*"Key Person"* .......................................................... Schedule A
*"Laws"* .......................................................... 3.1
*"Marketing Materials"* .......................................................... 3.6
*"Marks"* .......................................................... 14.1
*"Monthly Bordereaux"* .......................................................... 5.3A
*"OFAC"* .......................................................... 3.5
*"Party"* or *"Parties"* .......................................................... Preamble
*"Cardigan"* .......................................................... Preamble
*"Cardigan Indemnitee"* .......................................................... 13.2
*"Policyholders"* .......................................................... 1.5
*"Premium Cap"* .......................................................... Schedule A
*"Producers"* .......................................................... 4.1
*"Receiving Party"* .......................................................... 10.2A
*"Records"* .......................................................... 9.1
*"Regulators"* .......................................................... 1.8
*"Reinsurance"* .......................................................... 1.2
*"Reinsurance Agreement"* .......................................................... 2.3
*"Reinsurer"* .......................................................... 2.3
*"Required Insurance"* .......................................................... 12.2
*"Run-Off Period"* .......................................................... 7.6
*"Sanctions Rules"* .......................................................... 3.5
*"Secured Property"* .......................................................... 7.8
*"Services"* .......................................................... 1.4

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

"*Settlement Period*"................................................................................. <u>15.11</u>
"*Systems*"................................................................................................. <u>10.5B</u>
"*TPA*"...................................................................................................... <u>11.2</u>
"*Underwriting Instructions*"..................................................................... <u>1.2</u>

[SIGNATURE BLOCKS ON FOLLOWING PAGE]

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

The following officers of each Party are signing this Agreement to be effective as of the Effective Date:

**EVERSPAN INDEMNITY INSURANCE COMPANY**

By: _Steven Dresner_

Name: Steve Dresner

Title: Chief Underwriting Officer

Date: 4/30/2021

**CARDIGAN GENERAL INSURANCE SERVICES, LLC**

By: _Brenda Sherman_

Name: Brenda Sherman

Title: President

Date: 4/30/2021

*[Signature Page to Program Administrator Agreement]*

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

**SCHEDULE A**

**Authorized Business**

Everspan may amend this Schedule of Authorized Business upon prior written notice to Cardigan.

A.    **Territories**



B.    **Lines of Business**

Non-Emergency Medical Transportation (E&S) ("NEMT")

*Limited authority* Commercial Auto (E&S) ("Trucking")



C.    **Maximum Limits and Fees**



D.    **Production Limitation**



DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

E.     **Exclusions**

Cardigan shall have no authority with respect to any risks, classes, or types of insurance excluded under either the Underwriting Instructions or the Reinsurance Agreement(s).

F.     **Key Person.**

The following are "***Key Persons***" and Cardigan will provide prompt notice to Everspan if any Key Person ceases active employment with Cardigan or any of Cardigan's affiliates:

- Brenda Sherman

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

## SCHEDULE B

### Commission



DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233



DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

# EXHIBIT A

## Reinsurance Agreement

## INTERESTS AND LIABILITIES AGREEMENT
### Master No. 75813 / Treaty ID 5019915

between

## EVERSPAN INDEMNITY INSURANCE COMPANY
(herein referred to as the "Company")

and

## GENERAL REINSURANCE CORPORATION
a Delaware corporation
having its principal offices at
120 Long Ridge Road
Stamford, Connecticut  06902
(herein referred to as the "Subscribing Reinsurer")

The Subscribing Reinsurer agrees to assume a 20% share of the liability under the Quota Share Agreement of Reinsurance, effective May 1, 2021, attached hereto.

As consideration, the Subscribing Reinsurer shall receive an identical share of the premiums named therein.

The share of the Subscribing Reinsurer shall be separate and apart from the shares of the other reinsurers, and the Subscribing Reinsurer shall in no event participate in the Interests and Liabilities of the other reinsurers.

**IN WITNESS WHEREOF**, the parties hereto have caused this Interests and Liabilities Agreement to be executed in duplicate, through their duly authorized representatives,

## EVERSPAN INDEMNITY INSURANCE COMPANY

this __28th__ day of _____June_____, 2021,

*DATE SIGNED BY EVERSPAN*

*Steven K. Dresner*
_____
*EVERSPAN OFFICER SIGNATURE*

Steven K. Dresner
_____
*PRINTED EVERSPAN OFFICER NAME*

CUO
_____
*EVERSPAN OFFICER TITLE*

_____
*EVERSPAN WITNESS SIGNATURE*

**GENERAL REINSURANCE CORPORATION**

and this <u>28th</u> day of <u>     June                              </u>, 2021,
<i>DATE SIGNED BY GRC</i>

<u>                                                            </u>
<i>GRC OFFICER SIGNATURE</i>

<u>                Michael Vagnone                </u>
<i>PRINTED GRC OFFICER NAME</i>

<u>             Senior Vice President             </u>
<i>GRC OFFICER TITLE</i>

<u>                                                            </u>
<i>GRC WITNESS SIGNATURE</i>


**Agreement Master No. 75813 / Treaty ID 5019915**

## QUOTA SHARE REINSURANCE AGREEMENT

This QUOTA SHARE REINSURANCE AGREEMENT (this "*Reinsurance Agreement*") is effective **May 1, 2021** (the "*Effective Date*") and is made by and between the subscribing reinsurers executing the Interests and Liabilities Agreement(s) attached hereto (the "*Reinsurer*") and **Everspan Indemnity Insurance Company** ("*Everspan*").  Everspan and Reinsurer will be referred to each as a "*Party*" and, collectively, the "*Parties*."

## ARTICLE I
## BUSINESS REINSURED

1.1    <u>Subject Business</u>.  From and after the Effective Date, Everspan shall cede to Reinsurer, and Reinsurer shall accept, Reinsurer's quota share (the "*Quota Share*") of Everspan's gross liability ("*Covered Liabilities*") associated with all policies, certificates, contracts, binders, agreements, insurance bonds, or other proposals or evidences of insurance, new or renewal on or after May 1, 2021, classified by Everspan as Commercial Automobile Liability and produced, quoted, underwritten, bound, processed, issued, serviced, or managed by Program Administrator for or on behalf of Everspan pursuant to the Program Administrator Agreement, effective **May 1, 2021** (as may be amended, supplemented or otherwise modified, the "*Program Agreement*"), by and between Everspan, on one hand, and Cardigan General Insurance Services, LLC, on the other hand ("*Program Administrator*"), a copy of which is attached hereto as <u>Exhibit A</u> ("*Policies*"). Everspan shall not amend Schedule A (Authorized Business) to the Program Agreement without Reinsurer's prior consent.

1.2    <u>Exclusions</u>.  This Reinsurance Agreement does not apply to and specifically excludes:

        A.     Reinsurance assumed by Everspan other than reinsurance of primary business assumed from affiliated companies;

        B.     The risks described in the following clauses and endorsements, which are attached to and form part of this Reinsurance Agreement:

            (i) NUCLEAR, BIOLOGICAL, CHEMICAL AND RADIOLOGICAL EXCLUSION CLAUSE

            (ii) SANCTION LIMITATION AND EXCLUSION CLAUSE

            (iii) ASBESTOS EXCLUSION CLAUSE

            (iv) COMMUNICABLE DISEASE EXCLUSION

            (v) WAR AND TERRORISM EXCLUSION ENDORSEMENT

Notwithstanding the foregoing, (A) should any judicial, regulatory or legislative entity having legal jurisdiction invalidate any exclusion, whether on an underlying Policy or with respect to the clauses and endorsements referenced in exclusion B.(iii) or B.(iv) of this <u>Section 1.2</u>, any amount of loss for which Everspan is liable because of such invalidation will not be excluded hereunder; and (B) should Everspan, by reason of an inadvertent act, error or omission, be bound to afford coverage excluded under exclusions A., B.(iii) or B.(iv) of this <u>Section 1.2</u> or should an existing

insured extend its operations to include coverage excluded under exclusions A., B.(iii), or B.(iv). of this <u>Section 1.2</u>, the Reinsurer shall waive the application of any such applicable exclusion(s).

## ARTICLE II
## ORIGINAL CONDITIONS

Reinsurer's liability shall attach as of the Effective Date and commence obligatorily and simultaneously with that of Everspan under the Policies. Subject to the terms and conditions of this Reinsurance Agreement, all reinsurance for which Reinsurer shall be liable by virtue of this Reinsurance Agreement shall be subject, in all respects, to the same rates, terms, conditions, interpretations, assessments, waivers, and premium adjustments, and to the same modifications, alterations, and cancellations applicable or deemed applicable to the Policies, as the Covered Liabilities, the true intent of this Reinsurance Agreement being that Reinsurer will, in every case to which this Reinsurance Agreement applies, follow Everspan's fortunes.

## ARTICLE III
## TERM, TERMINATION, AND RUNOFF

3.1    <u>Term</u>.  Following the Effective Date, this Reinsurance Agreement will remain continuously in force for consecutive annual terms (each a "***Contract Year***") unless terminated according to the provisions set forth in this <u>ARTICLE III</u>.  The Contract Year ends at 12:00:01 AM Eastern Time on May 1, 2022 and each subsequent Contract Year ends at 12:00:01 AM Eastern Time on each May 1st thereafter (each a "***Renewal Date***").

3.2    <u>Termination</u>.

3.2.1  This Reinsurance Agreement may be terminated by mutual written agreement of the Parties at any time.

3.2.2  This Reinsurance Agreement may be terminated as follows, with notice of such termination to be sent by the terminating Party to the other Party, with a copy to the Program Administrator, by a recognized overnight courier service, tracking and return receipt requested:

A.    By either Party, effective as of a Renewal Date, by providing written notice to the other Party no less than ninety (90) days prior to such Renewal Date (a "***Termination Notice***").  Alternatively, a Party may provide a provisional notice of termination (a "***Provisional Notice***") by providing written notice to the other Party no less than ninety (90) days prior to any Renewal Date. If the Provisional Notice is not withdrawn before thirty (30) days prior to the Renewal Date, then the effective date of the termination shall be ninety

(90) days following the next Renewal Date (in which case, the final Calendar Year will be extended by such 90-day period).

B.    By Everspan immediately if:

(i)    The Program Agreement is terminated or Everspan has grounds to so terminate the Program Agreement;

(ii)    A state insurance department or other legal authority (a "***Regulator***") orders Reinsurer to cease writing business, or Reinsurer is placed under supervision by a Regulator or any material license of Reinsurer is suspended, terminated, modified, limited, cancelled, revoked, not renewed or impaired by a Regulator;

(iii)    Reinsurer has become insolvent or has been placed into liquidation or receivership (whether voluntary or involuntary), or there have been instituted against it proceedings for the appointment of a receiver, liquidator, rehabilitator, conservator, trustee in bankruptcy, or other agent known by whatever name, to take possession of its assets or control of its operations;

(iv)    Reinsurer has merged with or has become acquired or controlled by any entity(ies) not controlling Reinsurer's operations at the inception of this Reinsurance Agreement;

(v)    Reinsurer has retroceded its entire liability under this Reinsurance Agreement without the Everspan's prior written consent;

(vi)    Reinsurer has been assigned an A.M. Best's rating of less than "A-" and/or an S&P rating of less than "BBB+";

(vii)    Reinsurer fails to make any undisputed payment under this Reinsurance Agreement when due, and fails remit the overdue payment within forty-five (45) days of the relevant due date;

(viii)    Reinsurer fails to secure its obligations or provide collaterals as required under this Reinsurance Agreement; or

(ix)    Reinsurer breaches any of its obligations under this Reinsurance Agreement in any material respect and Reinsurer fails to cure such breach within thirty (30) days after it becomes aware of or receives notice of such breach; <u>provided</u>, however, that a repeated breach after such notice and cure involving the same or substantially similar actions or conduct, shall be grounds for termination without the opportunity to cure.

3.3    <u>Consequences of Termination</u>.  Subject to 3.4 below, in the event of termination of this Reinsurance Agreement for any reason, (A) reinsurance hereunder shall continue to apply to the Policies in force at the time and date of termination until expiration, termination or cancellation of such Policies (it is understood that any Policies with effective dates prior to the termination date but issued, renewed, rewritten, or extended after or beyond the termination date are covered under

3

this Reinsurance Agreement), (B) reinsurance hereunder shall continue if the Company is required by law, regulation, judgment, injunction, governmental orders or decrees (collectively, "***Laws***") to continue coverage, including by issuing renewals on any such Policies, until the Company compliantly cancels or non-renews the relevant Policies and all obligations under such Policies are satisfied, (C) Reinsurer shall not be relieved of or released from any obligation created by or under this Reinsurance Agreement in relation to payment, expenses, reports, accounting or handling, which relate to the Policies (or its ongoing obligations hereunder including with respect to adjustments made to the Ceding Commission in accordance with Section 6.4), and (D) Reinsurer shall cooperate with Everspan and the Program Administrator in the handling or management of all such run-off Policies until all obligations under Policies are fully and finally satisfied, and all outstanding losses and Loss Adjustment Expenses have been settled.

3.4    <u>Basis for Termination</u>.    Termination of this Reinsurance Agreement will, by default, be on a run-off basis; <u>provided</u>, however, that Everspan and the Reinsurer may mutually elect in writing to terminate this Reinsurance Agreement on a cut-off basis.  If Everspan and the Reinsurer so elect, (A) Reinsurer will pay to Everspan (or its designee) an amount equal to the sum of the ceded outstanding unearned statutory premium as of the date of termination; and (B) Reinsurer will incur no liability with respect to claims on Policies incurred after the date of termination.  Reinsurer will, however, remain liable for all other obligations hereunder.


# ARTICLE IV
# REINSURER LIABILITIES

4.1    <u>Loss</u>.  Reinsurer shall assume and be liable for the Quota Share of the Covered Liabilities, such Covered Liabilities defined as:

      A.    all loss settlements and payments made by Everspan, Program Administrator, or Everspan's designated third-party claims administrator (the "***TPA***"), whether under the terms of the Policies, by way of compromise, or made due to an order or instruction by a court, panel, or Regulator;

      B.    all costs, expenses, and fees (including attorney's fees) incurred in connection with investigating, appraising, adjusting, litigating, defending, appealing, settling, or contesting the validity of claims or losses associated in any manner with the Policies (including, without limitation, interest on judgments, expenses of outside adjusters, declaratory judgment expenses not to exceed $1,000,000 in any one accident, or other legal expenses and costs incurred in connection with coverage questions and legal actions connected thereto, and costs of supersedeas and appeal bonds) (the "***Loss Adjustment Expenses***"), it being understood and agreed that fees paid by Everspan to, and retained by, the TPA as outlined in the Claims Agreement solely as respects the TPA's unallocated loss adjustment expenses (not to exceed 3.0% of the gross premium written by the Program Administrator during any one Contract Year) are Loss Adjustment Expenses hereunder;

      C.    all assessments levied by a Regulator related to the Policies or connected to the business reinsured hereunder, which are assessed based on the premium

4

written and subject to this Reinsurance Agreement, whether incurred before or after termination of this Reinsurance Agreement, including those due pursuant to Laws creating obligatory or guaranty funds, pools, joint underwriting associations, FAIR plans, and similar plans; as well as any special assessments levied by a Regulator, including those following a catastrophic event ("**Assessments**"); and

D.    Extra Contractual Obligations and Loss in Excess of Policy Limits.

4.2    TPA.    Everspan will designate and appoint Program Administrator or a TPA to accept notice of, investigate, adjust, settle, pay, resist or compromise any claim arising under any Policy provided, however, that Everspan reserves the right to unilaterally direct any specific action or inaction with respect to any individual claim.  Subject to the terms and conditions of this Reinsurance Agreement, all loss settlements made by or on behalf of Everspan shall be unconditionally binding upon Reinsurer and Reinsurer shall benefit proportionately in all salvage and recoveries.  Any TPA engaged will execute a claims administration contract (each a "**Claims Agreement**"), the initial Claims Agreement is attached to this Reinsurance Agreement as Exhibit B hereto.

4.3    Claims.    Everspan's good faith determination shall govern:

A.    What constitutes a claim, loss, or occurrence covered under any Policy;

B.    Everspan's liability thereunder; and

C.    The amount or amounts Everspan shall pay thereunder.

4.4    Claims Cooperation.    When so requested in writing Everspan shall afford the Reinsurer or its representatives an opportunity to be associated with Everspan, at the expense of the Reinsurer, in the defense of any claim, suit or proceeding involving this reinsurance, and Everspan and the Reinsurer shall cooperate in every respect in the defense of such claim, suit or proceeding.

**ARTICLE V**
**EXTRA CONTRACTUAL OBLIGATIONS AND LOSS IN EXCESS OF POLICY LIMITS**

5.1    Extra Contractual Obligations and any Loss in Excess of Policy Limits.    Included in Reinsurer's obligations under this Reinsurance Agreement are the Quota Share of any Extra Contractual Obligations and any Loss in Excess of Policy Limits.  Any Extra Contractual Obligation or Loss in Excess of Policy Limits shall be deemed to have occurred on the same date as the loss or alleged loss under the relevant Policy, and shall constitute part of the original loss.

5.2    For purposes of this Reinsurance Agreement:

A.    "**Extra Contractual Obligations**" means any liabilities, expenses or other obligations arising out of or relating to the Policies, exclusive of Loss in Excess of Policy Limits and liabilities, expenses or other obligations arising under the express terms and conditions of the Policies, including any liability for fines, penalties, forfeitures, punitive, special, exemplary or

5

other form of extra-contractual damages, which liabilities or obligations arise from any act, error or omission, whether or not intentional, negligent, in bad faith or otherwise relating to: (i) the investigation, defense, trial, settlement or handling of claims, benefits or payments under the Policies; (ii) the failure to pay, the delay in payment, or errors in calculating or administering the payment of benefits, claims or any other amounts due or alleged to be due under or in connection with the Policies, (iii failure by Everspan (or any entity involved with the handling of claims hereunder) to settle within the Policy limit, (iv) negligence or bad faith, including in rejecting an offer of settlement or in the preparation of the defense or in the trial of any action, or (v) in the preparation or prosecution of an appeal consequent upon such action.

B.    "***Loss in Excess of Policy Limits***" means any amount Everspan pays or is liable to pay in excess of the Policy limit, having been incurred because of, but not limited to, failure by Everspan to settle within the Policy limit or by reason of alleged or actual negligence, fraud or bad faith in rejecting an offer of settlement or in the preparation of the defense or in the trial of any action against its insured or reinsured or in the preparation or prosecution of an appeal consequent upon such action.

5.3    <u>Exception</u>.  This Article will not apply where an Extra Contractual Obligation or Loss in Excess of Policy Limits has been incurred due to the proven fraud of a member of Everspan's Board of Directors acting individually, collectively, or in collusion with any individual or entity involved in the presentation, defense, or settlement of any claim covered hereunder, and which has been finally determined by a court of competent jurisdiction, after the exhaustion of all appeals.

5.4    <u>Liability Limitation</u>.    Subject to all other provisions of this Agreement, the Reinsurer's maximum liability with respect to all Policies incepting during any one Contract Year for all Extra Contractual Obligation and Loss in Excess of Policy Limits combined shall be the Reinsurer's Quota Share of $5,000,000 ("ECO/XPL Cap").  Reinsurer's liability with respect to the ECO/XPL Cap shall be reduced by recoveries made by Everspan in connection with any liability associated with such Extra Contractual Obligation or Loss in Excess of Policy Limits, and Everspan shall use commercially reasonable efforts to pursue such recoveries, including with respect to (i) any errors and omissions policy(ies); (ii) any indemnification provided under the Program Agreement or the Claims Agreement; or (iii) the guarantee executed in connection with the Program Agreement.

**ARTICLE VI**
**PREMIUM, COMMISSION, TAXES AND ASSESSMENTS**

6.1    <u>Premium</u>.  In consideration of the acceptance by Reinsurer of the Quota Share of the Covered Liabilities, Everspan shall pay to Reinsurer the Quota Share of the gross premiums written or charged on the Policies reinsured hereunder actually collected from the policyholder *minus* any refunds or returns of premium to policyholders for any reason, in each case excluding any policy fees (if applicable) on the Policies ("***Net Premium***").  The Net Premium shall be reported and calculated in accordance with <u>ARTICLE VII</u> and subject to <u>ARTICLE VIII</u>.

6

6.2    Provisional Commission. Reinsurer will allow Everspan a ceding fee (the "**Provisional Commission**") equal to the Quota Share of twenty-five and sixth-tenths percent (**25.60%**) of all Net Premiums . Everspan shall allow return commission on return premiums at the same rates as the original premium.

6.3    [This Section Left Intentionally Blank]

6.4    Sliding Scale Commission.  The Provisional Commission shall be adjusted for each Contract Year in accordance with the provisions set forth in this Section.

6.4.1  For purposes of this Section 6.4, the following definitions apply:

A.    "Loss Ratio" means the ratio of Losses Incurred to Premiums Earned.

B.    "Losses Incurred" means, with respect to Policies incepting during each Contract Year:

(i)    Ceded losses and Loss Adjustment Expenses paid as of the effective date of calculation; plus

(ii)    The ceded reserves for losses and Loss Adjustment Expenses outstanding as of the effective date of calculation; plus

(iii)    IBNR.

C.    "Premiums Earned" means the earned portion of the Net Premiums on Policies incepting during the Contract Year.

D.    "IBNR" means Everspan's determination of losses and Loss Adjustment Expenses incurred but not yet reported provided, however, that with respect to the period of months following the end of each Contact Year outlined in the table below, the IBNR shall not exceed the corresponding percentage for that Contract Year.  The IBNR percentages are expressed as a ratio to the applicable premium base.

| | |
|---|---|
| 24 Months | 22.5% |
| 36 Months | 12.5% |
| 48 Months | 3.0% |

After 48 months following the end of each Contract Year, Everspan's determination of losses incurred but not yet reported with respect to the Contract Years will be utilized until Everspan determines that all obligations under Policies, including those that are not yet known, are fully and finally settled.

E.    "Contract Year" means the definition ascribed in Section 3.1 provided, however, that the Parties understand and agree that the final Contract Year may, due to circumstances including the timing of any extension or termination of this Reinsurance Agreement, be less or greater than 12-

7

months, and such modified period shall be used as the applicable period for the final Contract Year.

6.4.2 The adjusted Provisional Commission for each Contract Year will be calculated as follows:

A. If the Loss Ratio is 59.5% or greater, the Provisional Commission for such Contract Year will be decreased by 1.0947% for every 1.0% of Loss Ratio above 59.5%, subject to a minimum adjusted Provisional Commission of 15.2%.

B. If the Loss Ratio is less than 59.5%, the Provisional Commission for such Contract Year will be increased by 0.4410% for every 1.0% of Loss Ratio less than 59.5%, subject to a maximum adjusted Provisional Commission of 34.2%.

6.4.3 Everspan will calculate and report the Loss Ratio and any adjustments to the Provisional Commission in accordance with the provisions of this Section 6.4, for the first time with respect to each Contract Year, within sixty (60) days after the end of the period that is 24-months following the last day of each Contract Year, and then annually thereafter (with remittances made following the end of each 12-month period in accordance with ARTICLE VII) until Everspan determines that all obligations under Policies incepting during (including renewals) to such Contract Year, including those that are not yet known, are fully and finally settled.

6.4.4 Any amounts due to the Reinsurer as respects any adjusted Provisional Commission shall be paid by Everspan at the next monthly remittance in accordance with ARTICLE VII after the determination is made in accordance with Section 6.4.3 subject to ARTICLE VIII.

6.4.5 Any amounts due to Everspan as respects any adjusted Provisional Commission shall be paid by the Reinsurer at the next monthly remittance in accordance with ARTICLE VII, subject to ARTICLE VIII.

## ARTICLE VII
## REPORTING AND SETTLEMENT

7.1    Monthly Report.

7.1.1 Everspan will furnish or cause to be furnished to Reinsurer, within thirty (30) days following the end of each month, a monthly reinsurance settlement report (the *"Monthly Report"*) that shall set forth the Monthly Settlement Amount and each component thereof.

7.1.2 The *"Monthly Settlement Amount"* shall be an amount equal to A *minus* B, where:

A. Equals:

(i) the Net Premiums for such month; plus

8

        (ii)      any adjustments made, and at the time of such settlement payable to the Reinsurer, pursuant to <u>Section 6.4</u> (Sliding Scale Commission); plus

        (iii)    the ceded portion of subrogation, salvage, or other recoveries received during such month;

B.     equals:

        (i)       the Provisional Commission for such month; *plus*

        (ii)      ceded losses and Loss Adjustment Expense in respect of the Covered Liabilities paid during such month; *plus*

        (iii)    any adjustments made, and at the time of such settlement payable to Everspan, pursuant to <u>Section 6.4</u> (Sliding Scale Commission); *plus*

        (iv)    other expenses as agreed to by the Parties, if applicable.

       7.1.3  If the Monthly Settlement Amount is positive, such amount shall be considered due to Reinsurer by Everspan and if the Monthly Settlement Amount is negative, the absolute value of such amount shall be considered due to Everspan by Reinsurer.  Each net amount due Everspan or Reinsurer as reflected on a Monthly Report shall be paid by the owing Party no later than fifteen (15) days after receipt by Reinsurer of the Monthly Report, unless Reinsurer disputes the amounts due in good faith, in which case the payment period should be extended until the Parties have resolved such dispute.

     7.2    <u>Additional Reports</u>.  Without limitation of <u>Sections 7.1</u>, each of the Parties shall periodically furnish to the other on a timely basis such other reports and information as may be reasonably requested by such other Party for financial reporting, regulatory, tax, rating agency or similar purposes and reasonably available to it.

     7.3    <u>Late Payment</u>.  Interest shall be credited on any amount under <u>Section 7.1.3</u> due to Everspan unpaid prior to the due date, starting with the first business day following the due date, and ending on the date of remittance of such payment.  Interest on such amount due shall be payable at a rate equal to the U.S. 10-Year Treasury Rate *plus* twenty-five (25) basis points ("***Crediting Rate***"), as published by the Wall Street Journal Eastern Edition on the due date.  In the event the U.S. 10-Year Treasury Rate is no longer published, another regularly published interest rate comparable to the U.S. 10-Year Treasury Rate and chosen by Everspan in its sole discretion, *plus* twenty-five (25) basis points, may be credited on any undisputed due.

     7.4    <u>Claims Payments</u>.  Should payment due from Reinsurer exceed its Quota Share of $250,000, Everspan may give Reinsurer notice of payment made or its intention to make payment on a certain date.  If Everspan intends to pay such claim by a certain date and has submitted a reasonably satisfactory proof of loss or similar document, payment shall be due from Reinsurer twenty-four (24) hours prior to scheduled date of settlement, provided Reinsurer has a period of five (5) business days after receipt of said notice to dispatch the payment.  Cash loss amounts specifically remitted by Reinsurer as set forth herein shall be credited to their next statement of account.

## ARTICLE VIII
## PREMIUM DEFAULT; ERRORS AND OMISSIONS

8.1    <u>Premium Default.</u>  In the event the Program Administrator fails to remit premium to Everspan, the Reinsurer shall be liable for its share of such uncollected premium, provided however that the Reinsurer's liability for such uncollected premium on Policies incepting during any one Contract Year shall not exceed Reinsurer's proportionate share of $500,000.  To the extent the Reinsurer is liable for such uncollected premium, the Reinsurer shall have no obligation to pay commission thereon.  Further, Reinsurer's obligations under this <u>ARTICLE VIII</u> shall be reduced by any recovery received by Everspan, directly or indirectly, which recoveries Everspan will pursue in good faith including with respect to (i) any errors and omissions policy; (ii) any indemnification provided under the Program Agreement; or (iii) the unlimited guarantee of payment and performance issued by Venbrook Group executed in connection with the Program Agreement.

8.2    <u>Errors and Omissions.</u>  Everspan will not be prejudiced by any error or omission through clerical error, accident, or oversight, but any such error or omission will be corrected promptly upon discovery.

## ARTICLE IX
## ACCESS TO RECORDS

Each Party shall keep accurate and complete records, files and accounts of all transactions and matters with respect to the Policies and the administration thereof in accordance with Laws and its record management practices in effect from time to time.  Reinsurer and its designated representatives may at its own expense and upon reasonable notice inspect, at the locations where such records are located, and to make and retain copies of, the papers and any and all other books or documents of Everspan reasonably relating to this Reinsurance Agreement, including the Policies and the administration thereof by, and shall have access to appropriate employees and representatives of Everspan, in each case during normal business hours for such period as this Reinsurance Agreement is in effect or for as long thereafter as Everspan seeks performance by Reinsurer pursuant to the terms of this Reinsurance Agreement or Reinsurer reasonably needs access to such records for regulatory, tax or, similar purposes.  The information obtained shall be used only for purposes relating to the transactions contemplated under this Reinsurance Agreement.  Everspan shall use commercially reasonable efforts to permit the Reinsurer to inspect the books and records of Program Administrator and the TPA in the manner proscribed in this <u>ARTICLE IX</u>.

## ARTICLE X
## INSOLVENCY

10.1    <u>Notice of Insolvency.</u>  Any liquidator, receiver, conservator or statutory successor of Everspan will give written notice to Reinsurer of the pendency of a claim against Everspan indicating the Policy reinsured which claim would involve a possible liability on the part of Reinsurer within thirty (30) days after such claim is filed in the relevant proceeding, and that during the pendency of such claim, Reinsurer may investigate such claims and interpose, at its own expense, in the proceeding where such claim is to be adjudicated, any defense or defenses that it

may deem available to Everspan or its liquidator, receiver, conservator or statutory successor. The expense thus incurred by Reinsurer will be chargeable, subject to the approval of the applicable court, against Everspan as part of the expense of conservation or liquidation to the extent of a pro rata share of the benefit which may accrue to Everspan solely as a result of the defense undertaken by Reinsurer.

      10.2   <u>Consequence of Everspan Insolvency</u>. In the event of the insolvency of Everspan, the reinsurance under this Reinsurance Agreement will be payable directly by Reinsurer to Everspan or to its liquidator, receiver or statutory successor, except (A) to the extent as provided or required otherwise by applicable law, (B) where this Reinsurance Agreement specifically provides another payee of such reinsurance in the event of the insolvency of Everspan, and (C) where Reinsurer, with the consent of the direct insured or insureds, has assumed such policy obligations of Everspan as direct obligations of Reinsurer to the payees under such policies and in substitution for the obligation of Everspan to such payees.

**ARTICLE XI**
**UNAUTHORIZED REINSURANCE**

      11.1   If, at any time during the period of this Reinsurance Agreement and thereafter, the reinsurance provided by Reinsurer does not qualify for full statutory accounting credit for reinsurance by regulatory authorities having jurisdiction over Everspan (including by reason of lack of license, accreditation or otherwise) such that a financial penalty to Everspan would result on any statutory statement or report Everspan is required to make or file with the applicable Regulators (or a court of law in the event of insolvency), Reinsurer shall secure the Quota Share of the Reinsurance Obligations for which such full statutory credit is not granted by those authorities under this Reinsurance Agreement in a manner, form, and amount acceptable to Everspan and to all applicable Regulators in accordance with this <u>ARTICLE XI</u>. Reinsurer shall take any other reasonable steps that may be required for Everspan to take full credit on its statutory financial statements for the reinsurance provided by this Reinsurance Agreement.

      11.2   Reinsurer shall secure such Reinsurance Obligations, within thirty (30) days after the receipt of Everspan's written request regarding the Quota Share of the Reinsurance Obligations under this Reinsurance Agreement (but not later than the end of the applicable calendar) by either:

        A.   Clean, irrevocable, and unconditional evergreen letter(s) of credit issued and confirmed, if confirmation is required by the applicable insurance regulatory authorities, by a qualified United States financial institution as defined under the applicable Laws of Everspan's domiciliary state and acceptable to Everspan and to insurance regulatory authorities;

        B.   A trust account meeting at least the standards of New York's Insurance Regulation 114 and the applicable Laws of Everspan's domiciliary state; or

        C.   Cash advances or funds withheld or a combination of both, which will be under the exclusive control of Everspan ("***Funds Deposit***").

      11.3   <u>Reinsurance Obligations</u>.

11

11.3.1 The "**_Reinsurance Obligations_**" referred to herein means, subject to the preceding paragraphs, the then current (as of the end of each calendar quarter) sum of any the following, each as reasonably determined by Everspan or Everspan's designee(s):

    A.    reserves for losses reported and outstanding;

    B.    reserves for Losses Incurred but not reported;

    C.    reserves for Loss Adjustment Expenses including for those relating to Claims incurred but not yet reported;

    D.    unearned premiums;

    E.    losses, Loss Adjustment Expenses, and other amounts paid by Everspan but not recovered from Reinsurer; and

    F.    amount of return and refund premiums paid by Everspan but not recovered from Reinsurer.

11.3.2 Everspan, or its successors in interest, may draw, at any time and from time to time, upon the:

    A.    Established letter of credit (or subsequent cash deposit);

    B.    Established trust account (or subsequent cash deposit); or

    C.    Funds Deposit;

without diminution or restriction because of the insolvency of either Everspan or Reinsurer for one or more of the following purposes set forth below. For clarity, Everspan's "successors in interest" will include those by operation of law, including without limitation, any liquidator, rehabilitator, receiver, or conservator.

11.3.3 Draws shall be made to make payment to and reimburse Everspan for the Quota Share of any amounts paid by Everspan under the Policies and for which Reinsurer is responsible under this Reinsurance Agreement that is due to Everspan but unpaid by Reinsurer, including the Quota Share of premium refunds and returns; or to obtain a cash advance of the entire amount of the remaining balance under any letter of credit in the event that Everspan:

    A.    has received notice of non-renewal or expiration of the letter of credit or trust account;

    B.    has not received assurances satisfactory to Everspan of any required increase in the amount of the letter of credit or trust account, or its replacement or other continuation of the letter of credit or trust account at least thirty (30) days before its stated expiration date;

    C.    has been made aware that others may attempt to attach or otherwise place in jeopardy the security represented by the letter of credit or trust account; or

D.     has concluded that the trustee or issuing (or confirming) bank's financial condition is such that the value of the security represented by the letter of credit or trust account may be in jeopardy;

and under any of those circumstances set forth in (A) through (D) above, where the Reinsurance Obligations, or part thereof, under this Reinsurance Agreement remain un-liquidated and un-discharged at least thirty (30) days prior to the stated expiration date or at the time Everspan learns of the possible jeopardy to the security represented by the letter of credit or trust account.

11.3.4 If Everspan draws on the letter of credit or trust account to obtain a cash advance, Everspan will hold the amount of the cash advance so obtained in the name of Everspan in any qualified United States financial institution as defined under the Law of Everspan's domiciliary state in trust solely to secure the Reinsurance Obligations referred to above and for the use and purposes enumerated above and to return any balance thereof to Reinsurer:

A.     Upon the complete and final liquidation and discharge of all of the Reinsurance Obligations to Everspan under this Reinsurance Agreement; or

B.     In the event Reinsurer subsequently provides alternate or replacement security consistent with the terms hereof and acceptable to Everspan.

11.4    <u>Collateral Reporting and Settlement</u>.  Everspan will prepare and report quarterly to Reinsurer a statement for the purposes of this <u>Article XI</u>, showing the Reinsurance Obligations as set forth above.  If the Reinsurance Obligations so reported exceeds the then existing balance of the security provided, Reinsurer will, within fifteen (15) days of receipt of Everspan's statement, but never later than the end of the applicable calendar quarter, increase the amount of the letter of credit, (or subsequent cash deposit), trust account or Funds Deposit to the required amount of the Reinsurance Obligations set forth in Everspan's statement.  If the Reinsurance Obligations so reported are less than the then existing balance of the security provided, Everspan will release the excess thereof to Reinsurer upon Reinsurer's written request.  Reinsurer will not attempt to prevent Everspan from holding the cash advance or Funds Deposit so long as Everspan is acting in accordance with this Article.  Everspan shall pay interest earned on the deposited amounts to Reinsurer as the Parties shall have agreed at the time of the deposit.

11.5    <u>Asset Valuation</u>.  Any assets deposited to a trust account will be valued according to their current fair market value and will consist only of cash (U.S. legal tender), certificates of deposit issued by a qualified United States financial institution as defined under the Law of Everspan's domiciliary state and payable in cash and investments of the types no less conservative than those specified in Section 1404(a)(1), (2), (3), (8) and (10) of the New York Insurance Law and which are admitted assets under the Law of Everspan's domiciliary state.  Investments issued by the parent, subsidiary, or affiliate of either Everspan or Reinsurer will not be eligible investments.  All assets so deposited will be accompanied by all necessary assignments, endorsements in blank, or transfer of legal title to the trustee in order that Everspan may negotiate any such assets without the requirement of consent or signature from Reinsurer or any other entity.

11.6    <u>Account Settlement</u>.  All settlements of account between Everspan and Reinsurer will be made in cash or its equivalent.  All income earned and received by the amount held in an established trust account will be added to the principal.

13

## ARTICLE XII
## DISPUTE RESOLUTION

12.1     Any disputes or disagreements arising out of or relating to this Reinsurance Agreement (including its formation), the performance of the duties and obligations arising hereunder, or the business relationship between Everspan and the Reinsurer will be referred to an arbitration panel. Arbitration will be initiated by delivery of a written notice of demand for arbitration by a Party to the other Party. Such notice of demand will set out the reason for the request for arbitration.

12.2     The arbitration panel will consist of two (2) arbitrators and an umpire. The Party demanding arbitration will appoint one (1) arbitrator at the time of its demand and the Party receiving the demand will appoint one (1) arbitrator. The Party receiving the demand will appoint its arbitrator within thirty (30) days after receiving the demand; if it fails to do so, the Party that demanded arbitration may appoint both arbitrators. The two (2) arbitrators will then select an umpire. The arbitrators and umpire will each be active or retired executives of insurance or reinsurance companies and disinterested in the outcome of the arbitration. Should the two arbitrators fail to choose an umpire within thirty (30) days of the appointment of the second arbitrator, each arbitrator will propose eight (8) umpire candidates. Umpire candidates will complete disclosure statements, which must list any past or present relationship with the Parties or their counsel, direct or indirect, whether financial, professional, social, or of any other kind; the umpire ultimately selected must also disclose any such relationship that arises during the course of the arbitration. Of the eight (8) umpire candidates proposed by each arbitrator, the other will strike seven (7), and the decision from the remaining two (2) will be made by drawing lots, e.g., an odd or even digit in the Dow Jones Industrial Average for a particular day.

12.3     The arbitration hearing(s) will be held in the Borough of Manhattan in New York City, New York, unless otherwise mutually agreed. Each Party will submit its case to the arbitration panel within sixty (60) days of the appointment of the umpire or within such time as may be agreed by the Parties or directed by the arbitration panel.

12.4     The arbitration panel will have the power to determine all procedural rules for the arbitration, including discretionary power to make orders as to any matters which it may consider proper in the circumstances of the case with regard to pleadings, discovery, inspection of documents, examination of witnesses, and any other matter relating to the conduct of the arbitration. The arbitration panel may require pre-hearing security in its discretion. The arbitration panel may receive and act upon evidence, whether oral or written, strictly admissible or not, as it will in its discretion think fit. The arbitration panel will not be obliged to follow judicial formalities or the rules of evidence, may abstain from following the strict rules of law, and will make its decision giving due consideration to the custom and practice of the insurance and reinsurance business. The arbitration panel will not have the power to award punitive, exemplary, or treble damages. The arbitration panel will have the power to award reasonable attorneys' fees, including fees incurred in connection with the arbitration or any litigation commenced to stay or dismiss arbitration. The decision of the majority of the arbitration panel will be final and binding on all Parties. Judgment upon the award rendered may be entered in any court having jurisdiction.

14

12.5    Each Party will pay the fees and expenses of its own arbitrator. The Parties will divide equally the fees and expenses of the umpire and other expenses of the arbitration, unless such fees and expenses are otherwise allocated by the arbitration panel.

## ARTICLE XIII
## CONFIDENTIALITY AND DATA SECURITY

13.1    <u>Confidential Information</u>.  "***Confidential Information***" means all information, whether or not reduced to written or recorded form, which (A) pertains to Everspan or Reinsurer, any negotiations or business pertaining thereto, or any of the transactions either contemplates, including all financial, customer, and reinsurance information, and is not intended for general dissemination; (B) is confidential or proprietary in nature, was provided to the Party or its representatives by Everspan or Reinsurer, as applicable, and relates directly or indirectly to either Everspan or Reinsurer or the business of either; (C) pertains to confidential or proprietary information of Everspan or Reinsurer which has been labeled in writing as confidential or proprietary, or (D) qualifies as non-public personal information or personal health information that is protected under Law.  Confidential Information includes all information regarding applicants, policyholders, beneficiaries, and claimants (collectively, "***Customer Information***").  For clarity, information which: (A) is available, or becomes available, to the public through no fault or action by such Party, its agents, representatives or employees; or (B) becomes available on a non-confidential basis from any source other than Everspan or Reinsurer, as applicable, and such source is not prohibited from disclosing such information, shall not be deemed Confidential Information.

13.2    <u>Confidentiality</u>.

13.2.1 During the term of this Reinsurance Agreement, a Party ("***Disclosing Party***") may reveal to the Party ("***Receiving Party***") certain Confidential Information. Receiving Party agrees to use Confidential Information solely for the purpose of this Reinsurance Agreement and shall keep Confidential Information confidential and not disclose Confidential Information to others, except as expressly permitted by this Reinsurance Agreement.  Each Party shall each keep confidential and shall not disclose to others and shall use reasonable efforts to prevent its affiliates, successors, and assigns, employees and agents, if any, from disclosing to others, any Confidential Information other than to carry out the purposes set forth in this Reinsurance Agreement for which such Party disclosed such information.  The Parties acknowledge that it is not practical, and shall not be necessary, to mark such information as "confidential," nor to transfer it by confidential envelope or communication, in order to preserve the confidential nature of the information.

13.2.2 Receiving Party may disclose Confidential Information pursuant to the process of law and to its representatives who need to know Confidential Information solely for the purpose of Receiving Party's performance under this Reinsurance Agreement, provided that each representative shall be obligated to treat such Confidential Information in accordance with the terms of this Reinsurance Agreement as if such representative were the Receiving Party.  Receiving Party shall be responsible for any breach of this Reinsurance Agreement by its representatives.  Reinsurer may also disclose Confidential Information to its retrocessionaires, financial auditors, governing regulatory bodies, legal counsel, and arbitrator(s).

15

13.2.3 Confidential Information, and all copies thereof, shall remain at all times the property of the Everspan or Reinsurer, as applicable. Each Party will, upon request and at the cost of the Party owning the Confidential Information, promptly return and/or destroy any Confidential Information received from the other. However, to the extent Confidential Information exists on a Party's computer or electronic networks in any form or location that would be prohibitively time consuming or expensive to locate and destroy (i.e., back up tapes or off site electronic storage) or from which it cannot be destroyed due to regulatory or business recovery concerns, then, in such instances, the Confidential Information shall remain subject to confidential treatment and shall be destroyed or overwritten in that Party's ordinary course of business. Everspan and Reinsurer acknowledge and agree that Confidential Information is valuable information to Disclosing Party and unauthorized disclosure or use of Confidential Information by Receiving Party or its representatives may cause irreparable harm and damage to Disclosing Party, and in the event of any breach of the provisions of this Section 13.2, Disclosing Party shall be entitled to seek equitable relief, including injunctions and orders for specific performance, in addition to all other remedies available to it at law or in equity.

13.3    Data Security, Breach Reporting, and Mitigation.    Reinsurer hereby covenants to:

13.3.1 Implement and maintain adequate administrative, technical, and physical safeguards to protect against any anticipated threats or hazards to the security or integrity of Systems and Confidential Information and unauthorized access to or use of such information that could result in substantial harm or inconvenience to any consumer or policyholder, in compliance with Law;

13.3.2 Immediately give written notice to Everspan of any suspected or actual breach of any data or systems relating to its performance of this Reinsurance Agreement ("*Systems*"), including misuse or unauthorized disclosure of Confidential Information by a third party;

13.3.3 With respect to the Systems and Confidential Information, (A) use multi-factor authentication; and (B) encrypt data in transit and at rest unless alternative compensating controls are employed;

13.3.4 Immediately implement adequate measures to restore security when Confidential Information or the Systems are compromised, and provide assistance and information, at its sole cost, as Everspan may require in connection with such restoration as well as required notifications to relevant Regulators and affected individuals;

13.4    Disaster Recovery.    Reinsurer will implement a disaster recovery plan, maintain its Systems and records in accordance with such plan, and test such plan from time to time. Such disaster recovery plan will require an incremental system backup no less than daily, a full system backup no less than weekly, and a second full system backup no less than monthly. The daily backups will be maintained by Reinsurer for at least one week, the weekly backups will be maintained by Reinsurer for at least one month, and the monthly backups will be maintained by Reinsurer for at least one (1) year. The backups of the system will be maintained at an approved facility outside of Reinsurer's facility. In the event of damage to or malfunction of Reinsurer's computer hardware or software or loss of data, Reinsurer will use reasonable best efforts to obtain replacement computer hardware or software and recovery data to restore the services to an acceptable level as soon as possible.

13.5    <u>Disclosure to Subcontractors</u>.  Without prejudice to the generality of <u>Section 14.5</u>, when transferring or disclosing Customer Information to subcontractors in connection with meeting any obligations under this Reinsurance Agreement (a) Reinsurer shall not transfer any Customer Information from one country to another, except with the prior written consent of Everspan and in accordance with any additional terms required by applicable law and/or which Everspan may impose on the transfer and (b) Reinsurer shall require such subcontractors to enter into appropriate security and data protection terms, including confidentiality and privacy contract terms, and all such terms shall be consistent with this Reinsurance Agreement.

**ARTICLE XIV**
**MISCELLANEOUS**

14.1    <u>Notice</u>.  All written notices required under this Reinsurance Agreement will be deemed given when received by the other Party via a recognized mail or courier service, provided delivery receipt has been confirmed, at the address set forth below:

<table>
<tr><td>To Everspan:</td><td>Everspan Indemnity Insurance Company<br>One World Trade Center, Fl. 41<br>New York, NY 10007<br>Attention: General Counsel<br>legal@everspangroup.com</td></tr>
<tr><td>To Reinsurer:</td><td>General Reinsurance Corporation<br>120 Long Ridge Road<br>Stamford, CT 06902<br>Attention:  Regional-Specialty Treaty Manager<br>Robert.Jones@genre.com</td></tr>
</table>

All notices will also be provided, as courtesy, by e-mail to the individuals designated above.

14.2    <u>Entire Agreement</u>.  This Reinsurance Agreement embodies the entire agreement and understanding between the Parties with respect to the transactions contemplated hereby and supersedes all prior agreements and understandings, whether or not written, except for separate contracts expressly disclosed within this Reinsurance Agreement or in an exhibit incorporated by reference.

14.3    <u>Modifications</u>.  Except as specifically provided herein, this Reinsurance Agreement may not be modified, amended or supplemented, nor may any provision hereof be waived, except by written amendment signed by both Parties stating the effective date and extent of such amendment, modification, supplement or waiver.

14.4    <u>No Third-Party Beneficiaries</u>.  This Reinsurance Agreement is not intended to confer upon any person other than the Parties any rights or remedies hereunder.  Accordingly, nothing herein will in any manner create any obligations, establish any rights, or create any direct right of action against Reinsurer in favor of any third party, or other person not party to this Reinsurance Agreement; or create any privity of contract between the policyholder under any Policy and Reinsurer, except as expressly outlined herein.

14.5    No Assignment or Delegation; Use of Affiliates.    Other than as expressly provided for in this Reinsurance Agreement, a Party may not assign, delegate or otherwise transfer any of its rights or obligations under this Reinsurance Agreement whether by agreement, operation of applicable law or otherwise, without the express prior written consent of the other Party (which consent shall not be unreasonably withheld or delayed) and any purported assignment, delegation or transfer in violation of this provision shall be void and of no force or effect.

14.6    Authority. Each Party represents and warrants that it has the full right, power, legal capacity and authority to enter into and perform its obligations under this Reinsurance Agreement and that those obligations will be binding and enforceable without approval of any other person or entity.  Each person signing this Reinsurance Agreement on behalf of a Party represents and warrants that he or she has the full right, power, legal capacity and authority to sign this Reinsurance Agreement on behalf of that Party.

14.7    Offset.  Everspan or the Reinsurer may offset balances due from one Party to the other Party under this Reinsurance Agreement or any other contract between Everspan and the Reinsurer.

14.8    No Waiver.  The failure of either Party to enforce any provision of this Reinsurance Agreement or to assert a default or breach of any of the terms and conditions of this Reinsurance Agreement shall not be construed as a waiver of any of said terms and conditions, nor estop either that Party from thereafter demanding a full and complete compliance therewith.  The past waiver of a provision by either Party will not constitute a course of conduct or a waiver in the future as to that same provision.

14.9    Severability.  If any portion of this Reinsurance Agreement is found to be invalid or unenforceable, the remainder of this Reinsurance Agreement will remain in full force and effect.  Both Parties shall use best efforts to appropriately rewrite such illegal, invalid or unenforceable provision(s) in accordance with the original intent of such provision(s) and incorporate such rewritten provision(s) into the Reinsurance Agreement.

14.10    Governing Law.  The terms and conditions of this Reinsurance Agreement will be governed exclusively by New York law, without regard to conflicts of laws principles (other than Section 5-1401 and 5-1402 of the New York General Obligations Law which shall apply).  However, with respect to credit for reinsurance, the rules of all applicable states shall apply.

14.11    Waiver of Certain Defenses.  EACH PARTY WAIVES ITS RIGHT TO ASSERT A DEFENSE BASED ON THE STATUTE OF LIMITATIONS, LACHES, OR ANY THEORY THAT THE AGGRIEVED PARTY'S CLAIM IS TIME BARRED.  Notwithstanding the foregoing, the Reinsurer reserves the right to assert a defense based on late notice in the event that the Reinsurer is materially prejudiced by the failure of Everspan to provide prompt notice of a claim in accordance with the terms of this Reinsurance Agreement.

14.12    Counterparts.  This Reinsurance Agreement may be executed simultaneously in several counterparts, each of which will constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Reinsurance Agreement by scanned pages shall be effective as delivery of a manually executed counterpart to this Reinsurance Agreement.

18

14.13   Jointly Drafted.  This Reinsurance Agreement will be deemed to have been jointly drafted by the Parties and, in the event of a dispute, any perceived ambiguity will not be construed against either Party.

14.14   Interpretation.    The term "this Reinsurance Agreement" shall mean this Reinsurance Agreement together with the Schedules and exhibits hereto, as the same may from time to time be amended, modified, supplemented or restated in accordance with the terms hereof. Any collective defined term and any defined term used in the plural will be taken to encompass individually and collectively all members of the relevant class.  Any defined term used in the singular preceded by "any" will be taken to indicate any number of the members of the relevant class.  Any defined term used in the singular and preceded by the word "each" will indicate all members of the relevant class, individually.  The use of the word "include" (and all derivations therefrom) in this Reinsurance Agreement is illustrative and not restrictive; any list or example preceded by "include" or "including" is not necessarily exhaustive or complete.  Unless otherwise stated, the absence of "include" or "including" preceding (or otherwise qualifying) any list or example will mean that such list or example is restricted to the items listed.  All references to articles, sections, subsections, clauses, paragraphs, schedules, and exhibits mean such provisions of this Reinsurance Agreement, except where otherwise stated.  The use herein of the masculine, feminine, or neuter forms shall also denote the other forms, as in each case the context may require. The headings in this Reinsurance Agreement are for reference only and will not limit or otherwise affect the meaning or interpretation of this Reinsurance Agreement.  Unless otherwise stated, all timeframes in this Reinsurance Agreement refer to calendar days.  Deadlines falling on weekends or U.S. bank holidays are extended to the next business day.  References to "dollars" or "$" shall mean the lawful currency of the United States of America.

14.15   No Exclusivity.  This Reinsurance Agreement is not exclusive and Everspan may appoint, contract, or transact with other reinsurers, agents, or managing agents without limitation.

14.16   Definitions.  The following terms shall have the meanings defined in the Section indicated:

| | |
|---|---|
| "*Assessments*" | 4.1C |
| "*Claims Agreement*" | 4.2 |
| "*Confidential Information*" | 13.1 |
| "*Contract Year*" | 3.1 |
| "*Covered Liabilities*" | 1.1 |
| "*Crediting Rate*" | 7.3 |
| "*Customer Information*" | 13.1 |
| "*Disclosing Party*" | 13.2.1 |
| "*Effective Date*" | Preamble |
| "*Everspan*" | Preamble |
| "*Extra Contractual Obligations*" | 5.2A |
| "*Funds Deposit*" | 11.2C |
| "*Law*" | 3.3 |
| "*Loss Adjustment Expenses*" | 4.1B |
| "*Loss in Excess of Policy Limits*" | 5.2B |
| "*Monthly Report*" | 7.1.1 |
| "*Monthly Settlement Amount*" | 7.1.2 |

"*Net Premium*" ............................................................... 6.1

"*Party*" or "*Parties*" ...................................................... Preamble

"*Policies*" ....................................................................... 1.1

"*Program Administrator*" .............................................. 1.1

"*Program Agreement*" .................................................... 1.1

"*Provisional Commission*" .............................................. 6.2

"*Provisional Notice*" ...................................................... 3.2.2.A

"*Monthly Report*" ........................................................... 7.1.1

"*Monthly Settlement Amount*" ......................................... 7.1.2

"*Quota Share*" ................................................................ 1.1

"*Receiving Party*" ........................................................... 13.2.1

"*Regulator*" .................................................................... 3.2.2B(ii)

"*Reinsurance Agreement*" ............................................... Preamble

"*Reinsurance Obligations*" ............................................. 11.3

"*Reinsurer*" .................................................................... Preamble

"*Renewal Date*" ............................................................. 3.1

"*Systems*" ...................................................................... 13.3.2

"*Termination Notice*" .................................................... 3.2.2.A**Error! Reference source not found.**

"*TPA*" ............................................................................ 4.1A

[SIGNATURE BLOCK ON FOLLOWING PAGE]

**IN WITNESS WHEREOF**, Everspan agrees to be bound by the terms and conditions of this Reinsurance Agreement and has executed this Reinsurance Agreement by its duly authorized representative on this the 29th day of _____June_____, in the year 2021.

By: _____

EVERSPAN INDEMNITY INSURANCE COMPANY

[Signature Page to Quota Share Reinsurance Agreement]

## NUCLEAR, BIOLOGICAL, CHEMICAL AND RADIOLOGICAL EXCLUSION CLAUSE

Loss, damage, liability or expense directly or indirectly caused by or contributed to by, or arising from:

1) ionising radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel;
2) the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof;
3) any weapon or device employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter;
4) the radioactive, toxic, explosive or other hazardous or contaminating properties of any radioactive matter. The exclusion in this sub-clause does not extend to radioactive isotopes, other than nuclear fuel, when such isotopes are being prepared,  carried, stored, or used for commercial, agricultural, medical, scientific or other similar peaceful purposes;
5) any chemical, biological, bio-chemical, or electromagnetic weapon.

However, the parties to this Agreement mutually agree that loss, damage, cost or expense caused by chemicals that are contained in a weapon or device solely to effect an explosion (as opposed to those intended to cause contamination) are not excluded hereunder. "Device" as used herein shall mean an object whose sole purpose is to cause harm or destruction.

## <u>SANCTION LIMITATION AND EXCLUSION CLAUSE</u>

No (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America.

15/09/10
LMA3100

## ASBESTOS EXCLUSION CLAUSE

This Policy does not cover any claims of any kind whatsoever directly or indirectly relating to, arising out of or in consequence of:

1) the actual, alleged or threatened presence of asbestos in any form whatsoever, or any material or product containing, or alleged to contain, asbestos; or

2) any obligation, request, demand, order, or statutory or regulatory requirement that any Insured or others test for, monitor, clean up, remove, contain, treat, neutralize, protect against or in any other way respond to the actual, alleged or threatened presence of asbestos or any material or product containing, or alleged to contain, asbestos.


However, this exclusion shall not apply to any claim caused by or resulting in a crash fire explosion or collision or a recorded in-flight emergency causing abnormal aircraft operation.

Notwithstanding any other provisions of this Policy, Insurers will have no duty to investigate, defend or pay defence costs in respect of any claim excluded in whole or in part under paragraphs (1) or (2) hereof.

LSW 2488 AGM 00003

## COMMUNICABLE DISEASE EXCLUSION

(For use on liability policies)

1.  Notwithstanding any provision to the contrary within this policy, this policy does not cover all actual or alleged loss, liability, damage, compensation, injury, sickness, disease, death, medical payment, defence cost, cost, expense or any other amount, directly or indirectly and regardless of any other cause contributing concurrently or in any sequence, originating from, caused by, arising out of, contributed to by, resulting from, or otherwise in connection with a Communicable Disease or the fear or threat (whether actual or perceived) of a Communicable Disease.

2.  For the purposes of this endorsement, loss, liability, damage, compensation, injury, sickness, disease, death, medical payment, defence cost, cost, expense or any other amount, includes, but is not limited to, any cost to clean-up, detoxify, remove, monitor or test for a Communicable Disease.

3.  As used herein, a Communicable Disease means any disease which can be transmitted by means of any substance or agent from any organism to another organism where:

    3.1.  the substance or agent includes, but is not limited to, a virus, bacterium, parasite or other organism or any variation thereof, whether deemed living or not, and

    3.2.  the method of transmission, whether direct or indirect, includes but is not limited to, airborne transmission, bodily fluid transmission, transmission from or to any surface or object, solid, liquid or gas or between organisms, and

    3.3.  the disease, substance or agent can cause or threaten bodily injury, illness, emotional distress, damage to human health, human welfare or property damage.

LMA5396

17  April 2020

# WAR AND TERRORISM EXCLUSION ENDORSEMENT

Notwithstanding any provision to the contrary within this Reinsurance contract or any endorsement thereto it is agreed that this Reinsurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss;

1) war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

2) any act of terrorism. For the purpose of this endorsement an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to 1 and/or 2 above.

If the Reinsurers allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Company.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

08/10/01 NMA2918

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

**EXHIBIT B**

**Parental Guaranty**

DocuSign Envelope ID: 6D0294E4-2064-4D0C-B4E8-B08C166AF2DB

## PARENTAL GUARANTY

**THIS PARENTAL GUARANTY** (the "*Guaranty*") dated as of May 1, 2021 by Venbrook Group, LLC ("*Guarantor*"), is made in favor of **Everspan Indemnity Insurance Company** ("*Everspan*").

**WHEREAS**, Cardigan General Insurance Services, LLC ("*Program Administrator*") and Everspan entered into a Program Administrator Agreement (the "*Program Agreement*") dated May 1, 2021;

**WHEREAS**, Program Administrator is a wholly-owned subsidiary of Guarantor; and

**WHEREAS**, Guarantor acknowledges that it will derive indirect benefit under the Program Agreement, and accordingly, desires to enter into this Guaranty.

**NOW THEREFORE**, in consideration of the promises and mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Guarantor, intending to be legally bound, agrees as follows:

**SECTION 1.** __Definitions__

Capitalized terms used and not defined herein shall have the meanings assigned to such terms in the Program Agreement.

**SECTION 2.** __Guarantee__

Guarantor guarantees the performance of the terms, conditions, and obligations of the Program Administrator under the Program Agreement including all amounts due and owing to Everspan under the Program Agreement and unconditionally guarantees to Everspan the full and prompt payment of Funds, as defined in the Program Agreement, when due to Everspan under the Program Agreement.

To the fullest extent permitted by applicable law, Guarantor waives demand upon or payment from the Program Administrator as a condition to performance of Guarantor's obligations hereunder. The obligations of Guarantor shall not be affected by (i) the election or failure of Everspan to assert or not assert any claim or to make or not make demand against the Program Administrator, (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, this Guaranty, the Program Agreement or any other agreement. Guarantor hereby also waives notice of any accommodations made or extended to the Program Administrator, notice of any adverse change in the financial condition of the Program Administrator or of any other fact that might increase Guarantor's risk hereunder or the dollar amount of Guarantor's liability.

**SECTION 3.** __Payment__

Guarantor's liability hereunder shall be immediate and shall not be contingent upon the exercise or enforcement of any lien, security interest, or realization upon any security or collateral Everspan may at any time possess. Any release which may be given by Everspan to the Program Administrator shall not release Guarantor from Guarantor's obligations and liabilities hereunder.

DocuSign Envelope ID: 6D0294E4-2064-4D0C-B4E8-B08C166AF2DB

**SECTION 4.    Performance**

Guarantor hereby unconditionally and irrevocably guarantees the performance of the terms, conditions, and obligations of the Program Administrator under the Program Agreement.  If performing any of the terms, conditions, and obligations of the Program Administrator under the Program Agreement requires an insurance, producer, or other license (a "License," with such obligations referred to herein as "Licensed Obligations"), then Guarantor may fulfill its obligation hereunder by, in any event at its sole cost, immediately following any default by Program Administrator (i) compelling an affiliate with the appropriate License(s) to perform the Licensed Obligations; or (ii) engaging a third party with the appropriate License(s) acceptable to Everspan to perform the Licensed Obligations.

**SECTION 5.    Application of Payments**

All payments to be made hereunder by Guarantor shall be made in lawful money of the United States of America at the time of payment, shall be made in immediately available funds, and shall be made without deduction (whether for taxes or otherwise) or offset.  All payments made by Guarantor hereunder shall be applied as follows: first, to all costs and expenses (including, but not limited to, reasonable attorneys' fees, expenses and court costs) incurred by Everspan in enforcing this Guaranty or in collecting hereunder and second, to any principal amounts owed under this Guaranty.

**SECTION 6.    No Discharge or Diminishment of Guaranty**

The obligations of the Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, other than the payment in full in cash of any and all obligations and amounts owed to Everspan under the Program Agreement, which are hereby guaranteed and shall not be subject to any defense or setoff by Guarantor.

**SECTION 7.    Information**

Guarantor assumes all responsibility for being and keeping itself informed of the Program Administrator's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of any and all amounts owed under the Program Agreement hereby guaranteed. Everspan will not have any duty to advise Guarantor of any information known to Everspan regarding the Program Administrator.

**SECTION 8.    Representations and Warranties**

This Guaranty is a legal, valid and binding obligation of Guarantor and is enforceable against Guarantor in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the enforcement of creditors' rights generally.  There are no actions, suits or proceedings pending or to the best of Guarantor's knowledge threatened against Guarantor before any court or any governmental or regulatory authority that will materially adversely affect performance by Guarantor as contemplated by the terms and provisions of this Guaranty.  Guarantor is currently informed of the financial condition of the Program Administrator and of all other circumstances which a diligent inquiry would reveal and which would bear upon the risk of nonpayment of any and all amounts hereby guaranteed.

2

DocuSign Envelope ID: 6D0294E4-2064-4D0C-B4E8-B08C166AF2DB

SECTION 9.    <u>Assignment</u>

Whenever in this Guaranty any of the parties hereto is referred to, such reference shall be deemed to include the successors and permitted assigns of such party; and all covenants, promises and agreements by or on behalf of the Guarantor that are contained in this Guaranty shall bind and inure to the benefit of Everspan and any respective successors or assigns of Everspan.  Guarantor shall have no right to assign its rights or obligations hereunder or any interest herein except by written consent of Everspan, which shall not unreasonably withheld, conditioned, or delayed.

SECTION 10.    <u>Waivers; Amendment</u>

(a)    No failure or delay of Everspan of any kind in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of Everspan hereunder and under the Program Agreement are cumulative and are not exclusive of any rights or remedies that it would otherwise have.  No waiver of any provision of this Guaranty or consent to any departure by Guarantor therefrom shall in any event be effective unless the same shall be permitted by subsection (b) below, and then such waiver and consent shall be effective only in the specific instance and for the purpose for which given.  No notice or demand on any Guarantor in any case shall entitle Guarantor to any other or further notice in similar or other circumstances.

(b)    Neither this Guaranty nor any provision hereof may be waived, amended or modified except pursuant to a written agreement entered into between (i) Everspan and (ii) the Guarantor.

SECTION 11.    <u>Governing Law</u>

THIS GUARANTY SHALL BE CONSTRUED IN ALL RESPECTS IN ACCORDANCE WITH, AND ENFORCED AND GOVERNED BY, THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THAT WOULD REQUIRE THE APPLICATION OF ANY OTHER LAWS.

SECTION 12.    <u>Severability</u>

In the event one or more of the provisions contained in this Guaranty or in the Program Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired.

SECTION 13.    <u>Counterparts</u>

This Guaranty may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed signature page to this Guaranty by electronic transmission shall be as effective as delivery of a manually executed counterpart of this Guaranty.

DocuSign Envelope ID: 6D0294E4-2064-4D0C-B4E8-B08C166AF2DB

**SECTION 14.  Enforcement**

(a)    GUARANTOR HEREBY CONSENTS TO THE JURISDICTION OF AND AGREES THAT ANY LEGAL ACTION OR PROCEEDING BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS GUARANTY SHALL BE BROUGHT AND MAINTAINED EXCLUSIVELY IN THE COURTS OF THE STATE OF NEW YORK, NEW YORK COUNTY, OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND APPELLATE COURTS THEREOF. NOTHING IN THIS GUARANTY SHALL BE DEEMED OR OPERATE TO PRECLUDE EVERSPAN FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION.

(b)    EVERSPAN SHALL BE ENTITLED TO ALL ATTORNEY'S FEES AND COSTS RELATED TO COLLECTION OF ANY AND ALL AMOUNTS GUARANTEED HEREUNDER IN THE EVENT THAT EVERSPAN INITIATES LEGAL PROCEEDINGS TO ENFORCE THIS AGREEMENT INCLUDING, BUT NOT LIMITED TO, ANY PROCEEDING TO ENFORCE GUARANTOR'S OBLIGATION TO POST CASH COLLATERAL.

(c)    GUARANTOR SHALL BE ENTITLED TO ALL ATTORNEY'S FEES AND COSTS IN THE EVENT THAT GUARANTOR HAS TO DEFEND LEGAL PROCEEDINGS PURSUANT TO THIS AGREEMENT AND IS DECLARED THE PREVAILING PARTY IN SUCH LEGAL PROCEEDINGS, AS DETERMINED BY THE TRIER OF FACT SUBJECT TO EVERSPAN EXHAUSTING ANY RIGHTS TO APPEAL.

**SECTION 15.  WAIVER OF JURY TRIAL**

**EACH PARTY HERETO IRREVOCABLY AND KNOWINGLY WAIVES (TO THE FULLEST EXTENT PERMITTED BY LAW) ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING (INCLUDING, WITHOUT LIMITATION, ANY COUNTERCLAIM) ARISING OUT OF THIS GUARANTY, THE PROGRAM AGREEMENT OR ANY OTHER AGREEMENTS OR TRANSACTIONS RELATED THERETO. EACH PARTY AGREES THAT ANY ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT A JURY.**

**SECTION 16.  Review by Guarantor**

Guarantor acknowledges that Guarantor has thoroughly read and reviewed the terms and provisions of this Guaranty, and that such terms and provisions are clearly understood by Guarantor and have been fully and unconditionally consented to by Guarantor with the full benefit and advice of counsel chosen by Guarantor.

[SIGNATURE BLOCK ON NEXT PAGE]

DocuSign Envelope ID: 6D0294E4-2064-4D0C-B4E8-B08C166AF2DB

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Guaranty as of the day and year first above written.

**GUARANTOR:**

Venbrook Group, LLC

By: _Sonia Anuja_

Name: _Sonia Anuja_

Date: _4/30/2021_

Title: _Chief Operating Officer_

5

JUDGE VARGAS

25 CV 10463

# EXHIBIT 2

**INTERESTS AND LIABILITIES AGREEMENT**
**Master No. 75813 / Treaty ID 5019915**

between

**EVERSPAN INDEMNITY INSURANCE COMPANY**
(herein referred to as the "Company")

and

**GENERAL REINSURANCE CORPORATION**
a Delaware corporation
having its principal offices at
120 Long Ridge Road
Stamford, Connecticut  06902
(herein referred to as the "Subscribing Reinsurer")

The Subscribing Reinsurer agrees to assume a 20% share of the liability under the Quota Share Agreement of Reinsurance, effective May 1, 2021, attached hereto.

As consideration, the Subscribing Reinsurer shall receive an identical share of the premiums named therein.

The share of the Subscribing Reinsurer shall be separate and apart from the shares of the other reinsurers, and the Subscribing Reinsurer shall in no event participate in the Interests and Liabilities of the other reinsurers.

**IN WITNESS WHEREOF**, the parties hereto have caused this Interests and Liabilities Agreement to be executed in duplicate, through their duly authorized representatives,

**EVERSPAN INDEMNITY INSURANCE COMPANY**

this ___28th___ day of _____June_____, 2021,
<em>DATE SIGNED BY EVERSPAN</em>

_Steven K. Dresner_
_____
*EVERSPAN OFFICER SIGNATURE*

Steven K. Dresner
_____
*PRINTED EVERSPAN OFFICER NAME*

CUO
_____
*EVERSPAN OFFICER TITLE*

_____
*EVERSPAN WITNESS SIGNATURE*

**GENERAL REINSURANCE CORPORATION**

and this <u>28th</u> day of <u>    June                </u>, 2021,

<i>DATE SIGNED BY GRC</i>

_____
<i>GRC OFFICER SIGNATURE</i>

_____
Michael Vagnone<br><i>PRINTED GRC OFFICER NAME</i>

_____
Senior Vice President<br><i>GRC OFFICER TITLE</i>

_____
<i>GRC WITNESS SIGNATURE</i>

<b>Agreement Master No. 75813 / Treaty ID 5019915</b>

## QUOTA SHARE REINSURANCE AGREEMENT

This QUOTA SHARE REINSURANCE AGREEMENT (this "***Reinsurance Agreement***") is effective **May 1, 2021** (the "***Effective Date***") and is made by and between the subscribing reinsurers executing the Interests and Liabilities Agreement(s) attached hereto (the "***Reinsurer***") and **Everspan Indemnity Insurance Company** ("***Everspan***"). Everspan and Reinsurer will be referred to each as a "***Party***" and, collectively, the "***Parties***."

## ARTICLE I
## BUSINESS REINSURED

1.1    <u>Subject Business</u>.  From and after the Effective Date, Everspan shall cede to Reinsurer, and Reinsurer shall accept, Reinsurer's quota share (the "***Quota Share***") of Everspan's gross liability ("***Covered Liabilities***") associated with all policies, certificates, contracts, binders, agreements, insurance bonds, or other proposals or evidences of insurance, new or renewal on or after May 1, 2021, classified by Everspan as Commercial Automobile Liability and produced, quoted, underwritten, bound, processed, issued, serviced, or managed by Program Administrator for or on behalf of Everspan pursuant to the Program Administrator Agreement, effective **May 1, 2021** (as may be amended, supplemented or otherwise modified, the "***Program Agreement***"), by and between Everspan, on one hand, and Cardigan General Insurance Services, LLC, on the other hand ("***Program Administrator***"), a copy of which is attached hereto as <u>Exhibit A</u> ("***Policies***"). Everspan shall not amend Schedule A (Authorized Business) to the Program Agreement without Reinsurer's prior consent.

1.2    <u>Exclusions.</u>    This Reinsurance Agreement does not apply to and specifically excludes:

        A.    Reinsurance assumed by Everspan other than reinsurance of primary business assumed from affiliated companies;

        B.    The risks described in the following clauses and endorsements, which are attached to and form part of this Reinsurance Agreement:

            (i) NUCLEAR, BIOLOGICAL, CHEMICAL AND RADIOLOGICAL EXCLUSION CLAUSE

            (ii) SANCTION LIMITATION AND EXCLUSION CLAUSE

            (iii) ASBESTOS EXCLUSION CLAUSE

            (iv) COMMUNICABLE DISEASE EXCLUSION

            (v) WAR AND TERRORISM EXCLUSION ENDORSEMENT

Notwithstanding the foregoing, (A) should any judicial, regulatory or legislative entity having legal jurisdiction invalidate any exclusion, whether on an underlying Policy or with respect to the clauses and endorsements referenced in exclusion B.(iii) or B.(iv) of this <u>Section 1.2</u>, any amount of loss for which Everspan is liable because of such invalidation will not be excluded hereunder; and (B) should Everspan, by reason of an inadvertent act, error or omission, be bound to afford coverage excluded under exclusions A., B.(iii) or B.(iv) of this <u>Section 1.2</u> or should an existing

insured extend its operations to include coverage excluded under exclusions A., B.(iii), or B.(iv). of this <u>Section 1.2</u>, the Reinsurer shall waive the application of any such applicable exclusion(s).

**ARTICLE II**
**ORIGINAL CONDITIONS**

Reinsurer's liability shall attach as of the Effective Date and commence obligatorily and simultaneously with that of Everspan under the Policies. Subject to the terms and conditions of this Reinsurance Agreement, all reinsurance for which Reinsurer shall be liable by virtue of this Reinsurance Agreement shall be subject, in all respects, to the same rates, terms, conditions, interpretations, assessments, waivers, and premium adjustments, and to the same modifications, alterations, and cancellations applicable or deemed applicable to the Policies, as the Covered Liabilities, the true intent of this Reinsurance Agreement being that Reinsurer will, in every case to which this Reinsurance Agreement applies, follow Everspan's fortunes.

**ARTICLE III**
**TERM, TERMINATION, AND RUNOFF**

3.1    <u>Term</u>.  Following the Effective Date, this Reinsurance Agreement will remain continuously in force for consecutive annual terms (each a "***Contract Year***") unless terminated according to the provisions set forth in this <u>ARTICLE III</u>. The Contract Year ends at 12:00:01 AM Eastern Time on May 1, 2022 and each subsequent Contract Year ends at 12:00:01 AM Eastern Time on each May 1st thereafter (each a "***Renewal Date***").

3.2    <u>Termination</u>.

3.2.1 This Reinsurance Agreement may be terminated by mutual written agreement of the Parties at any time.

3.2.2 This Reinsurance Agreement may be terminated as follows, with notice of such termination to be sent by the terminating Party to the other Party, with a copy to the Program Administrator, by a recognized overnight courier service, tracking and return receipt requested:

A.    By either Party, effective as of a Renewal Date, by providing written notice to the other Party no less than ninety (90) days prior to such Renewal Date (a "***Termination Notice***"). Alternatively, a Party may provide a provisional notice of termination (a "***Provisional Notice***") by providing written notice to the other Party no less than ninety (90) days prior to any Renewal Date. If the Provisional Notice is not withdrawn before thirty (30) days prior to the Renewal Date, then the effective date of the termination shall be ninety

2

(90) days following the next Renewal Date (in which case, the final Calendar Year will be extended by such 90-day period).

B.    By Everspan immediately if:

(i)    The Program Agreement is terminated or Everspan has grounds to so terminate the Program Agreement;

(ii)    A state insurance department or other legal authority (a "*Regulator*") orders Reinsurer to cease writing business, or Reinsurer is placed under supervision by a Regulator or any material license of Reinsurer is suspended, terminated, modified, limited, cancelled, revoked, not renewed or impaired by a Regulator;

(iii)    Reinsurer has become insolvent or has been placed into liquidation or receivership (whether voluntary or involuntary), or there have been instituted against it proceedings for the appointment of a receiver, liquidator, rehabilitator, conservator, trustee in bankruptcy, or other agent known by whatever name, to take possession of its assets or control of its operations;

(iv)    Reinsurer has merged with or has become acquired or controlled by any entity(ies) not controlling Reinsurer's operations at the inception of this Reinsurance Agreement;

(v)    Reinsurer has retroceded its entire liability under this Reinsurance Agreement without the Everspan's prior written consent;

(vi)    Reinsurer has been assigned an A.M. Best's rating of less than "A-" and/or an S&P rating of less than "BBB+";

(vii)    Reinsurer fails to make any undisputed payment under this Reinsurance Agreement when due, and fails remit the overdue payment within forty-five (45) days of the relevant due date;

(viii)    Reinsurer fails to secure its obligations or provide collaterals as required under this Reinsurance Agreement; or

(ix)    Reinsurer breaches any of its obligations under this Reinsurance Agreement in any material respect and Reinsurer fails to cure such breach within thirty (30) days after it becomes aware of or receives notice of such breach; provided, however, that a repeated breach after such notice and cure involving the same or substantially similar actions or conduct, shall be grounds for termination without the opportunity to cure.

3.3    <u>Consequences of Termination</u>.  Subject to 3.4 below, in the event of termination of this Reinsurance Agreement for any reason, (A) reinsurance hereunder shall continue to apply to the Policies in force at the time and date of termination until expiration, termination or cancellation of such Policies (it is understood that any Policies with effective dates prior to the termination date but issued, renewed, rewritten, or extended after or beyond the termination date are covered under

3

this Reinsurance Agreement), (B) reinsurance hereunder shall continue if the Company is required by law, regulation, judgment, injunction, governmental orders or decrees (collectively, "*Laws*") to continue coverage, including by issuing renewals on any such Policies, until the Company compliantly cancels or non-renews the relevant Policies and all obligations under such Policies are satisfied, (C) Reinsurer shall not be relieved of or released from any obligation created by or under this Reinsurance Agreement in relation to payment, expenses, reports, accounting or handling, which relate to the Policies (or its ongoing obligations hereunder including with respect to adjustments made to the Ceding Commission in accordance with Section 6.4), and (D) Reinsurer shall cooperate with Everspan and the Program Administrator in the handling or management of all such run-off Policies until all obligations under Policies are fully and finally satisfied, and all outstanding losses and Loss Adjustment Expenses have been settled.

      3.4    <u>Basis for Termination</u>.  Termination of this Reinsurance Agreement will, by default, be on a run-off basis; <u>provided</u>, however, that Everspan and the Reinsurer may mutually elect in writing to terminate this Reinsurance Agreement on a cut-off basis.  If Everspan and the Reinsurer so elect, (A) Reinsurer will pay to Everspan (or its designee) an amount equal to the sum of the ceded outstanding unearned statutory premium as of the date of termination; and (B) Reinsurer will incur no liability with respect to claims on Policies incurred after the date of termination.  Reinsurer will, however, remain liable for all other obligations hereunder.

**ARTICLE IV**
**REINSURER LIABILITIES**

      4.1    <u>Loss</u>.  Reinsurer shall assume and be liable for the Quota Share of the Covered Liabilities, such Covered Liabilities defined as:

      A.    all loss settlements and payments made by Everspan, Program Administrator, or Everspan's designated third-party claims administrator (the "*TPA*"), whether under the terms of the Policies, by way of compromise, or made due to an order or instruction by a court, panel, or Regulator;

      B.    all costs, expenses, and fees (including attorney's fees) incurred in connection with investigating, appraising, adjusting, litigating, defending, appealing, settling, or contesting the validity of claims or losses associated in any manner with the Policies (including, without limitation, interest on judgments, expenses of outside adjusters, declaratory judgment expenses not to exceed $1,000,000 in any one accident, or other legal expenses and costs incurred in connection with coverage questions and legal actions connected thereto, and costs of supersedeas and appeal bonds) (the "*Loss Adjustment Expenses*"), it being understood and agreed that fees paid by Everspan to, and retained by, the TPA as outlined in the Claims Agreement solely as respects the TPA's unallocated loss adjustment expenses (not to exceed 3.0% of the gross premium written by the Program Administrator during any one Contract Year) are Loss Adjustment Expenses hereunder;

      C.    all assessments levied by a Regulator related to the Policies or connected to the business reinsured hereunder, which are assessed based on the premium

4

written and subject to this Reinsurance Agreement, whether incurred before or after termination of this Reinsurance Agreement, including those due pursuant to Laws creating obligatory or guaranty funds, pools, joint underwriting associations, FAIR plans, and similar plans; as well as any special assessments levied by a Regulator, including those following a catastrophic event ("***Assessments***"); and

D.    Extra Contractual Obligations and Loss in Excess of Policy Limits.

4.2    TPA.  Everspan will designate and appoint Program Administrator or a TPA to accept notice of, investigate, adjust, settle, pay, resist or compromise any claim arising under any Policy provided, however, that Everspan reserves the right to unilaterally direct any specific action or inaction with respect to any individual claim.  Subject to the terms and conditions of this Reinsurance Agreement, all loss settlements made by or on behalf of Everspan shall be unconditionally binding upon Reinsurer and Reinsurer shall benefit proportionately in all salvage and recoveries.  Any TPA engaged will execute a claims administration contract (each a "***Claims Agreement***"), the initial Claims Agreement is attached to this Reinsurance Agreement as Exhibit B hereto.

4.3    Claims.  Everspan's good faith determination shall govern:

A.    What constitutes a claim, loss, or occurrence covered under any Policy;

B.    Everspan's liability thereunder; and

C.    The amount or amounts Everspan shall pay thereunder.

4.4    Claims Cooperation.  When so requested in writing Everspan shall afford the Reinsurer or its representatives an opportunity to be associated with Everspan, at the expense of the Reinsurer, in the defense of any claim, suit or proceeding involving this reinsurance, and Everspan and the Reinsurer shall cooperate in every respect in the defense of such claim, suit or proceeding.

**ARTICLE V**
**EXTRA CONTRACTUAL OBLIGATIONS AND LOSS IN EXCESS OF POLICY LIMITS**

5.1    Extra Contractual Obligations and any Loss in Excess of Policy Limits.  Included in Reinsurer's obligations under this Reinsurance Agreement are the Quota Share of any Extra Contractual Obligations and any Loss in Excess of Policy Limits.  Any Extra Contractual Obligation or Loss in Excess of Policy Limits shall be deemed to have occurred on the same date as the loss or alleged loss under the relevant Policy, and shall constitute part of the original loss.

5.2    For purposes of this Reinsurance Agreement:

A.    "***Extra Contractual Obligations***" means any liabilities, expenses or other obligations arising out of or relating to the Policies, exclusive of Loss in Excess of Policy Limits and liabilities, expenses or other obligations arising under the express terms and conditions of the Policies, including any liability for fines, penalties, forfeitures, punitive, special, exemplary or

5

other form of extra-contractual damages, which liabilities or obligations arise from any act, error or omission, whether or not intentional, negligent, in bad faith or otherwise relating to: (i) the investigation, defense, trial, settlement or handling of claims, benefits or payments under the Policies; (ii) the failure to pay, the delay in payment, or errors in calculating or administering the payment of benefits, claims or any other amounts due or alleged to be due under or in connection with the Policies, (iii failure by Everspan (or any entity involved with the handling of claims hereunder) to settle within the Policy limit, (iv) negligence or bad faith, including in rejecting an offer of settlement or in the preparation of the defense or in the trial of any action, or (v) in the preparation or prosecution of an appeal consequent upon such action.

B.  "*Loss in Excess of Policy Limits*" means any amount Everspan pays or is liable to pay in excess of the Policy limit, having been incurred because of, but not limited to, failure by Everspan to settle within the Policy limit or by reason of alleged or actual negligence, fraud or bad faith in rejecting an offer of settlement or in the preparation of the defense or in the trial of any action against its insured or reinsured or in the preparation or prosecution of an appeal consequent upon such action.

5.3    Exception.  This Article will not apply where an Extra Contractual Obligation or Loss in Excess of Policy Limits has been incurred due to the proven fraud of a member of Everspan's Board of Directors acting individually, collectively, or in collusion with any individual or entity involved in the presentation, defense, or settlement of any claim covered hereunder, and which has been finally determined by a court of competent jurisdiction, after the exhaustion of all appeals.

5.4    Liability Limitation.  Subject to all other provisions of this Agreement, the Reinsurer's maximum liability with respect to all Policies incepting during any one Contract Year for all Extra Contractual Obligation and Loss in Excess of Policy Limits combined shall be the Reinsurer's Quota Share of $5,000,000 ("ECO/XPL Cap").  Reinsurer's liability with respect to the ECO/XPL Cap shall be reduced by recoveries made by Everspan in connection with any liability associated with such Extra Contractual Obligation or Loss in Excess of Policy Limits, and Everspan shall use commercially reasonable efforts to pursue such recoveries, including with respect to (i) any errors and omissions policy(ies); (ii) any indemnification provided under the Program Agreement or the Claims Agreement; or (iii) the guarantee executed in connection with the Program Agreement.

**ARTICLE VI**
**PREMIUM, COMMISSION, TAXES AND ASSESSMENTS**

6.1    Premium.  In consideration of the acceptance by Reinsurer of the Quota Share of the Covered Liabilities, Everspan shall pay to Reinsurer the Quota Share of the gross premiums written or charged on the Policies reinsured hereunder actually collected from the policyholder *minus* any refunds or returns of premium to policyholders for any reason, in each case excluding any policy fees (if applicable) on the Policies ("*Net Premium*").  The Net Premium shall be reported and calculated in accordance with ARTICLE VII and subject to ARTICLE VIII.

6

6.2    Provisional Commission. Reinsurer will allow Everspan a ceding fee (the "***Provisional Commission***") equal to the Quota Share of twenty-five and sixth-tenths percent (**25.60%**) of all Net Premiums . Everspan shall allow return commission on return premiums at the same rates as the original premium.

6.3    [This Section Left Intentionally Blank]

6.4    Sliding Scale Commission. The Provisional Commission shall be adjusted for each Contract Year in accordance with the provisions set forth in this Section.

6.4.1    For purposes of this Section 6.4, the following definitions apply:

A.    "Loss Ratio" means the ratio of Losses Incurred to Premiums Earned.

B.    "Losses Incurred" means, with respect to Policies incepting during each Contract Year:

(i)    Ceded losses and Loss Adjustment Expenses paid as of the effective date of calculation; plus

(ii)    The ceded reserves for losses and Loss Adjustment Expenses outstanding as of the effective date of calculation; plus

(iii)    IBNR.

C.    "Premiums Earned" means the earned portion of the Net Premiums on Policies incepting during the Contract Year.

D.    "IBNR" means Everspan's determination of losses and Loss Adjustment Expenses incurred but not yet reported provided, however, that with respect to the period of months following the end of each Contact Year outlined in the table below, the IBNR shall not exceed the corresponding percentage for that Contract Year. The IBNR percentages are expressed as a ratio to the applicable premium base.

| | |
|---|---|
| 24 Months | 22.5% |
| 36 Months | 12.5% |
| 48 Months | 3.0% |

After 48 months following the end of each Contract Year, Everspan's determination of losses incurred but not yet reported with respect to the Contract Years will be utilized until Everspan determines that all obligations under Policies, including those that are not yet known, are fully and finally settled.

E.    "Contract Year" means the definition ascribed in Section 3.1 provided, however, that the Parties understand and agree that the final Contract Year may, due to circumstances including the timing of any extension or termination of this Reinsurance Agreement, be less or greater than 12-

7

months, and such modified period shall be used as the applicable period for the final Contract Year.

      6.4.2   The adjusted Provisional Commission for each Contract Year will be calculated as follows:

      A.     If the Loss Ratio is 59.5% or greater, the Provisional Commission for such Contract Year will be decreased by 1.0947% for every 1.0% of Loss Ratio above 59.5%, subject to a minimum adjusted Provisional Commission of 15.2%.

      B.     If the Loss Ratio is less than 59.5%, the Provisional Commission for such Contract Year will be increased by 0.4410% for every 1.0% of Loss Ratio less than 59.5%, subject to a maximum adjusted Provisional Commission of 34.2%.

      6.4.3   Everspan will calculate and report the Loss Ratio and any adjustments to the Provisional Commission in accordance with the provisions of this Section 6.4, for the first time with respect to each Contract Year, within sixty (60) days after the end of the period that is 24-months following the last day of each Contract Year, and then annually thereafter (with remittances made following the end of each 12-month period in accordance with ARTICLE VII) until Everspan determines that all obligations under Policies incepting during (including renewals) to such Contract Year, including those that are not yet known, are fully and finally settled.

      6.4.4   Any amounts due to the Reinsurer as respects any adjusted Provisional Commission shall be paid by Everspan at the next monthly remittance in accordance with ARTICLE VII after the determination is made in accordance with Section 6.4.3 subject to ARTICLE VIII.

      6.4.5   Any amounts due to Everspan as respects any adjusted Provisional Commission shall be paid by the Reinsurer at the next monthly remittance in accordance with ARTICLE VII, subject to ARTICLE VIII.

**ARTICLE VII**
**REPORTING AND SETTLEMENT**

7.1    Monthly Report.

      7.1.1   Everspan will furnish or cause to be furnished to Reinsurer, within thirty (30) days following the end of each month, a monthly reinsurance settlement report (the **"Monthly Report"**) that shall set forth the Monthly Settlement Amount and each component thereof.

      7.1.2   The **"Monthly Settlement Amount"** shall be an amount equal to A *minus* B, where:

      A.     Equals:

         (i)     the Net Premiums for such month; plus

8

(ii)    any adjustments made, and at the time of such settlement payable to the Reinsurer, pursuant to Section 6.4 (Sliding Scale Commission); plus

(iii)    the ceded portion of subrogation, salvage, or other recoveries received during such month;

B.    equals:

(i)    the Provisional Commission for such month; *plus*

(ii)    ceded losses and Loss Adjustment Expense in respect of the Covered Liabilities paid during such month; *plus*

(iii)    any adjustments made, and at the time of such settlement payable to Everspan, pursuant to Section 6.4 (Sliding Scale Commission); *plus*

(iv)    other expenses as agreed to by the Parties, if applicable.

7.1.3  If the Monthly Settlement Amount is positive, such amount shall be considered due to Reinsurer by Everspan and if the Monthly Settlement Amount is negative, the absolute value of such amount shall be considered due to Everspan by Reinsurer.  Each net amount due Everspan or Reinsurer as reflected on a Monthly Report shall be paid by the owing Party no later than fifteen (15) days after receipt by Reinsurer of the Monthly Report, unless Reinsurer disputes the amounts due in good faith, in which case the payment period should be extended until the Parties have resolved such dispute.

7.2    Additional Reports.  Without limitation of Sections 7.1, each of the Parties shall periodically furnish to the other on a timely basis such other reports and information as may be reasonably requested by such other Party for financial reporting, regulatory, tax, rating agency or similar purposes and reasonably available to it.

7.3    Late Payment.  Interest shall be credited on any amount under Section 7.1.3 due to Everspan unpaid prior to the due date, starting with the first business day following the due date, and ending on the date of remittance of such payment.  Interest on such amount due shall be payable at a rate equal to the U.S. 10-Year Treasury Rate *plus* twenty-five (25) basis points ("***Crediting Rate***"), as published by the Wall Street Journal Eastern Edition on the due date.  In the event the U.S. 10-Year Treasury Rate is no longer published, another regularly published interest rate comparable to the U.S. 10-Year Treasury Rate and chosen by Everspan in its sole discretion, *plus* twenty-five (25) basis points, may be credited on any undisputed due.

7.4    Claims Payments.  Should payment due from Reinsurer exceed its Quota Share of $250,000, Everspan may give Reinsurer notice of payment made or its intention to make payment on a certain date.  If Everspan intends to pay such claim by a certain date and has submitted a reasonably satisfactory proof of loss or similar document, payment shall be due from Reinsurer twenty-four (24) hours prior to scheduled date of settlement, provided Reinsurer has a period of five (5) business days after receipt of said notice to dispatch the payment.  Cash loss amounts specifically remitted by Reinsurer as set forth herein shall be credited to their next statement of account.

## ARTICLE VIII
## PREMIUM DEFAULT; ERRORS AND OMISSIONS

8.1    <u>Premium Default.</u>  In the event the Program Administrator fails to remit premium to Everspan, the Reinsurer shall be liable for its share of such uncollected premium, provided however that the Reinsurer's liability for such uncollected premium on Policies incepting during any one Contract Year shall not exceed Reinsurer's proportionate share of $500,000.  To the extent the Reinsurer is liable for such uncollected premium, the Reinsurer shall have no obligation to pay commission thereon.  Further, Reinsurer's obligations under this <u>ARTICLE VIII</u> shall be reduced by any recovery received by Everspan, directly or indirectly, which recoveries Everspan will pursue in good faith including with respect to (i) any errors and omissions policy; (ii) any indemnification provided under the Program Agreement; or (iii) the unlimited guarantee of payment and performance issued by Venbrook Group executed in connection with the Program Agreement.

8.2    <u>Errors and Omissions.</u>  Everspan will not be prejudiced by any error or omission through clerical error, accident, or oversight, but any such error or omission will be corrected promptly upon discovery.

## ARTICLE IX
## ACCESS TO RECORDS

Each Party shall keep accurate and complete records, files and accounts of all transactions and matters with respect to the Policies and the administration thereof in accordance with Laws and its record management practices in effect from time to time.  Reinsurer and its designated representatives may at its own expense and upon reasonable notice inspect, at the locations where such records are located, and to make and retain copies of, the papers and any and all other books or documents of Everspan reasonably relating to this Reinsurance Agreement, including the Policies and the administration thereof by, and shall have access to appropriate employees and representatives of Everspan, in each case during normal business hours for such period as this Reinsurance Agreement is in effect or for as long thereafter as Everspan seeks performance by Reinsurer pursuant to the terms of this Reinsurance Agreement or Reinsurer reasonably needs access to such records for regulatory, tax or, similar purposes.  The information obtained shall be used only for purposes relating to the transactions contemplated under this Reinsurance Agreement.  Everspan shall use commercially reasonable efforts to permit the Reinsurer to inspect the books and records of Program Administrator and the TPA in the manner proscribed in this <u>ARTICLE IX</u>.

## ARTICLE X
## INSOLVENCY

10.1    <u>Notice of Insolvency.</u>  Any liquidator, receiver, conservator or statutory successor of Everspan will give written notice to Reinsurer of the pendency of a claim against Everspan indicating the Policy reinsured which claim would involve a possible liability on the part of Reinsurer within thirty (30) days after such claim is filed in the relevant proceeding, and that during the pendency of such claim, Reinsurer may investigate such claims and interpose, at its own expense, in the proceeding where such claim is to be adjudicated, any defense or defenses that it

may deem available to Everspan or its liquidator, receiver, conservator or statutory successor. The expense thus incurred by Reinsurer will be chargeable, subject to the approval of the applicable court, against Everspan as part of the expense of conservation or liquidation to the extent of a pro rata share of the benefit which may accrue to Everspan solely as a result of the defense undertaken by Reinsurer.

10.2    <u>Consequence of Everspan Insolvency</u>.  In the event of the insolvency of Everspan, the reinsurance under this Reinsurance Agreement will be payable directly by Reinsurer to Everspan or to its liquidator, receiver or statutory successor, except (A) to the extent as provided or required otherwise by applicable law, (B) where this Reinsurance Agreement specifically provides another payee of such reinsurance in the event of the insolvency of Everspan, and (C) where Reinsurer, with the consent of the direct insured or insureds, has assumed such policy obligations of Everspan as direct obligations of Reinsurer to the payees under such policies and in substitution for the obligation of Everspan to such payees.

# ARTICLE XI
# UNAUTHORIZED REINSURANCE

11.1    If, at any time during the period of this Reinsurance Agreement and thereafter, the reinsurance provided by Reinsurer does not qualify for full statutory accounting credit for reinsurance by regulatory authorities having jurisdiction over Everspan (including by reason of lack of license, accreditation or otherwise) such that a financial penalty to Everspan would result on any statutory statement or report Everspan is required to make or file with the applicable Regulators (or a court of law in the event of insolvency), Reinsurer shall secure the Quota Share of the Reinsurance Obligations for which such full statutory credit is not granted by those authorities under this Reinsurance Agreement in a manner, form, and amount acceptable to Everspan and to all applicable Regulators in accordance with this <u>ARTICLE XI</u>.  Reinsurer shall take any other reasonable steps that may be required for Everspan to take full credit on its statutory financial statements for the reinsurance provided by this Reinsurance Agreement.

11.2    Reinsurer shall secure such Reinsurance Obligations, within thirty (30) days after the receipt of Everspan's written request regarding the Quota Share of the Reinsurance Obligations under this Reinsurance Agreement (but not later than the end of the applicable calendar) by either:

    A.    Clean, irrevocable, and unconditional evergreen letter(s) of credit issued and confirmed, if confirmation is required by the applicable insurance regulatory authorities, by a qualified United States financial institution as defined under the applicable Laws of Everspan's domiciliary state and acceptable to Everspan and to insurance regulatory authorities;

    B.    A trust account meeting at least the standards of New York's Insurance Regulation 114 and the applicable Laws of Everspan's domiciliary state; or

    C.    Cash advances or funds withheld or a combination of both, which will be under the exclusive control of Everspan ("***Funds Deposit***").

11.3    <u>Reinsurance Obligations</u>.

11.3.1 The "*Reinsurance Obligations*" referred to herein means, subject to the preceding paragraphs, the then current (as of the end of each calendar quarter) sum of any the following, each as reasonably determined by Everspan or Everspan's designee(s):

A.    reserves for losses reported and outstanding;

B.    reserves for Losses Incurred but not reported;

C.    reserves for Loss Adjustment Expenses including for those relating to Claims incurred but not yet reported;

D.    unearned premiums;

E.    losses, Loss Adjustment Expenses, and other amounts paid by Everspan but not recovered from Reinsurer; and

F.    amount of return and refund premiums paid by Everspan but not recovered from Reinsurer.

11.3.2 Everspan, or its successors in interest, may draw, at any time and from time to time, upon the:

A.    Established letter of credit (or subsequent cash deposit);

B.    Established trust account (or subsequent cash deposit); or

C.    Funds Deposit;

without diminution or restriction because of the insolvency of either Everspan or Reinsurer for one or more of the following purposes set forth below.   For clarity, Everspan's "successors in interest" will include those by operation of law, including without limitation, any liquidator, rehabilitator, receiver, or conservator.

11.3.3 Draws shall be made to make payment to and reimburse Everspan for the Quota Share of any amounts paid by Everspan under the Policies and for which Reinsurer is responsible under this Reinsurance Agreement that is due to Everspan but unpaid by Reinsurer, including the Quota Share of premium refunds and returns; or to obtain a cash advance of the entire amount of the remaining balance under any letter of credit in the event that Everspan:

A.    has received notice of non-renewal or expiration of the letter of credit or trust account;

B.    has not received assurances satisfactory to Everspan of any required increase in the amount of the letter of credit or trust account, or its replacement or other continuation of the letter of credit or trust account at least thirty (30) days before its stated expiration date;

C.    has been made aware that others may attempt to attach or otherwise place in jeopardy the security represented by the letter of credit or trust account; or

> D.    has concluded that the trustee or issuing (or confirming) bank's financial condition is such that the value of the security represented by the letter of credit or trust account may be in jeopardy;

and under any of those circumstances set forth in (A) through (D) above, where the Reinsurance Obligations, or part thereof, under this Reinsurance Agreement remain un-liquidated and un-discharged at least thirty (30) days prior to the stated expiration date or at the time Everspan learns of the possible jeopardy to the security represented by the letter of credit or trust account.

11.3.4 If Everspan draws on the letter of credit or trust account to obtain a cash advance, Everspan will hold the amount of the cash advance so obtained in the name of Everspan in any qualified United States financial institution as defined under the Law of Everspan's domiciliary state in trust solely to secure the Reinsurance Obligations referred to above and for the use and purposes enumerated above and to return any balance thereof to Reinsurer:

> A.    Upon the complete and final liquidation and discharge of all of the Reinsurance Obligations to Everspan under this Reinsurance Agreement; or

> B.    In the event Reinsurer subsequently provides alternate or replacement security consistent with the terms hereof and acceptable to Everspan.

11.4    <u>Collateral Reporting and Settlement</u>. Everspan will prepare and report quarterly to Reinsurer a statement for the purposes of this <u>Article XI</u>, showing the Reinsurance Obligations as set forth above. If the Reinsurance Obligations so reported exceeds the then existing balance of the security provided, Reinsurer will, within fifteen (15) days of receipt of Everspan's statement, but never later than the end of the applicable calendar quarter, increase the amount of the letter of credit, (or subsequent cash deposit), trust account or Funds Deposit to the required amount of the Reinsurance Obligations set forth in Everspan's statement. If the Reinsurance Obligations so reported are less than the then existing balance of the security provided, Everspan will release the excess thereof to Reinsurer upon Reinsurer's written request. Reinsurer will not attempt to prevent Everspan from holding the cash advance or Funds Deposit so long as Everspan is acting in accordance with this Article. Everspan shall pay interest earned on the deposited amounts to Reinsurer as the Parties shall have agreed at the time of the deposit.

11.5    <u>Asset Valuation</u>. Any assets deposited to a trust account will be valued according to their current fair market value and will consist only of cash (U.S. legal tender), certificates of deposit issued by a qualified United States financial institution as defined under the Law of Everspan's domiciliary state and payable in cash and investments of the types no less conservative than those specified in Section 1404(a)(1), (2), (3), (8) and (10) of the New York Insurance Law and which are admitted assets under the Law of Everspan's domiciliary state. Investments issued by the parent, subsidiary, or affiliate of either Everspan or Reinsurer will not be eligible investments. All assets so deposited will be accompanied by all necessary assignments, endorsements in blank, or transfer of legal title to the trustee in order that Everspan may negotiate any such assets without the requirement of consent or signature from Reinsurer or any other entity.

11.6    <u>Account Settlement</u>. All settlements of account between Everspan and Reinsurer will be made in cash or its equivalent. All income earned and received by the amount held in an established trust account will be added to the principal.

# ARTICLE XII
# DISPUTE RESOLUTION

12.1    Any disputes or disagreements arising out of or relating to this Reinsurance Agreement (including its formation), the performance of the duties and obligations arising hereunder, or the business relationship between Everspan and the Reinsurer will be referred to an arbitration panel. Arbitration will be initiated by delivery of a written notice of demand for arbitration by a Party to the other Party. Such notice of demand will set out the reason for the request for arbitration.

12.2    The arbitration panel will consist of two (2) arbitrators and an umpire. The Party demanding arbitration will appoint one (1) arbitrator at the time of its demand and the Party receiving the demand will appoint one (1) arbitrator. The Party receiving the demand will appoint its arbitrator within thirty (30) days after receiving the demand; if it fails to do so, the Party that demanded arbitration may appoint both arbitrators. The two (2) arbitrators will then select an umpire. The arbitrators and umpire will each be active or retired executives of insurance or reinsurance companies and disinterested in the outcome of the arbitration. Should the two arbitrators fail to choose an umpire within thirty (30) days of the appointment of the second arbitrator, each arbitrator will propose eight (8) umpire candidates. Umpire candidates will complete disclosure statements, which must list any past or present relationship with the Parties or their counsel, direct or indirect, whether financial, professional, social, or of any other kind; the umpire ultimately selected must also disclose any such relationship that arises during the course of the arbitration. Of the eight (8) umpire candidates proposed by each arbitrator, the other will strike seven (7), and the decision from the remaining two (2) will be made by drawing lots, e.g., an odd or even digit in the Dow Jones Industrial Average for a particular day.

12.3    The arbitration hearing(s) will be held in the Borough of Manhattan in New York City, New York, unless otherwise mutually agreed. Each Party will submit its case to the arbitration panel within sixty (60) days of the appointment of the umpire or within such time as may be agreed by the Parties or directed by the arbitration panel.

12.4    The arbitration panel will have the power to determine all procedural rules for the arbitration, including discretionary power to make orders as to any matters which it may consider proper in the circumstances of the case with regard to pleadings, discovery, inspection of documents, examination of witnesses, and any other matter relating to the conduct of the arbitration. The arbitration panel may require pre-hearing security in its discretion. The arbitration panel may receive and act upon evidence, whether oral or written, strictly admissible or not, as it will in its discretion think fit. The arbitration panel will not be obliged to follow judicial formalities or the rules of evidence, may abstain from following the strict rules of law, and will make its decision giving due consideration to the custom and practice of the insurance and reinsurance business. The arbitration panel will not have the power to award punitive, exemplary, or treble damages. The arbitration panel will have the power to award reasonable attorneys' fees, including fees incurred in connection with the arbitration or any litigation commenced to stay or dismiss arbitration. The decision of the majority of the arbitration panel will be final and binding on all Parties. Judgment upon the award rendered may be entered in any court having jurisdiction.

12.5    Each Party will pay the fees and expenses of its own arbitrator.  The Parties will divide equally the fees and expenses of the umpire and other expenses of the arbitration, unless such fees and expenses are otherwise allocated by the arbitration panel.

**ARTICLE XIII**
**CONFIDENTIALITY AND DATA SECURITY**

13.1    <u>Confidential Information</u>.  "***Confidential Information***" means all information, whether or not reduced to written or recorded form, which (A) pertains to Everspan or Reinsurer, any negotiations or business pertaining thereto, or any of the transactions either contemplates, including all financial, customer, and reinsurance information, and is not intended for general dissemination; (B) is confidential or proprietary in nature, was provided to the Party or its representatives by Everspan or Reinsurer, as applicable, and relates directly or indirectly to either Everspan or Reinsurer or the business of either; (C) pertains to confidential or proprietary information of Everspan or Reinsurer which has been labeled in writing as confidential or proprietary, or (D) qualifies as non-public personal information or personal health information that is protected under Law.  Confidential Information includes all information regarding applicants, policyholders, beneficiaries, and claimants (collectively, "***Customer Information***").  For clarity, information which: (A) is available, or becomes available, to the public through no fault or action by such Party, its agents, representatives or employees; or (B) becomes available on a non-confidential basis from any source other than Everspan or Reinsurer, as applicable, and such source is not prohibited from disclosing such information, shall not be deemed Confidential Information.

13.2    <u>Confidentiality</u>.

13.2.1 During the term of this Reinsurance Agreement, a Party ("***Disclosing Party***") may reveal to the Party ("***Receiving Party***") certain Confidential Information. Receiving Party agrees to use Confidential Information solely for the purpose of this Reinsurance Agreement and shall keep Confidential Information confidential and not disclose Confidential Information to others, except as expressly permitted by this Reinsurance Agreement.  Each Party shall each keep confidential and shall not disclose to others and shall use reasonable efforts to prevent its affiliates, successors, and assigns, employees and agents, if any, from disclosing to others, any Confidential Information other than to carry out the purposes set forth in this Reinsurance Agreement for which such Party disclosed such information.  The Parties acknowledge that it is not practical, and shall not be necessary, to mark such information as "confidential," nor to transfer it by confidential envelope or communication, in order to preserve the confidential nature of the information.

13.2.2 Receiving Party may disclose Confidential Information pursuant to the process of law and to its representatives who need to know Confidential Information solely for the purpose of Receiving Party's performance under this Reinsurance Agreement, provided that each representative shall be obligated to treat such Confidential Information in accordance with the terms of this Reinsurance Agreement as if such representative were the Receiving Party.  Receiving Party shall be responsible for any breach of this Reinsurance Agreement by its representatives.  Reinsurer may also disclose Confidential Information to its retrocessionaires, financial auditors, governing regulatory bodies, legal counsel, and arbitrator(s).

15

13.2.3 Confidential Information, and all copies thereof, shall remain at all times the property of the Everspan or Reinsurer, as applicable. Each Party will, upon request and at the cost of the Party owning the Confidential Information, promptly return and/or destroy any Confidential Information received from the other. However, to the extent Confidential Information exists on a Party's computer or electronic networks in any form or location that would be prohibitively time consuming or expensive to locate and destroy (i.e., back up tapes or off site electronic storage) or from which it cannot be destroyed due to regulatory or business recovery concerns, then, in such instances, the Confidential Information shall remain subject to confidential treatment and shall be destroyed or overwritten in that Party's ordinary course of business. Everspan and Reinsurer acknowledge and agree that Confidential Information is valuable information to Disclosing Party and unauthorized disclosure or use of Confidential Information by Receiving Party or its representatives may cause irreparable harm and damage to Disclosing Party, and in the event of any breach of the provisions of this <u>Section 13.2</u>, Disclosing Party shall be entitled to seek equitable relief, including injunctions and orders for specific performance, in addition to all other remedies available to it at law or in equity.

13.3    <u>Data Security, Breach Reporting, and Mitigation</u>. Reinsurer hereby covenants to:

13.3.1 Implement and maintain adequate administrative, technical, and physical safeguards to protect against any anticipated threats or hazards to the security or integrity of Systems and Confidential Information and unauthorized access to or use of such information that could result in substantial harm or inconvenience to any consumer or policyholder, in compliance with Law;

13.3.2 Immediately give written notice to Everspan of any suspected or actual breach of any data or systems relating to its performance of this Reinsurance Agreement ("**Systems**"), including misuse or unauthorized disclosure of Confidential Information by a third party;

13.3.3 With respect to the Systems and Confidential Information, (A) use multi-factor authentication; and (B) encrypt data in transit and at rest unless alternative compensating controls are employed;

13.3.4 Immediately implement adequate measures to restore security when Confidential Information or the Systems are compromised, and provide assistance and information, at its sole cost, as Everspan may require in connection with such restoration as well as required notifications to relevant Regulators and affected individuals;

13.4    <u>Disaster Recovery</u>. Reinsurer will implement a disaster recovery plan, maintain its Systems and records in accordance with such plan, and test such plan from time to time. Such disaster recovery plan will require an incremental system backup no less than daily, a full system backup no less than weekly, and a second full system backup no less than monthly. The daily backups will be maintained by Reinsurer for at least one week, the weekly backups will be maintained by Reinsurer for at least one month, and the monthly backups will be maintained by Reinsurer for at least one (1) year. The backups of the system will be maintained at an approved facility outside of Reinsurer's facility. In the event of damage to or malfunction of Reinsurer's computer hardware or software or loss of data, Reinsurer will use reasonable best efforts to obtain replacement computer hardware or software and recovery data to restore the services to an acceptable level as soon as possible.

16

13.5    Disclosure to Subcontractors.  Without prejudice to the generality of Section 14.5, when transferring or disclosing Customer Information to subcontractors in connection with meeting any obligations under this Reinsurance Agreement (a) Reinsurer shall not transfer any Customer Information from one country to another, except with the prior written consent of Everspan and in accordance with any additional terms required by applicable law and/or which Everspan may impose on the transfer and (b) Reinsurer shall require such subcontractors to enter into appropriate security and data protection terms, including confidentiality and privacy contract terms, and all such terms shall be consistent with this Reinsurance Agreement.

## ARTICLE XIV
## MISCELLANEOUS

14.1    Notice.  All written notices required under this Reinsurance Agreement will be deemed given when received by the other Party via a recognized mail or courier service, provided delivery receipt has been confirmed, at the address set forth below:

|  | |
|---|---|
| To Everspan: | Everspan Indemnity Insurance Company<br>One World Trade Center, Fl. 41<br>New York, NY 10007<br>Attention: General Counsel<br>legal@everspangroup.com |
| To Reinsurer: | General Reinsurance Corporation<br>120 Long Ridge Road<br>Stamford, CT 06902<br>Attention:  Regional-Specialty Treaty Manager<br>Robert.Jones@genre.com |

All notices will also be provided, as courtesy, by e-mail to the individuals designated above.

14.2    Entire Agreement.  This Reinsurance Agreement embodies the entire agreement and understanding between the Parties with respect to the transactions contemplated hereby and supersedes all prior agreements and understandings, whether or not written, except for separate contracts expressly disclosed within this Reinsurance Agreement or in an exhibit incorporated by reference.

14.3    Modifications.  Except as specifically provided herein, this Reinsurance Agreement may not be modified, amended or supplemented, nor may any provision hereof be waived, except by written amendment signed by both Parties stating the effective date and extent of such amendment, modification, supplement or waiver.

14.4    No Third-Party Beneficiaries.  This Reinsurance Agreement is not intended to confer upon any person other than the Parties any rights or remedies hereunder.  Accordingly, nothing herein will in any manner create any obligations, establish any rights, or create any direct right of action against Reinsurer in favor of any third party, or other person not party to this Reinsurance Agreement; or create any privity of contract between the policyholder under any Policy and Reinsurer, except as expressly outlined herein.

14.5    No Assignment or Delegation; Use of Affiliates.    Other than as expressly provided for in this Reinsurance Agreement, a Party may not assign, delegate or otherwise transfer any of its rights or obligations under this Reinsurance Agreement whether by agreement, operation of applicable law or otherwise, without the express prior written consent of the other Party (which consent shall not be unreasonably withheld or delayed) and any purported assignment, delegation or transfer in violation of this provision shall be void and of no force or effect.

14.6    Authority.  Each Party represents and warrants that it has the full right, power, legal capacity and authority to enter into and perform its obligations under this Reinsurance Agreement and that those obligations will be binding and enforceable without approval of any other person or entity.  Each person signing this Reinsurance Agreement on behalf of a Party represents and warrants that he or she has the full right, power, legal capacity and authority to sign this Reinsurance Agreement on behalf of that Party.

14.7    Offset.  Everspan or the Reinsurer may offset balances due from one Party to the other Party under this Reinsurance Agreement or any other contract between Everspan and the Reinsurer.

14.8    No Waiver.  The failure of either Party to enforce any provision of this Reinsurance Agreement or to assert a default or breach of any of the terms and conditions of this Reinsurance Agreement shall not be construed as a waiver of any of said terms and conditions, nor estop either that Party from thereafter demanding a full and complete compliance therewith.  The past waiver of a provision by either Party will not constitute a course of conduct or a waiver in the future as to that same provision.

14.9    Severability.  If any portion of this Reinsurance Agreement is found to be invalid or unenforceable, the remainder of this Reinsurance Agreement will remain in full force and effect. Both Parties shall use best efforts to appropriately rewrite such illegal, invalid or unenforceable provision(s) in accordance with the original intent of such provision(s) and incorporate such rewritten provision(s) into the Reinsurance Agreement.

14.10    Governing Law.  The terms and conditions of this Reinsurance Agreement will be governed exclusively by New York law, without regard to conflicts of laws principles (other than Section 5-1401 and 5-1402 of the New York General Obligations Law which shall apply). However, with respect to credit for reinsurance, the rules of all applicable states shall apply.

14.11    Waiver of Certain Defenses.  EACH PARTY WAIVES ITS RIGHT TO ASSERT A DEFENSE BASED ON THE STATUTE OF LIMITATIONS, LACHES, OR ANY THEORY THAT THE AGGRIEVED PARTY'S CLAIM IS TIME BARRED.  Notwithstanding the foregoing, the Reinsurer reserves the right to assert a defense based on late notice in the event that the Reinsurer is materially prejudiced by the failure of Everspan to provide prompt notice of a claim in accordance with the terms of this Reinsurance Agreement.

14.12    Counterparts.  This Reinsurance Agreement may be executed simultaneously in several counterparts, each of which will constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Reinsurance Agreement by scanned pages shall be effective as delivery of a manually executed counterpart to this Reinsurance Agreement.

14.13   <u>Jointly Drafted</u>.  This Reinsurance Agreement will be deemed to have been jointly drafted by the Parties and, in the event of a dispute, any perceived ambiguity will not be construed against either Party.

14.14   <u>Interpretation</u>.   The term "this Reinsurance Agreement" shall mean this Reinsurance Agreement together with the Schedules and exhibits hereto, as the same may from time to time be amended, modified, supplemented or restated in accordance with the terms hereof. Any collective defined term and any defined term used in the plural will be taken to encompass individually and collectively all members of the relevant class.  Any defined term used in the singular preceded by "any" will be taken to indicate any number of the members of the relevant class.  Any defined term used in the singular and preceded by the word "each" will indicate all members of the relevant class, individually.  The use of the word "include" (and all derivations therefrom) in this Reinsurance Agreement is illustrative and not restrictive; any list or example preceded by "include" or "including" is not necessarily exhaustive or complete.  Unless otherwise stated, the absence of "include" or "including" preceding (or otherwise qualifying) any list or example will mean that such list or example is restricted to the items listed.  All references to articles, sections, subsections, clauses, paragraphs, schedules, and exhibits mean such provisions of this Reinsurance Agreement, except where otherwise stated.  The use herein of the masculine, feminine, or neuter forms shall also denote the other forms, as in each case the context may require. The headings in this Reinsurance Agreement are for reference only and will not limit or otherwise affect the meaning or interpretation of this Reinsurance Agreement.  Unless otherwise stated, all timeframes in this Reinsurance Agreement refer to calendar days.  Deadlines falling on weekends or U.S. bank holidays are extended to the next business day.  References to "dollars" or "$" shall mean the lawful currency of the United States of America.

14.15   <u>No Exclusivity</u>.  This Reinsurance Agreement is not exclusive and Everspan may appoint, contract, or transact with other reinsurers, agents, or managing agents without limitation.

14.16   <u>Definitions</u>.  The following terms shall have the meanings defined in the Section indicated:

| | |
|---|---|
| "*Assessments*" | <u>4.1C</u> |
| "*Claims Agreement*" | <u>4.2</u> |
| "*Confidential Information*" | <u>13.1</u> |
| "*Contract Year*" | 3.1 |
| "*Covered Liabilities*" | <u>1.1</u> |
| "*Crediting Rate*" | <u>7.3</u> |
| "*Customer Information*" | <u>13.1</u> |
| "*Disclosing Party*" | <u>13.2.1</u> |
| "*Effective Date*" | <u>Preamble</u> |
| "*Everspan*" | <u>Preamble</u> |
| "*Extra Contractual Obligations*" | <u>5.2A</u> |
| "*Funds Deposit*" | <u>11.2C</u> |
| "*Law*" | <u>3.3</u> |
| "*Loss Adjustment Expenses*" | <u>4.1B</u> |
| "*Loss in Excess of Policy Limits*" | <u>5.2B</u> |
| "*Monthly Report*" | <u>7.1.1</u> |
| "*Monthly Settlement Amount*" | <u>7.1.2</u> |

19

"*Net Premium*" ................................................................ 6.1
"*Party*" or "*Parties*" ...................................................... Preamble
"*Policies*" ...................................................................... 1.1
"*Program Administrator*" .............................................. 1.1
"*Program Agreement*" .................................................... 1.1
"*Provisional Commission*" ............................................ 6.2
"*Provisional Notice*" .................................................... 3.2.2.A
"*Monthly Report*" .......................................................... 7.1.1
"*Monthly Settlement Amount*" ...................................... 7.1.2
"*Quota Share*" ................................................................ 1.1
"*Receiving Party*" .......................................................... 13.2.1
"*Regulator*" .................................................................... 3.2.2B(ii)
"*Reinsurance Agreement*" .............................................. Preamble
"*Reinsurance Obligations*" ............................................ 11.3
"*Reinsurer*" .................................................................... Preamble
"*Renewal Date*" .............................................................. 3.1
"*Systems*" ...................................................................... 13.3.2
"*Termination Notice*" .................................................... 3.2.2.A**Error! Reference source not found.**
"*TPA*" .............................................................................. 4.1A

[SIGNATURE BLOCK ON FOLLOWING PAGE]

**IN WITNESS WHEREOF**, Everspan agrees to be bound by the terms and conditions of this Reinsurance Agreement and has executed this Reinsurance Agreement by its duly authorized representative on this the 29th day of _____June_____, in the year 2021.

By: _____

EVERSPAN INDEMNITY INSURANCE COMPANY

[Signature Page to Quota Share Reinsurance Agreement]

## NUCLEAR, BIOLOGICAL, CHEMICAL AND RADIOLOGICAL EXCLUSION CLAUSE

Loss, damage, liability or expense directly or indirectly caused by or contributed to by, or arising from:

1) ionising radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel;
2) the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof;
3) any weapon or device employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter;
4) the radioactive, toxic, explosive or other hazardous or contaminating properties of any radioactive matter. The exclusion in this sub-clause does not extend to radioactive isotopes, other than nuclear fuel, when such isotopes are being prepared,  carried, stored, or used for commercial, agricultural, medical, scientific or other similar peaceful purposes;
5) any chemical, biological, bio-chemical, or electromagnetic weapon.

However, the parties to this Agreement mutually agree that loss, damage, cost or expense caused by chemicals that are contained in a weapon or device solely to effect an explosion (as opposed to those intended to cause contamination) are not excluded hereunder. "Device" as used herein shall mean an object whose sole purpose is to cause harm or destruction.

## SANCTION LIMITATION AND EXCLUSION CLAUSE

No (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America.

15/09/10
LMA3100

## **ASBESTOS EXCLUSION CLAUSE**

This Policy does not cover any claims of any kind whatsoever directly or indirectly relating to, arising out of or in consequence of:

1) the actual, alleged or threatened presence of asbestos in any form whatsoever, or any material or product containing, or alleged to contain, asbestos; or

2) any obligation, request, demand, order, or statutory or regulatory requirement that any Insured or others test for, monitor, clean up, remove, contain, treat, neutralize, protect against or in any other way respond to the actual, alleged or threatened presence of asbestos or any material or product containing, or alleged to contain, asbestos.

However, this exclusion shall not apply to any claim caused by or resulting in a crash fire explosion or collision or a recorded in-flight emergency causing abnormal aircraft operation.

Notwithstanding any other provisions of this Policy, Insurers will have no duty to investigate, defend or pay defence costs in respect of any claim excluded in whole or in part under paragraphs (1) or (2) hereof.

LSW 2488 AGM 00003

## COMMUNICABLE DISEASE EXCLUSION

(For use on liability policies)

1.  Notwithstanding any provision to the contrary within this policy, this policy does not cover all actual or alleged loss, liability, damage, compensation, injury, sickness, disease, death, medical payment, defence cost, cost, expense or any other amount, directly or indirectly and regardless of any other cause contributing concurrently or in any sequence, originating from, caused by, arising out of, contributed to by, resulting from, or otherwise in connection with a Communicable Disease or the fear or threat (whether actual or perceived) of a Communicable Disease.

2.  For the purposes of this endorsement, loss, liability, damage, compensation, injury, sickness, disease, death, medical payment, defence cost, cost, expense or any other amount, includes, but is not limited to, any cost to clean-up, detoxify, remove, monitor or test for a Communicable Disease.

3.  As used herein, a Communicable Disease means any disease which can be transmitted by means of any substance or agent from any organism to another organism where:

    3.1.  the substance or agent includes, but is not limited to, a virus, bacterium, parasite or other organism or any variation thereof, whether deemed living or not, and

    3.2.  the method of transmission, whether direct or indirect, includes but is not limited to, airborne transmission, bodily fluid transmission, transmission from or to any surface or object, solid, liquid or gas or between organisms, and

    3.3.  the disease, substance or agent can cause or threaten bodily injury, illness, emotional distress, damage to human health, human welfare or property damage.

LMA5396

17 April 2020

## WAR AND TERRORISM EXCLUSION ENDORSEMENT

Notwithstanding any provision to the contrary within this Reinsurance contract or any endorsement thereto it is agreed that this Reinsurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss;

1) war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

2) any act of terrorism. For the purpose of this endorsement an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to 1 and/or 2 above.

If the Reinsurers allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Company.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

08/10/01 NMA2918

**EXHIBIT A**

**PROGRAM AGREEMENT**

[*See Attachment*]

**EXHIBIT B**

**CLAIMS AGREEMENT**

[*See Attachment*]

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

EXECUTION VERSION

# PROGRAM ADMINISTRATOR AGREEMENT

by and between

## Everspan Indemnity Insurance Company

and

## Cardigan General Insurance Services, LLC

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

# TABLE OF CONTENTS

**Page**

ARTICLE I  AUTHORITY AND OBLIGATIONS OF CARDIGAN .................................. 1

 1.1 Authority ............................................................................. 1

 1.2 Underwriting Instructions ................................................. 1

 1.3 Forms and Rates ............................................................... 1

 1.4 Underwriting and Policy Services .................................... 1

 1.5 Fees and Assessments ...................................................... 2

 1.6 Cancelations and Non-Renewals ..................................... 2

 1.7 Performance Standard ...................................................... 2

 1.8 Cooperation; Complaints .................................................. 2

 1.9 Disclosures and Information Integrity .............................. 3

 1.10 Payment Processing .......................................................... 3

 1.11 Assigned Risks .................................................................. 3

ARTICLE II  LIMITATIONS AND RESTRICTIONS ON AUTHORITY .................. 3

 2.1 Restrictions ....................................................................... 3

 2.2 Retention of Authority ...................................................... 4

 2.3 Reinsurance ....................................................................... 4

ARTICLE III  COMPLIANCE .................................................................. 5

 3.1 General .............................................................................. 5

 3.2 Good Standing .................................................................. 5

 3.3 Oversight ........................................................................... 5

 3.4 Licensed Products ............................................................. 6

 3.5 Sanctions Rules ................................................................ 6

 3.6 Marketing .......................................................................... 6

ARTICLE IV  PRODUCERS .................................................................... 6

 4.1 Referrals from Producers .................................................. 7

 4.2 Appointment and Authority of Producers ........................ 7

 4.3 Producer Disqualification ................................................. 7

 4.4 Agreements with Producers .............................................. 7

 4.5 Producer Compensation .................................................... 7

 4.6 No Waiver of Rights ......................................................... 7

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

**TABLE OF CONTENTS**
(continued)

Page

| | | | |
|---|---|---|---|
| ARTICLE V | | BANKING; ACCOUNTING; FINANCIAL REPORTING | 7 |
| | 5.1 | Premium and Funds | 7 |
| | 5.2 | Premium Account and Remittance | 8 |
| | 5.3 | Transaction Reporting and Enforcement. | 9 |
| | 5.4 | Interest Penalty | 10 |
| | 5.5 | Financial Statements | 10 |
| | 5.6 | Internal Controls | 10 |
| ARTICLE VI | | COMMISSION | 10 |
| | 6.1 | Commission | 10 |
| | 6.2 | Uncollected Premium | 10 |
| | 6.3 | Sole Compensation | 10 |
| | 6.4 | Return Commission | 10 |
| | 6.5 | Overpayment of Commission | 11 |
| | 6.6 | Expenses | 11 |
| ARTICLE VII | | TERM; TERMINATION; SUSPENSION OF AUTHORITY | 11 |
| | 7.1 | Term | 11 |
| | 7.2 | Termination by Mutual Consent; Termination Without Cause | 11 |
| | 7.3 | Immediate Termination with Cause by Everspan | 11 |
| | 7.4 | Termination for Cause by Either Party | 12 |
| | 7.5 | Termination Following Uncured Breaches | 13 |
| | 7.6 | Scope of Termination. | 13 |
| | 7.7 | Post-Termination Obligations | 13 |
| | 7.8 | Security For Post-Termination Performance. | 14 |
| | 7.9 | Expirations | 14 |
| | 7.10 | Supplies | 14 |
| | 7.11 | Suspension of Authority | 14 |
| | 7.12 | Waiver of Statutory Termination Rights | 15 |
| ARTICLE VIII | | EXCLUSIVITY | 15 |
| | 8.1 | Exclusivity | 15 |
| ARTICLE IX | | ACCESS TO RECORDS; DATA REQUIREMENTS | 15 |
| | 9.1 | Records | 15 |

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

# TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 9.2 | Access to Records | 15 |
| 9.3 | Data Requirements | 16 |
| ARTICLE X | CONFIDENTIALITY; DATA SECURITY | 16 |
| 10.1 | Confidential Information | 16 |
| 10.2 | Confidentiality | 16 |
| 10.3 | Privacy Policies | 17 |
| 10.4 | No Disclosure | 17 |
| 10.5 | Data Security, Breach Reporting, and Mitigation | 17 |
| 10.6 | Disaster Recovery | 18 |
| 10.7 | Disclosure to Subcontractors | 18 |
| ARTICLE XI | CLAIMS AUTHORITY; REPORTING | 18 |
| 11.1 | Authority | 18 |
| 11.2 | Reporting | 18 |
| 11.3 | Cooperation | 18 |
| ARTICLE XII | REQUIRED INSURANCE | 18 |
| 12.1 | Required Insurance | 18 |
| 12.2 | Required Terms | 19 |
| 12.3 | Notice of Changes | 19 |
| 12.4 | Primary Nature of Cardigan's Insurance | 19 |
| ARTICLE XIII | INDEMNIFICATION | 19 |
| 13.1 | Cardigan Indemnification | 19 |
| 13.2 | Everspan Indemnification | 20 |
| 13.3 | Procedure for Indemnification | 20 |
| 13.4 | Direct Claims | 21 |
| ARTICLE XIV | INTELLECTUAL PROPERTY | 21 |
| 14.1 | Ownership of Marks | 21 |
| 14.2 | Background IP | 22 |
| 14.3 | License of Marks | 22 |
| 14.4 | Reservation of Rights | 22 |
| 14.5 | Disclaimer | 22 |
| ARTICLE XV | GENERAL | 23 |

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

**TABLE OF CONTENTS**
(continued)

**Page**

15.1    Notice ................................................................................................................ 23

15.2    Entire Agreement .............................................................................................. 23

15.3    Modifications ..................................................................................................... 23

15.4    No Third-Party Beneficiaries ........................................................................... 23

15.5    No Assignment or Delegation; Use of Affiliates ............................................. 23

15.6    Authority ............................................................................................................ 24

15.7    Offset ................................................................................................................. 24

15.8    No Waiver .......................................................................................................... 24

15.9    Severability ........................................................................................................ 24

15.10   Governing Law .................................................................................................. 24

15.11   Dispute Resolution; Consent to Jurisdiction; Waiver of Jury Trial ................. 24

15.12   Specific Performance ........................................................................................ 25

15.13   Waiver of Certain Defenses .............................................................................. 26

15.14   Independent Contractor ..................................................................................... 26

15.15   Counterparts ...................................................................................................... 26

15.16   Jointly Drafted ................................................................................................... 26

15.17   Interpretation ..................................................................................................... 26

15.18   Change in Control .............................................................................................. 26

15.19   Managing General Agent Status ....................................................................... 27

15.20   Conflicts of Interest ........................................................................................... 27

15.21   Definitions ......................................................................................................... 27

Schedules

Schedule A    Authorized Business
Schedule B    Compensation

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

## PROGRAM ADMINISTRATOR AGREEMENT

This PROGRAM ADMINISTRATOR AGREEMENT and all exhibits and schedules attached hereto (the "***Agreement***") is entered into by and between **Cardigan General Insurance Services, LLC** ("***Cardigan***") and **Everspan Indemnity Insurance Company** ("***Everspan***"), effective **May 1, 2021** (the "***Effective Date***"). Everspan and Cardigan will be referred to hereunder each as a "***Party***" and, collectively, the "***Parties***." Unless otherwise noted, capitalized terms shall have the meanings set forth or referenced in Section 15.21.

## ARTICLE I
## AUTHORITY AND OBLIGATIONS OF CARDIGAN

1.1     Authority. Subject to this Agreement's terms and conditions, as of the Effective Date, Cardigan is hereby authorized and agrees to perform all functions necessary to produce, service, administer, and manage all policies, certificates, contracts, binders, agreements, insurance bonds, or other proposals or evidences of insurance, new and renewal, made or issued in accordance with this Agreement (collectively, "***Policies***"). Subject to the terms and conditions of this Agreement, Everspan hereby agrees to appoint Cardigan to perform all functions contemplated in this Agreement in any jurisdiction that requires such appointment prior to the issuance of any Policies in such jurisdiction.

1.2     Underwriting Instructions. Cardigan will comply with (i) the underwriting guidelines and instructions approved in writing or provided in writing by Everspan, including the attached Schedule of Authorized Business, (ii) Forms and Rates (as defined below), and (iii) all other rules, instructions, and specifications provided in writing by Everspan (collectively, "***Underwriting Instructions***"). Cardigan will not quote, authorize, bind, or issue any Policy that is not within the territories, lines, limits, and classes of business authorized by the Underwriting Instructions. The Underwriting Instructions are incorporated into this Agreement by reference and may be revised by Everspan upon prior written notice to Cardigan and such revisions will be effective immediately. Notwithstanding the foregoing or anything to the contrary in this Agreement, in no event shall the authority of Cardigan under this Agreement (including pursuant to the Underwriting Instructions) be more extensive than the coverage provided to Everspan pursuant to the relevant Reinsurance Agreement(s) ("***Reinsurance***") and Cardigan shall be responsible for reviewing all such Reinsurance Agreement(s) to confirm that the Subject Business thereunder includes the Policies to be produced by Cardigan. The initial Reinsurance Agreement with respect to the Policies is attached as Exhibit A.

1.3     Forms and Rates. In issuing Policies, Cardigan shall only utilize forms and rates approved prior to such use by Everspan, including policies, endorsements, applications, notices, and rules which have been filed by or on Everspan's behalf and, when required by Law, approved by the appropriate Regulators ("***Forms and Rates***"). In filing any Forms and Rates, Cardigan may only use Everspan's account(s) for electronic filing systems (e.g., SERFF) and will reimburse Everspan for all costs associated with such access. During and after the Term, Everspan will retain the right to access and use all filings and supporting materials associated therewith.

1.4     Underwriting and Policy Services. Cardigan will perform all services necessary or customary, or as otherwise requested by Everspan, as would be performed by a direct insurance carrier to underwrite a risk, including performing or obtaining inspections; obtaining location, motor vehicle, inspection, or other reports; performing loss control services and analysis; and performing premium audits when applicable (the "***Services***"). Cardigan will not utilize a third party to perform any Services without Everspan's prior written approval.

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

    1.5    <u>Fees and Assessments</u>.  Cardigan will be responsible for timely determining, collecting, and reporting all fees, charges, and assessments relating to the Policies; and will promptly remit to Everspan such fees, charges, and assessments.  Cardigan shall undertake reasonable actions to procure that Producers comply with applicable law respecting disclosure to and written authorization of insureds under Policies ("***Policyholders***") concerning any policy issuance (or similar) fees (which will be approved by Everspan) permitted by Law.  Cardigan will not be entitled to Commission on such policy issuance (or similar) fees even if such fees are reported by Everspan to Regulators as premium.  The Parties agree that CGRPG fees referenced in Schedule A, Section C will be disclosed in a compliant manner to Policyholders and may be retained by Cardigan.

    1.6    <u>Cancelations and Non-Renewals</u>.  A Policy may be lawfully non-renewed or canceled by Cardigan; provided, that Cardigan will send any notices required to effect such non-renewal or cancelation as soon as reasonably possible and, in any event, within the timeframes and in the manner proscribed by that Policy and required by Law.  For clarity, if a Policy is not timely non-renewed or canceled due to a delay, error, or failure by Cardigan, Everspan will not be held responsible for any claim, cost, or Policy-related exposure which relate in any way to such delay, error, or failure.

    1.7    <u>Performance Standard</u>.  Cardigan shall perform its obligations under this Agreement, including performance of the Services, in good faith and by employing a professional standard of care.  Cardigan will maintain sufficient staff of licensed, competent, and trained personnel and will maintain the supplies and equipment as necessary to perform its obligations under this Agreement.  Cardigan will maintain written procedures to ensure sufficient operational and financial controls, including controls for Policy issuance, premium collection, notices to insureds, record retention, compliance with Law, systems and data, and security.

    1.8    <u>Cooperation; Complaints</u>.

        A.    Cardigan will assist Everspan in (i) communicating with Policyholders and any applicable state and federal governmental authorities with jurisdiction over any of this Agreement's subject matter including state insurance departments or other relevant agencies (collectively, "***Regulators***"); (ii) collecting premiums, deductibles, and other amounts due from Policyholders; (iii) producing disclosures, notices, or other filings required by Law; (iv) the investigation, adjustment, settlement, and timely payment of Claims; and (v) providing all information, reports and assistance reasonably necessary for Everspan to respond timely to inquiries from Regulators, including financial and market conduct examinations, data calls (scheduled and ad-hoc), and consumer complaints.

        B.    Cardigan shall promptly notify and cooperate with Everspan, and Everspan shall promptly notify and cooperate with Cardigan, if Cardigan or Everspan and its affiliates, as the case may be, receives any Customer complaint, written or verbal, related to underwriting by forwarding a copy of any written materials received in connection with such Customer complaint and such additional information as may be necessary to furnish a complete understanding of same (i.e., transcripts, written summaries, or call recordings).  Cardigan shall be responsible for attempting in a reasonable and good faith manner to resolve Customer complaints; <u>provided</u>, that each Party and its affiliates shall cooperate with the responsible responding Party and provide information to that related to such Customer complaints that is reasonably required by the responding Party to facilitate the resolution of such

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

C.    Customer complaint. Cardigan shall further be required to provide cumulative reporting of Customer complaints to Everspan monthly.

D.    Nothing contained in this <u>Section 1.8</u> shall limit a Party's or any of its affiliates' right to settle a third-party claim as provided in <u>Section 13.3</u>.

1.9    <u>Disclosures and Information Integrity</u>. Cardigan represents and warrants that it has disclosed and, during the Term, will disclose to Everspan any facts, events, or circumstances relevant to its performance of this Agreement or which may impact its solvency, cash flows, ability to perform this Agreement, and operations, including claims or suits made against Cardigan or its directors or officers; regulatory proceedings or developments impacting Cardigan's obligations hereunder; or any imminent or actual Change in Control. Cardigan will not provide data or information, regardless of the source, which Cardigan either knows, or through the exercise of reasonable diligence should know, is inaccurate, misleading, or contains errors.

1.10    <u>Payment Processing</u>. Cardigan shall arrange and be responsible for the due processing of Customer payments (including through debit and credit card transactions) made in connection with its performance of the Cardigan Services. For clarity, any related debit and credit card transaction fees shall solely be an expense of Cardigan. Cardigan shall, to the extent applicable, remain in compliance with the Payment Card Industry Data Security Standard requirements, including any changes to such requirements.

1.11    <u>Assigned Risks</u>. Cardigan will administer all Policies that Everspan is required to issue due to any assigned risk pool, joint underwriting association, or any other facility in which Everspan is required to participate ("***Assigned Risks***") and which shall be deemed to be "Policies" hereunder. Cardigan will administer Assigned Risks under the same terms and conditions of this Agreement applicable to all Policies. Cardigan will also enroll Everspan, when required, in all such groups at Cardigan's cost; pay all assessments related thereto; and provide Everspan with the information in the format required to timely satisfy Assigned Risks reporting obligations.

## ARTICLE II
## LIMITATIONS AND RESTRICTIONS ON AUTHORITY

2.1    <u>Restrictions</u>. Cardigan has no authority to act on Everspan's behalf except as expressly stated in this Agreement. Further, without prejudice to the generality of the foregoing, Cardigan will not, without Everspan's express prior written approval:

A.    Delegate any of its authority or obligations under this Agreement to a third party, including by appointing a sub-program administrator or sub-managing general agent;

B.    Transact with, or otherwise accept business from, a Producer without first (i) coordinating with the Company respecting the appointment of such Producer, when required; and (ii) confirming the Producer is licensed to solicit, negotiate, and sell Policies;

C.    Permit a Producer (or an employee thereof), other than an officer or employee of an affiliated company, to serve on Cardigan's board of directors;

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

D.  Jointly employ an individual who is employed by Everspan other than an officer or employee of an affiliated company.;

E.  Bind coverage with a retroactive effective date except for legitimate business reasons and in no event more than thirty (30) days before the binding date;

F.  Communicate with a Regulator for or on Everspan's behalf except for incidental or minor communications required for Cardigan to perform its obligations hereunder;

G.  Cancel or terminate a Policy before its stated expiration date and offer to issue a Policy to the same insured, with policy effective dates beyond the stated term of the original Policy;

H.  Incur any liability on behalf of Everspan, other than as permitted herein;

I.  Accept a promissory note or other debt instrument in lieu of any payment (with the exception of letters of credit or cash collateral for deductibles); or

J.  Institute, defend, or maintain any legal proceeding on behalf of Everspan.

2.2  Retention of Authority.  Although Cardigan has been granted certain authorities under this Agreement, Everspan retains its authority to unilaterally cancel, non-renew, renew, or otherwise process any individual Policy.  Cardigan will not take any action inconsistent with any such action by Everspan.

2.3  Reinsurance.

A.  Cardigan hereby acknowledges that Everspan will enter into one or more reinsurance agreements with a Reinsurer (each, a "***Reinsurer***") providing for the cession of a certain portion of the underwriting risk assumed by Everspan pursuant to this Agreement (each, a "***Reinsurance Agreement***"). Notwithstanding any other provision of this Agreement, and regardless of the Effective Date, Cardigan will have no authority to quote, bind, or issue any Policies until Everspan has provided written notice to Cardigan that Everspan has obtained Reinsurance.  Everspan shall be the sole judge as to whether it has obtained Reinsurance.

B.  Cardigan shall have no authority to: (a) bind, assume or cede reinsurance or retrocessions on behalf of Everspan or any of its affiliates; (b) commit Everspan or any of its affiliates to participate as a co-insurer or co-Reinsurer in insurance or reinsurance syndicates or pools; (c) collect any payment from a Reinsurer or commit Everspan or any of its affiliates to any claim settlement with a Reinsurer; (d) make any commitments on behalf of Everspan with a Reinsurer other than as agreed to or requested in writing by Everspan; (e) prescribe the reinsurance quote Everspan accepts; or (f) prescribe the terms of any Reinsurance Agreement. The duties and responsibilities for reporting to and paying Reinsurers (including pursuant to any Reinsurance Agreement) remains with Everspan.

C.  Notwithstanding any other provision herein, Cardigan agrees to perform its obligations pursuant to this Agreement as reasonably necessary for Everspan to

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

comply with such terms of a Reinsurance Agreement that specifically refer to this Agreement and Cardigan's obligations hereunder. As is more fully set forth herein, Cardigan will provide to the Company such information that it reasonably requires to report to Reinsurers pursuant to the Reinsurance Agreement.

## ARTICLE III
## COMPLIANCE

3.1    <u>General</u>. Cardigan will at all times comply with all applicable all laws, common law, rules, regulations, ordinances, codes, statutes, judgments, injunctions, governmental orders, and decrees of all governmental authorities applicable to the Person, place and situation in question (collectively, "*Laws*") as well as Everspan's Policies and Procedures Manual, which is incorporated herein and may be revised by Everspan from time-to-time, at its discretion, upon notice to Cardigan. Cardigan will promptly notify Everspan of any non-compliance with or violation of any Law or this Agreement by any entity other than Everspan, including Cardigan or a Producer. In the event of any such violation, whether intentional or not, Cardigan will immediately take all lawful actions it deems reasonably necessary with the objective of curing any such violation or minimizing Everspan's legal exposure or reputational harm.

3.2    <u>Good Standing</u>. Cardigan represents and warrants that it is in good standing in the state under whose Laws it is organized (as well as those in which it transacts business) and covenants that it, and its personnel, shall maintain all permits, licenses, and regulatory approvals necessary to lawfully conduct its obligations. Cardigan shall promptly notify Everspan if Cardigan or its personnel no longer has such permits, licenses, or regulatory approvals, in which case Cardigan's authority hereunder will be automatically suspended and limited to acts necessary for Cardigan to operate lawfully. Cardigan shall thereafter promptly take all commercially reasonable action to fully restore its license in that jurisdiction(s), whereupon Everspan may, in its discretion, reinstate Cardigan's authority to bind or issue further insurance coverage under this Agreement in the affected jurisdiction.

3.3    <u>Oversight</u>. Cardigan shall maintain an oversight program whereby Cardigan shall demonstrate to Everspan its compliance with the Underwriting Instructions, the service standards specified in <u>Section 1.7</u> and Law. Without prejudice to the generality of the foregoing:

A.    Cardigan shall establish and implement a loss control program to support underwriting/risk selection, monitor the risk profile of the portfolio, and provide feedback and corrective actions to Producers and Policyholders.

B.    Cardigan shall comply with Law regarding the prevention of insurance fraud. Cardigan shall provide notice to Everspan, to the attention of Everspan's Special Investigative Unit (SIU) Officer, with a copy to the Legal Department, all potential fraudulent claims, applications, or potentially fraudulent activity received or detected by Cardigan. On an annual basis, Cardigan will provide antifraud training to its integral antifraud personnel. Cardigan will also train all newly hired integral antifraud personnel within ninety (90) days of commencing their duties. Cardigan will provide an annual certification to Everspan of the completion of such training promptly following its completion.

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

3.4    <u>Licensed Products</u>.  If Everspan permits Cardigan to use products or materials that are licensed to Everspan by third parties, including ISO products ("***Licensed Products***"):

      A.    The Licensed Products will be used solely for Everspan's benefit of and not for any other business of Cardigan or any other insurer;

      B.    Cardigan will use the Licensed Products in compliance with Everspan's license agreements with the third parties;

      C.    Cardigan will sign all contracts or other documentation required by Everspan or such third before using the Licensed Products; and

      D.    Cardigan will not sell, (re)distribute, donate, license, or transfer by any other means the Licensed Products to any person other than Cardigan or Everspan, and then only as necessary to transact the business of this Agreement.

3.5    <u>Sanctions Rules</u>.  Without prejudice to the generality of <u>Section 3.1</u>, Cardigan is authorized to and shall investigate every Person and entity that is or may be party to a transaction entered into by Cardigan on behalf of Everspan, including all prospective insureds, to ensure that such person or entity is not on the list of Specially Designated Nationals and Blocked Persons issued by the Office of Foreign Assets Control ("***OFAC***"), a division of the U.S. Treasury Department, as such list may be amended by OFAC from time to time as well as the sanctions lists maintained by the United Nations and European Union.  (The OFAC, United Nations, and European Union sanctions lists, and Laws and regulations are collectively referred to herein as "***Sanctions Rules***.").  Cardigan shall conduct OFAC checks and comply with (a) all applicable Sanctions Rules, and (b) any written instruction from Everspan to Cardigan related to Sanctions Rules.  Cardigan will not bind any Policies that result in a match during the OFAC review and will immediately notify Everspan of the same.

3.6    <u>Marketing</u>.  Cardigan will not refer to Everspan, or its employees and affiliates, or use any of their respective Marks in any website, social media, publication, press release, advertisement, or marketing materials (whether electronic or paper) ("***Marketing Materials***") without Everspan's prior written approval and annual re-authorization.  Use by Cardigan of Everspan's Marks in conjunction with Marketing Materials or any other materials connected with the Policy shall not be construed to mean that Cardigan has acquired any ownership interest in any of Everspan's logos, trademarks, trade names, or service marks.  Cardigan will maintain specimen copies of all Marketing Materials, with a notation attached to each such advertisement indicating the manner and extent of distribution, and provide originals to Everspan upon request; <u>however</u>, Cardigan; shall not be required to maintain records of the names and addresses of recipients of any direct mailing or advertising but shall only record the geographical area in which such mailing or advertising was used except to the extent retention of such information is required under Law.  Cardigan will ensure all Marketing Materials published or distributed comply with Law, including with regard to content, review, and approval of advertising and maintenance of Records.

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

# ARTICLE IV
## PRODUCERS

4.1 <u>Referrals from Producers</u>. Cardigan may accept insurance business referred from duly licensed third parties, whether directly or indirectly, including agents, brokers, producers, sub-agents, distributors, retailers (traditional and non-traditional), wholesalers, affinity groups, websites, aggregators, corporations, and individuals (collectively "***Producers***"). Cardigan will administer all Policies produced through Producers. Cardigan will ensure Producers are appropriately licensed and in good standing, will maintain a list and current copies of the licenses held by such Producer and will promptly notify Everspan if it learns that any Producer no longer has the permits, licenses, or other approvals necessary to lawfully conduct business, in which case Cardigan may no longer accept submissions from such Producer until: (a) Producer regains appropriate licensing; and (b) Everspan provides its express consent in writing. Cardigan will also promptly notify Everspan if it learns that a Producer has violated any Law, misappropriated funds, or engaged in fraud, gross negligence, or willful misconduct. Cardigan will maintain a list and current copies of Producers' licenses and provide the list upon request. Cardigan will be responsible for requiring that Producers perform in compliance with Law and that Producers maintain in-force E& O insurance with no less than $1,000,000 per claim limit of liability.

4.2 <u>Appointment and Authority of Producers</u>. Cardigan is responsible for appointing Producers on Everspan's behalf with Regulators when required by Law or directed by Everspan. As Producers are not agents of Everspan, Producers have no authority to quote, underwrite, bind, or issue Policies or to otherwise act on Everspan's behalf. Prior to the first sale of a Policy in a jurisdiction, Everspan shall deliver to Cardigan a copy of the applicable rules, procedures, and requirements with respect to policy applications and delivery and appointment of Producers. Everspan may provide Cardigan with changes to such rules, procedures, and requirements from time-to-time. Subject to requirements of Law, Cardigan will be responsible for paying all appointment fees, including transfer fees and termination fees, necessary for Cardigan or any Producer to sell Policies. For clarity, Cardigan shall bear all cost and liability associated with any failure to comply with this <u>Section 4.2</u>.

4.3 <u>Producer Disqualification</u>. Everspan may direct Cardigan to not transact with any individual Producer and may revoke any Producer's appointment at any time.

4.4 <u>Agreements with Producers</u>. Any contracts or other agreements regarding the transaction of insurance business will be made directly between Cardigan and its Producers. Such agreements will be available to Everspan upon Everspan's request and will deemed to contain the following provisions: Producers (i) have no authority to act on behalf of Everspan; (ii) will not have any claim against Everspan and must look solely to Cardigan to recover any costs, expenses or damages incurred by Producers as a result of any act or omission of Cardigan; (iii) will receive no commission on uncollected premium; and (iv) will maintain adequate errors and omissions insurance.

4.5 <u>Producer Compensation</u>. Cardigan is solely responsible and liable for any compensation due to Producers and payment by Everspan to Cardigan of any compensation due in connection with Policies will fully satisfy Everspan's obligation or liability, if any, to Producers or other parties. When required, Cardigan will prepare IRS Form 1099 for any Producer that places business through Cardigan.

4.6 <u>No Waiver of Rights</u>. With respect to the provisions of this <u>Article IV</u>, Cardigan will take no action contrary to Everspan's best interests or waive any rights that Everspan or Cardigan have against any Producer.

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

## ARTICLE V
## BANKING; ACCOUNTING; FINANCIAL REPORTING

5.1     Premium and Funds.

A.     Premium Collection.    Cardigan will be responsible for, and hereby unconditionally guarantees the collection and remittance to Everspan of, all premiums, deposits, return commissions, fees, and other funds due Everspan ("***Funds***"), whether or not such Funds are collected.

B.     Installment Plans.    With Everspan's prior approval, Cardigan may offer to Policyholders installment plans compliant with Law and the filed Rates and Forms.    Cardigan may retain Commission only on premium actually collected pursuant to any approved installment plan.

C.     Premium Finance and Other Arrangements.    Cardigan may not accept financed premiums unless the arrangement is approved by Everspan and compliant with Law and the filed Rates and Forms.    If approved, Cardigan will be solely responsible for all aspects of such financing, including, Producers' acts or omissions, notices, cancellation, and proper remittance of return premiums.    The provisions of this Agreement governing return commission and uncollected premium apply to all Policies for which premiums are financed, including those cancelled.    Cardigan will not enter into any lending or similar premium financing arrangements with Policyholders.    Cardigan has no authority to waive, rebate, or extend the time for payment of premiums or other Funds.

D.     Cancellation for Non-Payment.    Cardigan will provide Policyholders with adequate and compliant notifications regarding premium payment deadlines.    If premium is not timely received, Cardigan will, before the end of the first business day following the deadline, send a Notice of Cancellation for Non-Payment, effective on the earliest possible date.    If payment is received by Cardigan or Everspan after the deadline (or cancellation date, as applicable), Cardigan may elect one of the following options: (i) bind the policy, effective from the date on which the full outstanding payment was received; (ii) reinstate the policy, effective on the date upon which the payment was due but only if a legally enforceable statement is received from the Policyholder which confirms there have been no covered loss events or occurrences following the reinstated Policy's effective date; (iii) maintain the cancellation (unless required to reinstate by Law or the insurance policy).    Cardigan may request approval from Everspan to offer a "grace periods" or other exceptions for good cause.

5.2     Premium Account and Remittance.

A.     Fiduciary Account.    All Funds collected by Cardigan, or other monies relating to business subject to this Agreement, including all interests generated thereon, are Everspan's exclusive property.    Cardigan will hold such Funds in a fiduciary capacity for Everspan's sole benefit.

B.     Bank Accounts.    After receipt, Cardigan will immediately deposit all Funds received into either (i) a general premium trust account ("***General Premium Bank***

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

*Account*"); or (ii) a premium account dedicated exclusively to the fiduciary funds of Everspan ("***Everspan Premium Bank Account***"). If funds are first deposited into a General Premium Bank Account, Cardigan will have five (5) business days to transfer to a Everspan Premium Bank Account. Funds held in the Everspan Premium Bank Account will not be comingled with any other funds of Cardigan or any third party. Everspan may withdraw Funds from the Everspan Premium Bank Account at any time. All banks in which Funds are held must be federally or state chartered and a member of the FDIC.

C.    <u>Banking Policy</u>. Cardigan is subject to and will remain in compliance with Everspan's Banking Policy, which is incorporated by reference herein and which may be modified by Everspan upon advance written notice to Cardigan.

D.    <u>Remittance</u>. With respect to all transactions in the preceding month, Cardigan will pay all Funds due to Everspan by electronic funds transfer from the Everspan Premium Bank Account on or before the tenth (10th) business day of each month in accordance with instructions provided by Everspan. For clarity, any late remittances shall be subject to the "interest penalty" described in <u>Section 5.4</u>.

5.3    <u>Transaction Reporting and Enforcement</u>.

A.    <u>Reporting Deadline</u>. Within ten (10) business days following the end of each month, Cardigan will furnish to Everspan reports that provide timely, complete, and accurate details of all Policy transactions for each calendar month ("***Monthly Bordereaux***").

B.    <u>Format</u>. The Monthly Bordereaux will be provided in a format and with the information as directed by Everspan and will include transactions for all Policies, whether or not premium is collected, and all payments received, whether or not due. The detail will include, at a minimum: written premium, less returns and cancellations; collected premium; gross policy fees; billing fees and filing fees; and Commissions.

C.    <u>Other Reports</u>. Cardigan will provide, upon request and at its own expense, all other reports and data reasonably required as respects premiums, losses, and other transactions to facilitate Everspan's reporting and other obligations. To facilitate such reporting, Cardigan will format and code data in a manner reasonably required; with respect to statistical reporting, such reports will include stat-ready policy, claim, and transaction level data as defined by the Independent Statistical Service, Inc. Statistical Plan for the relevant line of business and in the relevant jurisdiction(s) (which is available from Everspan upon request).

5.4    [SECTION LEFT INTENTIONALLY BLANK]

5.5    <u>Financial Statements</u>. As soon as reasonably practical after (A) the end of each of the first three fiscal quarters of each fiscal year, Cardigan will furnish Everspan with unaudited financial statements prepared in accordance with generally accepted accounting principles ("***GAAP***") and (B) the end of each fiscal year, Cardigan will furnish Everspan with audited financial statements prepared in accordance with GAAP and certified by Cardigan's President and Venbrook's Chief Financial Officer (or their respective equivalent), and accompanied by an independent auditor report. If Cardigan cannot

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

furnish GAAP-audited financial statements, Cardigan will provide its annual tax returns upon filing for each fiscal year. If requested by Everspan, Cardigan will provide a current organizational chart of all affiliates under common control.

## ARTICLE VI
## COMMISSION

6.1    <u>Commission</u>.  Cardigan's commission under this Agreement will be as stated in the Commission Schedule attached hereto ("***Commission***").  Cardigan will only be entitled to Commission, including any adjustable commission or profit sharing, if it is in substantial compliance with the terms of this Agreement.

6.2    <u>Uncollected Premium</u>.  No Commission is payable to Cardigan on premiums that Cardigan fails or is unable to collect (or which Everspan independently collects, regardless of the amount collected by Everspan).  Cardigan will be responsible for collecting all Funds and will document all attempts to collect such Funds.  Any attempt by Everspan to directly collect, as well as any forbearance by Everspan with respect to, Funds due but not remitted pursuant to this Article VI will not be construed as a waiver of any right Everspan has under this Agreement, in equity, or by Law.

6.3    <u>Sole Compensation</u>.  With the exception of CGRPG fees as referenced in Schedule A, Section C, Commission will be Cardigan's sole compensation for all services provided by Cardigan, its affiliates, employees, Producers, and representatives under this Agreement.  Commission will include all sales or other tax, if any, due from Everspan relating to the Services or any classes of expenses under <u>Section 6.6</u>; no additional tax will be charged to Everspan for these services.

6.4    <u>Return Commission</u>.  During and after the Term, Cardigan will refund Commission to Everspan or other funds paid on return premiums at the same rate as the original premium.  If any return premiums are due to a Policyholder as a result of any Law or order of a Regulator, including "rate rollbacks" or similar mechanism, whether or not such action requires insurance brokers, producers, or agents to return commissions or fees, Cardigan will return to Everspan funds equal to the Commission and fees previously received by Cardigan with regard to such return premiums.

6.5    <u>Overpayment of Commission</u>.  If Cardigan receives an overpayment of Commission, including if Cardigan receives or retains a Commission based on written but not yet collected premium, Cardigan will refund such overpayment within ten (10) business days of receiving written notice thereof from Everspan.

6.6    <u>Expenses</u>.  Cardigan will be responsible for all expenses incurred in performing this Agreement or in conducting its business, including all expenses associated with:

A.    The Services;

B.    The development, analysis, and filing of Forms and Rates, including any expenses incurred by approved third parties in connection therewith;

C.    Everspan's participation in any Assigned Risks;

D.    Licensing of Cardigan, Producers, and their respective employees;

E.    All expenses relating to Producer appointments, where permitted by Law;

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

F.    Cardigan's information technology and Systems;

G.    Cardigan's allocated share of any costs incurred by Everspan for Cardigan's use of Licensed Products; and

H.    Advertising expenses, bank charges, bureaus and license expenses, transportation, and all overhead and other expenses of any nature.

In addition to Everspan's other rights, remedies, and entitlements, Everspan will be entitled to immediate payment from Cardigan for all expenses, losses, costs, charges, fines, or penalties incurred by Everspan (i) due to Cardigan's material breach or non-performance of any part of this Agreement; or (ii) related to any audit, market conduct examination, or other investigation by a Regulator regarding the Policies or this Agreement.

## ARTICLE VII
## TERM; TERMINATION; SUSPENSION OF AUTHORITY

7.1    <u>Term</u>.  This Agreement will commence on the Effective Date and continue until the effective date of termination of this Agreement in accordance with this <u>Article VII</u> ("**_Term_**").

7.2    <u>Termination by Mutual Consent; Termination Without Cause</u>.

A.    This Agreement may be terminated by mutual written agreement of the Parties at any time.



7.3    <u>Immediate Termination with Cause by Everspan</u>.  Everspan may immediately, unless otherwise indicated, terminate this Agreement in whole or in part, for cause, which means the following:



DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233



7.4     <u>Termination for Cause by Either Party</u>.  Upon notice to the other Party, either Party may immediately, unless otherwise indicated, terminate this Agreement in whole or in part, if:



DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233



7.5    Termination Following Uncured Breaches. Except for circumstances outlined in Section 7.3 and Section 7.4, if Cardigan otherwise breaches this Agreement ("*Curable Breach*"), Everspan may notify Cardigan in writing and provide no less than ten (10) business days to cure such Curable Breach. If the Curable Breach is not cured within the notice period, Everspan may thereafter immediately terminate this Agreement.  Curable Breaches include when Cardigan:



7.6    Scope of Termination. Termination of this Agreement by Everspan relates to Cardigan's authority to quote, produce, and write business on Everspan's behalf; all terms, covenants, agreements, obligations, representations, and warranties made by Cardigan in this Agreement will survive termination of this Agreement and continue in full force and effect until all contractual obligations relating to the Policies, Claims, and this Agreement have been fully and finally satisfied to Everspan's satisfaction (the "*Run-Off Period*").  Article VII, VIII, IX, XI, XII, and XIII express obligations which will indefinitely survive termination of this Agreement.

7.7    Post-Termination Obligations.

   A.    Cardigan's authority to issue new or renewal quotes, binders, or Policies with effective dates on or after the effective date of termination of this Agreement will cease on receipt of notice of termination except as otherwise required by Law.

   B.    Unless Everspan elects otherwise, Cardigan will handle the run-off of all Policies during the Run-Off Period at its sole expense in accordance with the same practices, procedures, and standards under this Agreement at the date of termination.  The run-off obligations of Cardigan include handling and servicing

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

all Policies through their natural expiration, together with any policy renewals, required to be made by provisions of applicable law. All costs and expenses associated with the handling of such run-off business will be borne solely by Cardigan.

C.    If Everspan or its third party designee is required to handle the run-off due to Cardigan's improper administration of, or refusal to administer, Policies then: (i) Everspan will be entitled to indemnification pursuant to Article XII for all expenses incurred to run-off of the Policies; (ii) no Commission will be due to Cardigan relating to any such Policies; and (iii) Cardigan will take such actions and provide such assistance including to access and utilize its Records, premises, furniture, equipment, personnel, data, systems, software, and other resources, including accounts in financial institutions for the purpose of performing the Run-Off at the expense of Cardigan. Upon the delivery of any resources to Everspan pursuant to this Section 7.7C Cardigan shall be deemed, so far as is necessary, to have granted a limited license to Everspan or its designee to use such resources in connection with the conduct of the Run-Off. If any such resources are licensed by Cardigan from a third-party vendor, Cardigan shall use its best efforts to ensure that the associated license agreement provides for Everspan or its designee to have the limited right to use the relevant resource during the Run-Off Period, and Cardigan shall continue to pay all license fees to the third-party vendor during the pendency of the Run-Off. Everspan hereby acknowledges and agrees that such license is a limited right to use the relevant resources solely as herein provided and shall not be construed to convey title to such resources, or any part thereof, to Everspan or as conferring on Everspan any right to sell, lease, transfer or dispose of all or any portion of such resources. For clarity, Cardigan shall fully cooperate with Everspan to effect any assumption of rights with respect to the Run-Off in accordance with this Section 7.7C.

D.    In the event of a Termination of Cardigan for cause, if directed by Everspan, Cardigan will develop a plan to accelerate the run-off of Policies in a manner that complies with Law and the rights of Everspan's Policyholders, which may include some of the following: specific cancellation or non-renewal procedures, novation, portfolio transfer, assumption reinsurance, or a block non-renewal or withdrawal plan. If termination of this Agreement requires notice to or approval by any Regulator, Cardigan will be primarily responsible for the process associated therewith, subject to Everspan's oversight and involvement with any communications with a Regulator. If Cardigan terminates this Agreement, and the effect of such termination is or is deemed by a Regulator to be that Everspan is initiating a "withdrawal" (or similar terminology) from a state or a line of business, Cardigan shall reasonably cooperate with Everspan to (i) develop and implement a plan to ensure ongoing compliance with Laws; or (ii) continue underwriting of business hereunder until such time as a compliant plan is developed and, if required, approved by a Regulator.

7.8    Security For Post-Termination Performance. Cardigan shall procure the execution of a financial guarantee by its parent, Venbrook Group LLC in the form attached hereto as Exhibit "B".

7.9    Expirations. ████████████████████████████████████████████
████████████████████████████████████████████████████████████████

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233



7.10    <u>Supplies</u>. Any supplies furnished by Everspan to Cardigan, including Policies, jackets, or Marketing Materials, will remain the property of Everspan and will be returned to Everspan upon termination of this Agreement.

7.11    <u>Suspension of Authority</u>. In the event that Everspan terminates Cardigan for cause as set forth hereinabove, Everspan may unilaterally suspend Cardigan's authority (including its authority to issue quotes or bind quoted risks) hereunder during any termination notice period. Upon receipt of such a notice of suspension, Cardigan will immediately cease to exercise such authority in accordance with such notice, including issuing any quotes or binding Policies unless unequivocally required by Law. Everspan's suspension of any authority of Cardigan will continue during the pendency of any Dispute, including Disputes (i) regarding termination or suspension, (ii) that have been referred to dispute resolution proceedings pursuant to <u>Section 15.10</u>, (iii) for which Everspan has sought injunctive or other civil relief, or (iv) regarding default under or breach of this Agreement.

7.12    <u>Waiver of Statutory Termination Rights</u>**.** Cardigan hereby agrees to waive statutory termination requirements imposed on Everspan by Law and will instead be bound by the termination provisions in this Agreement.

**ARTICLE VIII**
**EXCLUSIVITY**

8.1    Exclusivity.



**ARTICLE IX**
**ACCESS TO RECORDS; DATA REQUIREMENTS**

9.1    <u>Records</u>. During the Term and for at least the seven (7) year period following the termination of the relevant Policy (or such longer period as would comply with (a) the record retention policies of Cardigan, as applicable to its own business; (b) Law; or (c) the completion of any examination of Everspan by a Regulator), Cardigan will keep and maintain accurate and complete records of the business transacted under this Agreement, including Policy data, underwriting and Policy files, Forms and Rates, accounting and financial records, and correspondence with Policyholders, claimants, Producers, Regulators, and Everspan ("***Records***"). The Records will be maintained separately from all

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

other records of Cardigan and Cardigan shall be solely responsible for and shall keep the Records in such manner and form as is generally recognized as acceptable in the insurance industry or as may be reasonably required by Everspan. Except as specifically provided in this Agreement, the Records will be the joint property of Everspan and Cardigan. Cardigan will not destroy any Records without Everspan's prior written approval. All other records relating to this Agreement will be maintained in accordance with Everspan's Policies and Procedures Manual, or such longer period as may be required by Law.

9.2    Access to Records.  Everspan, its Reinsurer(s), its designated representative(s), and all Regulators will be afforded complete access to and the right to copy the Records, including for the purpose of auditing Cardigan, upon reasonable notice and during the regular business hours of Cardigan. Such access shall not disrupt the normal course of business of Cardigan. The rights of Everspan and its designated representatives under this subsection will include the access necessary to test Cardigan's obligations with respect to data security under Section 10.3. The Records will be accessible, organized and indexed to facilitate inspection and copying.  Any expenses incurred by Everspan for audits or examinations conducted by or on behalf of a Regulator that relate to Everspan in general, and not specifically to the business transacted or produced pursuant to this Agreement, shall be borne by Everspan. Any expenses incurred by Everspan or Cardigan for audits or examinations conducted by or on behalf of a Regulator as it specifically relates to the business transacted or produced pursuant to this Agreement shall be borne by Cardigan.

9.3    Data Requirements.  Cardigan will develop and maintain an interface with its systems and Everspan's data warehouse to electronically transmit, in a compatible format, transaction level detail of the business of this Agreement.  All reports required under this Agreement or requested by Everspan will be made in accordance with Everspan's written specifications (the "***Data Requirements***") which are incorporated by reference herein and which may be modified by Everspan upon advance written notice to Cardigan.

**ARTICLE X**
**CONFIDENTIALITY; DATA SECURITY**

10.1    Confidential Information.  "***Confidential Information***" means all information, whether or not reduced to written or recorded form, which (i) pertains to Everspan or Cardigan, any negotiations or business pertaining thereto, or any of the transactions either contemplates, including all financial, Customer, and reinsurance information, and is not intended for general dissemination; (ii) is confidential or proprietary in nature, was provided to the Party or its representatives by Everspan or Cardigan, as applicable, and relates directly or indirectly to either Everspan or Cardigan or the business of either; (iii) pertains to confidential or proprietary information of Everspan or Cardigan which has been labeled in writing as confidential or proprietary, or (iv) qualifies as non-public personal information or personal health information that is protected under Law.  Confidential Information includes all information regarding applicants, Policyholders, beneficiaries, and claimants (collectively, "***Customer Information***").  For clarity, information which:  (i) is available, or becomes available, to the public through no fault or action by such Party, its agents, representatives or employees; or (ii) becomes available on a non-confidential basis from any source other than Everspan or Cardigan, as applicable, and such source is not prohibited from disclosing such information, shall not be deemed Confidential Information.

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

10.2    Confidentiality.

    A.    During the Term, a Party ("**_Disclosing Party_**") may reveal to the Party ("**_Receiving Party_**") certain Confidential Information. Receiving Party agrees to use Confidential Information solely for the purpose of this Agreement, and any and all related Reinsurance Agreements, and shall keep Confidential Information confidential and not disclose Confidential Information to others, except as expressly permitted by this Agreement. Each Party shall each keep confidential and shall not disclose to others and shall use reasonable efforts to prevent its affiliates, successors, and assigns, employees and agents, if any, from disclosing to others, any Confidential Information other than to carry out the purposes set forth in this Agreement for which such Party disclosed such information. The Parties acknowledge that it is not practical, and shall not be necessary, to mark such information as "confidential," nor to transfer it by confidential envelope or communication, in order to preserve the confidential nature of the information.

    B.    Receiving Party may disclose Confidential Information to (1) its representatives who need to know Confidential Information solely for the purpose of Receiving Party's performance under this Agreement, provided that each representative shall be obligated to treat such Confidential Information in accordance with the terms of this Agreement as if such representative were the Receiving Party; and (2) to Reinsurers in connection with any existing or potential Reinsurance Agreement related to this Agreement. Receiving Party shall be responsible for any breach of this Agreement by its representatives.

    C.    Confidential Information, and all copies thereof, shall remain at all times the property of the Everspan or Cardigan, as applicable. Each Party will, upon request and at the cost of the Party owning the Confidential Information, promptly return to any Confidential Information received from the other. Everspan and Cardigan acknowledge and agree that Confidential Information is valuable information to Disclosing Party and unauthorized disclosure or use of Confidential Information by Receiving Party or its representatives may cause irreparable harm and damage to Disclosing Party, and in the event of any breach of the provisions of this Section 10.2, Disclosing Party shall be entitled to seek equitable relief, including injunctions and orders for specific performance, in addition to all other remedies available to it at law or in equity.

10.3    Privacy Policies. Cardigan shall provide to each new Policyholder, prior to or upon the issuance of any Policies written under this Agreement, and in accordance with Law, an initial notice of Everspan's privacy policies and practices. Not less than annually thereafter, Cardigan, upon the request of Everspan, shall distribute a copy of Everspan's annual privacy notice, as may be amended from time to time, to each existing Policyholder. In addition, Cardigan shall, upon the request of Everspan, distribute revised privacy notices and opt-in notices as applicable to each Policyholder to reflect any revisions which may be made to Everspan's privacy policies and practices. In each case, Everspan shall be responsible for providing Cardigan with a copy of the forms for its privacy policies and practices notice, which forms Cardigan shall use to create and deliver the notices described herein, at Cardigan's sole cost and expense. These notices shall be created and delivered independent of any separate legal obligation Cardigan may have to create and deliver its own such notices.

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

     10.4    <u>No Disclosure</u>.  Cardigan shall not disclose or use any nonpublic personal financial information or nonpublic personal health information related to any Policyholder, or to any consumer or customer (as such terms are defined under applicable privacy Laws), except as necessary to carry out its duties and obligations under this Agreement, or as otherwise permitted under Law.

     10.5    <u>Data Security, Breach Reporting, and Mitigation</u>.  Cardigan hereby covenants to:

     A.    Implement and maintain adequate administrative, technical, and physical safeguards to protect against any anticipated threats or hazards to the security or integrity of Systems and Confidential Information and unauthorized access to or use of such information that could result in substantial harm or inconvenience to any consumer or Policyholder, in compliance with Law;

     B.    Immediately give written notice to Everspan of any suspected or actual breach of any data or systems relating to its performance of this Agreement ("***Systems***"), including misuse or unauthorized disclosure of Confidential Information by a third party;

     C.    With respect to the Systems and Confidential Information, (i) use multi-factor authentication; and (ii) encrypt data in transit and at rest;

     D.    Immediately implement adequate measures to restore security when Confidential Information or the Systems are compromised, and provide assistance and information, at its sole cost, as Everspan may require in connection with such restoration as well as required notifications to relevant Regulators and affected individuals; and

     E.    Fully assist Everspan to comply with Laws involving data privacy or protection.

     10.6    <u>Disaster Recovery</u>.  Cardigan will implement a disaster recovery plan, maintain its Systems and Records in accordance with such plan, and test such plan from time to time.  Such disaster recovery plan will require an incremental system backup no less than daily, a full system backup no less than weekly, and a second full system backup no less than monthly.  The daily backups will be maintained by Cardigan for at least one week, the weekly backups will be maintained by Cardigan for at least one month, and the monthly backups will be maintained by Cardigan for at least one year.  The backups of the system will be maintained at an approved facility outside of Cardigan's facility.  In the event of damage to or malfunction of Cardigan's computer hardware or software or loss of data, Cardigan will use reasonable best efforts to obtain replacement computer hardware or software and recovery data to restore the services to an acceptable level as soon as possible.  Cardigan's disaster recovery plan will be deemed to provide Everspan direct access as necessary to independently service Policies and obtain Policy information.  Everspan may test such system(s) in its discretion.

     10.7    <u>Disclosure to Subcontractors</u>.  Without prejudice to the generality of <u>Section 15.5</u>, when transferring or disclosing Customer Information to subcontractors in connection with meeting any obligations under this Agreement (a) Cardigan shall not transfer any Customer Information from one country to another, except with the prior written consent of Everspan and in accordance with any additional terms required by Law and/or which Everspan may impose on the transfer and (b) Cardigan shall require such subcontractors to enter into appropriate security and data protection terms, including confidentiality and privacy contract terms, and all such terms shall be consistent with this Agreement.

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

## ARTICLE XI
## CLAIMS AUTHORITY; REPORTING

11.1    Authority.  Cardigan has no authority to adjust, reserve, settle or negotiate the settlement of Claims or Disputes or to make any statements regarding Claims or Disputes.

11.2    Reporting.  Cardigan will immediately report in writing to Everspan or Everspan's third-party claims handling designee ("**TPA**") any claim, suit, notice of incident or loss, or threat of litigation ("**Claims**"), including Claims relating to actual or alleged acts, errors, omissions, or bad faith of Everspan, Cardigan, the TPA or any Producer.

11.3    Cooperation.  Cardigan will cooperate with Everspan or its designee with respect to any Claim, including the preservation of all related documents and data, as required by Law or as directed by Everspan.

## ARTICLE XII
## REQUIRED INSURANCE

12.1    Required Insurance.  Cardigan will maintain and provide evidence of coverage upon Everspan's written request:

A.    An errors and omissions policy with a limit, adjusted annually, equal to or greater than $10,000,000;

B.    A fidelity or surety bond in an amount not less than the greater of: (i) $500,000; and (ii) the largest balance of funds held in the Everspan Premium Bank Account at the end of any given month during the preceding twelve (12)-months (determined each January 1st);

C.    Adequate general liability insurance; and

D.    To the extent not covered by any of the insurances listed above, an insurance policy that covers breaches of and losses relating to the Systems and Confidential Information, with such policy to include both liability protection of no less than $1,000,000 as well as breach response services, including notifications and credit monitoring for affected Policyholders and consumers.

12.2    Required Terms.  The policies referenced in this Article XII ("**Required Insurance Policies**") will be issued by insurers rated no less than "A-" by A.M. Best Company.  If any Required Insurance Policy is written on a claims–made basis, Cardigan will purchase the maximum extended reporting period available upon termination of such coverage, unless the successor policy provides equivalent "prior acts" coverage dating back to at least the Effective Date.  The mandatory minimum limits of each Required Insurance Policy will be based on the per occurrence or per claim made basis, as appropriate.

12.3    Notice of Changes.  Cardigan will provide prompt notice to Everspan of any changes to the Required Insurance Policies including notice of lapse, increased deductible, decreased coverage or cancellation.

12.4    Primary Nature of Cardigan's Insurance.  Any insurance coverage maintained by Everspan will be considered excess of any Required Insurance Policies.

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

**ARTICLE XIII**
**INDEMNIFICATION**

13.1    <u>Cardigan Indemnification</u>. Cardigan will indemnify, defend, and hold harmless Everspan and its past, present, and future affiliates, successors, and assigns, and their respective shareholders, directors, officers, employees, agents, and representatives (each an "***Everspan Indemnitee***"), from and against any and all liabilities, losses, claims, proceedings, damages, costs, or expenses (including attorneys' fees and expenses) ("***Indemnifiable Loss***") incurred by any Everspan Indemnitee, including any Indemnifiable Loss arising out of a third-party claim including:

   A.    Any act, error, or omission of Cardigan, a Producer, or any of their respective officers, directors, employees, affiliates, agents, representatives, or business partners;

   B.    Cardigan's agreement(s) with or termination of any Producer;

   C.    Cardigan's breach or misuse of Licensed Products, including breach or misuse by Cardigan's representatives, agents or employees;

   D.    Everspan's failure or alleged failure to comply with any Law arising from or relating to Cardigan's acts, errors, omissions, or advice;

   E.    Any data security incident involving Cardigan's Systems; or

   F.    Cardigan's breach of this Agreement.

13.2    <u>Everspan Indemnification</u>.    Everspan will indemnify, defend, and hold harmless Venbrook Group, LLC and its direct and indirect subsidiaries including Cardigan and their collective past, present, and future successors, and assigns, and their respective shareholders, directors, officers, employees (each a "***Cardigan Indemnitee***"), from and against any and Indemnifiable Loss incurred by any Cardigan Indemnitee in connection with this Agreement, including any Indemnifiable Loss arising out of a third-party claim involving:

   A.    Any act, error, or omission of Everspan or any of its officers, directors, employees, affiliates, agents, representatives; or

   B.    Any violation of Law by Everspan unrelated to an act or omission of Cardigan or any Producer.

   C.    Everspan's breach of this Agreement.

13.3    <u>Procedure for Indemnification</u>. Where there is any claim against or involving either Party that may give rise to indemnification, both Parties shall give notice to all applicable insurers and seek coverage for such claim. Each Party will reasonably cooperate and do nothing to impair or prejudice the availability of such insurance coverage. If any Everspan Indemnitee or Cardigan Indemnitee (each, an "***Indemnified Party***") receives notice of assertion or commencement of any third-party claim against such Indemnified Party in respect of which a Party liable for such indemnification (the "***Indemnifying Party***") may be obligated to provide indemnification under this Agreement, the Indemnified Party shall give such Indemnifying Party reasonably prompt written notice (but in no event later than fifteen (15) days after becoming aware of such third-party claim) thereof and such notice shall include a reasonable

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

description of the claim based on the facts known at the time and any documents relating to the claim and an estimate of the Indemnifiable Loss (to the extent reasonably quantifiable at that time) and shall reference the specific sections of this Agreement that form the basis of such claim to the extent reasonably ascertainable; provided, that no delay on the part of the Indemnified Party in notifying any Indemnifying Party shall relieve the Indemnifying Party from any obligation hereunder unless (and then solely to the extent that) the Indemnifying Party is actually prejudiced by such delay (except that the Indemnifying Party shall not be liable for any expenses incurred during the period in which the Indemnified Party failed to give such notice). Thereafter, the Indemnified Party shall deliver to the Indemnifying Party, within five (5) Business Days after the Indemnified Party's receipt thereof, copies of all notices and documents (including court papers) received by the Indemnified Party relating to the third-party claim. Each Party will promptly furnish to the other Party copies of all papers and official documents received in respect of any Indemnifiable Loss. The Indemnifying Party shall be entitled to participate in the defense of any third-party claim and, if it so chooses, to assume the defense thereof with counsel selected by the Indemnifying Party. Should the Indemnifying Party so elect to assume the defense of a third-party claim, the Indemnifying Party shall not as long as it conducts such defense be liable to the Indemnified Party for legal expenses incurred by the Indemnified Party in connection with the defense thereof subsequent to the Indemnifying Party notifying the Indemnified Party in writing of its election to assume such defense. If the Indemnifying Party assumes such defense, the Indemnified Party shall have the right to participate in the defense thereof and, in the Indemnified Party's discretion, to either consent to the Indemnifying Party's selection of counsel (which consent shall not be unreasonably withheld or delayed) or, at the Indemnified Party's own expense, employ counsel separate from the counsel employed by the Indemnifying Party, it being understood that the Indemnifying Party shall control such defense. The Indemnifying Party shall be liable for the reasonable fees and expenses of counsel employed by the Indemnified Party for any period during which the Indemnifying Party has not assumed the defense thereof (other than during any period in which the Indemnified Party shall have not yet given notice of the third-party claim as provided above). If the Indemnifying Party chooses to defend any third-party claim, the Indemnified Party shall cooperate in the defense thereof. Such cooperation shall include the retention and (upon the Indemnifying Party's request) the provision to the Indemnifying Party of records and information that are relevant to such third-party claim, and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder; provided, in each case, that such other Party shall not be obligated to provide such records, information or access to Indemnifying Party if doing so would violate Law or jeopardize the protection of an attorney-client privilege. Whether or not the Indemnifying Party shall have assumed the defense of a third-party claim, the Indemnified Party shall not admit any liability with respect to, or pay, settle, compromise or discharge, such third-party claim without the Indemnifying Party's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed). If the Indemnifying Party has assumed the defense of a third-party claim, the Indemnifying Party may only pay, settle, compromise or discharge a third-party claim with the Indemnified Party's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed); provided, that the Indemnifying Party may pay, settle, compromise or discharge such a third-party claim without the written consent of the Indemnified Party if such settlement (i) includes a release of the Indemnified Party from all liability in respect of such third-party claim, (ii) does not subject the Indemnified Party to any injunctive relief or other equitable remedy, (iii) does not include a statement or admission of fault, culpability or failure to act by or on behalf of the Indemnified Party and (iv) does not impose any financial cost or reputational harm on the Indemnified Party. If the Indemnifying Party submits to the Indemnified Party a bona fide settlement offer with respect to a third-party claim that has been accepted by all persons bringing such third-party claim and otherwise satisfies the requirements set forth in the proviso of the immediately preceding sentence and the Indemnified Party refuses to consent to such settlement, then thereafter the Indemnifying Party's liability to the Indemnified Party with respect to

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

such third-party claim shall not exceed the Indemnifying Party's portion of the settlement amount included in such settlement offer. The Indemnifying Party will pay or reimburse the Indemnified Party for any amounts due within ten (10) days of receipt of a written statement from such Indemnified Party reasonably setting forth the amount due. Any payments for indemnification hereunder that are not otherwise covered by insurance shall be paid by the Indemnifying Party on an after-tax basis.

13.4    <u>Direct Claims</u>. The provisions of this <u>Article XIII</u> will be not construed as limiting a Party's pursuit of a direct action against the Party.

**ARTICLE XIV**
**INTELLECTUAL PROPERTY**

14.1    <u>Ownership of Marks</u>. For purposes of this Agreement, each Party acknowledges that the trademarks, trade dress, service marks, trade names, logos, domain names, slogans, and any other identifiers of source, origin or goodwill (including brand names, product names, and logos), drawings or graphic content, sound, colors, shapes, and letters and characters which create trademarks, service marks, trade dress or other marks, in all cases whether or not registered (together with the goodwill of the business connected to the foregoing), including registrations and applications for registration thereof (collectively, "*Marks*") of the other Party are the sole and exclusive property of such Party or its affiliate from which such Party has obtained a license to use and sublicense the use of the same, and that such Party or its affiliate shall retain the sole and exclusive ownership of, and all rights in all goodwill associated with its existing Marks as of the Effective Date.

14.2    <u>Background IP</u>. Nothing in this Agreement shall be construed as conveying or transferring ownership of either Party's patents, copyrights, trade secrets or other intellectual property and proprietary rights (collectively, "*Intellectual Property*"), to the extent owned, developed or acquired by such Party or its affiliates prior to the Effective Date or outside the scope of this Agreement (collectively, "*Background IP*"). Each Party acknowledges and agrees that, as between the Parties, each Party shall retain all of its rights, title and interest in and to its Background IP perpetually (except for the right to use such Background IP as expressly permitted under this Agreement or any licenses expressly granted under this Agreement).

14.3    <u>License of Marks</u>. Each Party hereto grants to the other a non-exclusive, non-transferable and royalty-free license to use its Marks during the Term and subject to the terms and conditions hereinafter set forth, solely in connection with and as necessary for exercising its rights and performing its obligations hereunder. Each Party may use the Marks of the other Party only in the form, color, dimension, and manner as approved by the other Party. Each Party must also obtain the prior written consent of the other Party prior to any new use of the other Party's Marks, which approval shall not be unreasonably withheld or delayed. Use of a Party's Marks may be subject to such reasonable conditions as the other Party may impose including conditions affording each Party adequate protection of its Marks. Neither Party will impugn, challenge, or assist in any challenge to the validity of the other Party's Marks, any registrations thereof, or the ownership thereof. Each Party will be solely responsible for taking any actions as it deems appropriate to obtain trademark, service mark, or copyright registration for its respective Marks. All uses of or references to the Marks will inure to the benefit of the respective owner, and all rights with respect to the Marks not specifically granted in this Agreement will be and are hereby reserved to the respective owner.

14.4    <u>Reservation of Rights</u>. For clarity, the Intellectual Property rights of each Party and its affiliates remain the property of that Party (and its affiliates), which, as between the Parties and their respective affiliates, shall continue to be the sole owner thereof. Each Party's and its affiliates' rights

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

and licenses to use the Intellectual Property rights of the other Party and its affiliates are specifically provided for in this Article XIV and no other licenses or rights whatsoever are granted, expressly, or by implication or estoppel, by the provisions of this Agreement (including any rights to prosecute, maintain, enforce, defend, or settle). Any and all right, title, and interest in and to the Intellectual Property rights of each Party and its affiliates not expressly granted herein are hereby reserved and retained by such Party and its affiliates. Other than as set forth in Section 14.3, nothing in this Agreement may be construed to authorize one Party or any of its affiliates to use any Marks owned by the other Party or any of its affiliates, or any other mark, name, word, or sign of confusing similarity to one owned by the other Party (or any of its affiliates).

14.5    Disclaimer.    SUBJECT TO THE TERMS OF THIS AGREEMENT, ALL INTELLECTUAL PROPERTY IS PROVIDED PURSUANT TO THIS AGREEMENT ON AN AS-IS, WHERE-IS BASIS. EACH PARTY HEREBY EXPRESSLY DISCLAIMS ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, AS TO SUCH INTELLECTUAL PROPERTY.

## ARTICLE XV
## GENERAL

15.1    Notice.    All written notices required under this Agreement will be deemed given when received by the other Party via a recognized mail or courier service, provided delivery receipt has been confirmed, at the address set forth below:

|  |  |
|---|---|
| To Everspan: | Everspan Indemnity Insurance Company<br>One World Trade Center, 41st Floor<br>New York, NY 10007<br>Attention:    General Counsel<br>              legal@everspangroup.com |
|  | *with a copy to*:    Steve Dresner, Chief Underwriting Officer<br>              sdresner@everspangroup.com |
| To Cardigan: | Cardigan General Insurance Services, LLC<br>6320 Canoga Ave., 12th Floor<br>Woodland Hills, CA 91367<br>Attention:    Brenda Sherman<br>              bsherman@cardigangeneral.com |
|  | with a copy to:<br>              Legal Department |

All notices will also be provided, as courtesy, by e-mail to the individuals so designated above.

15.2    Entire Agreement.    This Agreement embodies the entire agreement and understanding between the Parties with respect to the transactions contemplated hereby and supersedes all prior agreements and understandings, whether or not written.

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

15.3    <u>Modifications</u>.    Except as specifically provided herein, this Agreement may not be modified, amended or supplemented, nor may any provision hereof be waived, except by written amendment signed by both Parties stating the effective date and extent of such amendment, modification, supplement or waiver.

15.4    <u>No Third-Party Beneficiaries</u>.    Except with respect to <u>Section 9.2</u> and <u>Article XIII</u>, this Agreement is not intended to confer upon any person other than the Parties any rights or remedies hereunder.

15.5    <u>No Assignment or Delegation; Use of Affiliates</u>.    Other than as expressly provided for in this Agreement, a Party may not assign, delegate or otherwise transfer any of its rights or obligations under this Agreement whether by agreement, operation of Law or otherwise, without the express prior written consent of the other Party (which consent shall not be unreasonably withheld or delayed) and any purported assignment, delegation or transfer in violation of this provision shall be void and of no force or effect, <u>provided,</u> that any obligations to be performed, or rights which may be exercised by a Party, pursuant to this Agreement may be performed or exercised, as the case may be, by any corporate affiliates of a Party, subject to Law and the licenses and authorities held by such corporate affiliates; <u>provided</u>, <u>further</u>, that such Party shall remain responsible for the full performance of all of its obligations under this Agreement until such obligations have been fully performed by it or such relevant corporate affiliate on its behalf. Each Party shall be solely responsible for its own personnel and shall be fully liable for the acts or omissions of its personnel as if such acts or omissions were committed by itself.

15.6    <u>Authority</u>.    Each Party represents and warrants that it has the full right, power, legal capacity and authority to enter into and perform its obligations under this Agreement and that those obligations will be binding and enforceable without approval of any other person or entity. Each person signing this Agreement on behalf of a Party represents and warrants that he or she has the full right, power, legal capacity and authority to sign this Agreement on behalf of that Party.

15.7    <u>Offset</u>.    The Parties may offset funds due to the other under this Agreement.

15.8    <u>No Waiver</u>.    The failure of a Party to enforce any provision of this Agreement or to assert a default or breach of any of the terms and conditions of this Agreement shall not be construed as a waiver of any of said terms and conditions, nor estop either that Party from thereafter demanding a full and complete compliance therewith. The past waiver of a provision by either Party will not constitute a course of conduct or a waiver in the future as to that same provision.

15.9    <u>Severability</u>.    If any portion of this Agreement is found to be invalid or unenforceable, the remainder of this Agreement will remain in full force and effect. Both Parties shall use best efforts to appropriately rewrite such illegal, invalid or unenforceable provision(s) in accordance with the original intent of such provision(s) and incorporate such rewritten provision(s) into the Agreement.

15.10    <u>Governing Law</u>.    The terms and conditions of this Agreement will be governed exclusively by the Law of the State of New York, without regard to conflicts of laws principles other than Section 5-1401 and 5-1402 of the General Obligations Law of the State of New York.

15.11    <u>Dispute Resolution; Consent to Jurisdiction; Waiver of Jury Trial</u>.    Subject to <u>Section 15.12</u>, any controversies resulting from and/or related to this Agreement (each, a "**_Dispute_**") shall be notified by one Party to the other Party, and the Parties shall undertake to use their best efforts to settle such Disputes amicably, through direct and good-faith negotiations, within thirty (30) days from the date

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

of receipt of such notice (the "**Settlement Period**").If, at the end of the Settlement Period, the Parties do not reach an amicable solution, notwithstanding the possibility of the aggrieved Party's filing any lawsuit seeking specific enforcement of the defaulting Party's obligations, the Parties irrevocably submit to the exclusive jurisdiction of the federal and state courts located in the Borough of Manhattan in New York City (the "**Chosen Courts**") and agree to be bound by any judgment rendered by any such court with respect to such Dispute. The Parties waive any objection they may now or hereafter have to the venue of any such proceeding in such Chosen Court and any claim that such proceeding has been brought in an inconvenient forum. Any order or judgment of a Chosen Court may be enforced in any court having jurisdiction over the Parties and/or the subject matter. Process in any proceeding in either of the Chosen Courts may be served by certified mail, which service will be sufficient to confer personal jurisdiction over the Party so served. The Parties agree that in any proceeding arising out of or relating to a Dispute, the Chosen Court is empowered to grant any legal or equitable relief which may be available, including specific performance, injunctive relief and any mandatory injunction it deems appropriate. Neither Cardigan nor any Cardigan Indemnitee will have or assert any claim against Everspan, its subsidiaries, successors, or assigns, or the shareholders, directors, officers, agents or employees of any of them, for loss of business, loss of profits, or damage to goodwill or reputation except in the event of Everspan's proven fraud or willful misconduct. Further, Cardigan will not have or assert any claim against Everspan relating in any manner to Everspan's termination of this Agreement. TO THE FULLEST EXTENT PERMITTED BY LAW, EACH PARTY WAIVES ITS RESPECTIVE RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING FROM OR RELATING TO THIS AGREEMENT OR ANY DEALINGS BETWEEN THEM ARISING FROM OR RELATING TO THE SUBJECT MATTER OF THE TRANSACTIONS CONTEMPLATED HEREUNDER. The scope of this waiver is intended to encompass any and all disputes that may be filed in any court and that arise from or relate to the subject matter of this Agreement, including contract claims, tort claims, breach of duty claims and all other common law and statutory claims. This waiver will apply to any subsequent amendments, renewals, supplements or modifications of or to this Agreement.

15.12  Notwithstanding Section 15.11, a Party may request a court to issue an order for the other Party to take an action or stop taking an action, but only if the requesting Party has a good faith reason to believe that the other Party would be irreparably damaged if a court did not take such action and, in any event, only with respect to actual or potential material breaches of the following Sections of this Agreement: Section 1.2 (Underwriting Instructions), 5.2(D) (Remittance), 5.3(A) (Reporting Deadline), 9.1 (Records), 9.2 (Access to Records), 10.2 (Confidentiality), or 10.5 (Data Security, Breach Reporting, and Mitigation). It is accordingly agreed that the Parties shall be entitled to seek an injunction or injunctions to prevent breaches of the sections expressly enumerated in this clause and to enforce specifically the terms and provisions of such Sections and Article, this being in addition to any other remedy to which such Party is entitled at law, in equity, in contract, in tort or otherwise.

15.13  Independent Contractor. Cardigan is an independent contractor and has full and exclusive control over its time, affairs, and operations. Cardigan may, from time to time, benefit from the recommendations, suggestions, answers to questions, or work product of Everspan's staff and vendors, including legal, actuarial, consulting, systems and financial support services. Everspan will have no liability or professional responsibility to, or create any professional relationship with, Cardigan other than as specifically set forth in this Agreement.

15.14  Counterparts. This Agreement may be executed simultaneously in several counterparts, each of which will constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by scanned pages shall be effective as delivery of a manually executed counterpart to this Agreement.

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

15.15  <u>Jointly Drafted</u>.  This Agreement will be deemed to have been drafted by both Parties and, in the event of a dispute, any perceived ambiguity will not be construed against either Party.

15.16  <u>Interpretation</u>.  The term "this Agreement" shall mean this Agreement together with the Schedules and exhibits hereto, as the same may from time to time be amended, modified, supplemented or restated in accordance with the terms hereof.  Any collective defined term and any defined term used in the plural will be taken to encompass individually and collectively all members of the relevant class.  Any defined term used in the singular preceded by "any" will be taken to indicate any number of the members of the relevant class.  Any defined term used in the singular and preceded by the word "each" will indicate all members of the relevant class, individually.  The use of the word "include" (and all derivations therefrom) in this Agreement is illustrative and not restrictive; any list or example preceded by "include" or "including" is not necessarily exhaustive or complete.  Unless otherwise stated, the absence of "include" or "including" preceding (or otherwise qualifying) any list or example will mean that such list or example is restricted to the items listed.  All references to articles, sections, subsections, clauses, paragraphs, schedules, and exhibits mean such provisions of this Agreement, except where otherwise stated.  The use herein of the masculine, feminine, or neuter forms shall also denote the other forms, as in each case the context may require.  The headings in this Agreement are for reference only and will not limit or otherwise affect the meaning or interpretation of this Agreement.  Unless otherwise stated, all timeframes in this Agreement refer to calendar days.  Deadlines falling on weekends or U.S. bank holidays are extended to the next business day.  References to "dollars" or "$" shall mean the lawful currency of the United States of America.

15.17  <u>Change in Control</u>.  Cardigan will notify Everspan in writing as soon as possible after it becomes aware of, but in no event more than thirty (30) days after, any of the following proposed or actual occurrences, each of which would be a "Change in Control:"

      A.     A sale, transfer or pledge, or the issuance to a new shareholder or member, of 10% or more of Cardigan's voting stock or membership interests;

      B.     A sale, transfer or pledge of a substantial portion of Cardigan's material assets;

      C.     Any merger or consolidation of Cardigan with another entity or entities with the exception of an affiliate of Venbrook Group, LLC or an affiliate Cardigan; or

      D.     A change in any executive, director, or principal of Cardigan.

15.18  <u>Managing General Agent Status</u>.  If at any time Everspan or a Regulator deems or determines that Cardigan is a "managing general agent" as defined in any Law, this Agreement will be automatically amended to comply with such Law and Cardigan will take all steps reasonably required to ensure compliance therewith or take such actions or refrain from taking actions that results in that determination.

15.19  <u>Conflicts of Interest</u>.  At any time during the Term or Run-Off Period, Cardigan believes, or reasonably should believe, that it has a conflict of interest because of differing interests of Everspan and any other entity for which Cardigan also provides services, it will immediately disclose the existence of such conflict to Everspan.  Cardigan must have adequate procedures for identifying and addressing such conflicts of interest.

15.20  <u>Definitions</u>.  The following terms shall have the meanings defined in the Section indicated:

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

*"Assigned Risks"* ............................................................... 1.11
*"Background IP"* .............................................................. 14.2
*"Chosen Courts"* ............................................................. 15.11
*"Claims"* ......................................................................... 11.2
*"Commission"* ................................................................ 6.1
*"Confidential Information"* .............................................. 10.1
*"Curable Breach"* ........................................................... 7.5
*"Customer Information"* .................................................. 10.1
*"Data Requirements"* ...................................................... 9.3
*"Disclosing Party"* .......................................................... 10.2A
*"Dispute"* ........................................................................ 15.11
*"Effective Date"* ............................................................. Preamble
*"Everspan"* ...................................................................... Preamble
*"Everspan Indemnitee"* .................................................... 13.1
*"Everspan Premium Bank Account"* .................................. 5.2B
*"Expirations"* ................................................................... 7.9
*"Financial Audit"* ............................................................ 5.6
*"Forms and Rates"* .......................................................... 1.3
*"Funds"* ........................................................................... 5.1A
*"GAAP"* ........................................................................... 5.5
*"General Premium Bank Account"* ..................................... 5.2B
*"GWP"* ............................................................................. 12.1A
*"Indemnifiable Loss"* ....................................................... 13.1
*"Indemnified Party"* ......................................................... 13.3
*"Indemnifying Party"* ....................................................... 13.3
*"Intellectual Property"* ..................................................... 14.2
*"Key Person"* ................................................................... Schedule A
*"Laws"* ............................................................................ 3.1
*"Marketing Materials"* ..................................................... 3.6
*"Marks"* ........................................................................... 14.1
*"Monthly Bordereaux"* ..................................................... 5.3A
*"OFAC"* ........................................................................... 3.5
*"Party"* or *"Parties"* ...................................................... Preamble
*"Cardigan"* ....................................................................... Preamble
*"Cardigan Indemnitee"* .................................................... 13.2
*"Policyholders"* ............................................................... 1.5
*"Premium Cap"* ............................................................... Schedule A
*"Producers"* ..................................................................... 4.1
*"Receiving Party"* ............................................................ 10.2A
*"Records"* ........................................................................ 9.1
*"Regulators"* .................................................................... 1.8
*"Reinsurance"* .................................................................. 1.2
*"Reinsurance Agreement"* ................................................ 2.3
*"Reinsurer"* ...................................................................... 2.3
*"Required Insurance"* ....................................................... 12.2
*"Run-Off Period"* ............................................................. 7.6
*"Sanctions Rules"* ............................................................ 3.5
*"Secured Property"* .......................................................... 7.8
*"Services"* ........................................................................ 1.4

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

"*Settlement Period*".................................................................................... 15.11
"*Systems*"..................................................................................................... 10.5B
"*TPA*"............................................................................................................ 11.2
"*Underwriting Instructions*"................................................................... 1.2

[SIGNATURE BLOCKS ON FOLLOWING PAGE]

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

The following officers of each Party are signing this Agreement to be effective as of the Effective Date:

**EVERSPAN INDEMNITY INSURANCE COMPANY**

By: _Steven Dresner_

Name: _Steve Dresner_

Title: _Chief Underwriting Officer_

Date: _4/30/2021_


**CARDIGAN GENERAL INSURANCE SERVICES, LLC**

By: _Brenda Sherman_

Name: _Brenda Sherman_

Title: _President_

Date: _4/30/2021_

*[Signature Page to Program Administrator Agreement]*

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

**SCHEDULE A**

**Authorized Business**

Everspan may amend this Schedule of Authorized Business upon prior written notice to Cardigan.

A.    **Territories**



B.    **Lines of Business**

Non-Emergency Medical Transportation (E&S) ("NEMT")

*Limited authority* Commercial Auto (E&S) ("Trucking")



C.    **Maximum Limits and Fees**



D.    **Production Limitation**

*[Schedule A – Authorized Business]*

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

E.    **Exclusions**

Cardigan shall have no authority with respect to any risks, classes, or types of insurance excluded under either the Underwriting Instructions or the Reinsurance Agreement(s).

F.    **Key Person.**

The following are "***Key Persons***" and Cardigan will provide prompt notice to Everspan if any Key Person ceases active employment with Cardigan or any of Cardigan's affiliates:

- Brenda Sherman

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

## SCHEDULE B

### Commission



DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233



DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

**EXHIBIT A**

**Reinsurance Agreement**

DocuSign Envelope ID: BF7EB703-9A74-4A00-ABF1-79506DF9E233

# EXHIBIT B

## Parental Guaranty

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

## CLAIMS ADMINISTRATION AGREEMENT

This CLAIMS ADMINISTRATION AGREEMENT (this "***Agreement***") is entered into as of May 1, 2021 (the "***Effective Date***"), by and between **Carl Warren & Company, LLC** (hereinafter referred to as "Carl Warren") and **Everspan Indemnity Insurance Company** ("***Everspan***"). Carl Warren and Everspan will each be referred to as a "***Party***" and collectively as the "***Parties***."

## ARTICLE 1.

## <u>SERVICES PROVIDED BY CARL WARREN</u>

1.1    <u>Program Exhibits</u>. Attached to, and forming part of, this Agreement are one or more exhibits that contain program-specific information (each, a "***Program Exhibit***"). The terms of this Agreement become effective with respect to each insurance program on the effective date specified in each Program Exhibit. If, and to the extent that, any provision of a Program Exhibit conflicts with a provision of this Agreement, the Program Exhibit will govern.

1.2    <u>Claims Services</u>. Everspan issues policies of insurance ("***Policies***") for each program described in a Program Exhibit ("***Claims***"). Subject to the terms and conditions of this Agreement, Carl Warren is authorized and agrees to provide the services necessary to properly handle Claims ("***Claims Services***"), including:

(a)    Review, investigate, adjust, resolve, disclaim, or deny all Claims, as appropriate;

(b)    Establish, maintain, and update appropriately documented files for each Claim;

(c)    Appoint approved, independent defense counsel ("***Defense Counsel***") for those insured under Policies ("***Insureds***");

(d)    Coordinate a proper defense with Defense Counsel and, as required, with Everspan;

(e)    Furnish Insureds with all forms necessary to properly administer claims;

(f)    Appoint adjusters, appraisers, engineers, assessors, or other parties necessary to evaluate Claims;

(g)    Establish timely reserves that reflect all amounts reasonably expected to be ultimately payable, which reserves will be reviewed with reasonable frequency and revised, as appropriate, in light of updated information;

(h)    Negotiate settlements of Claims;

(i)    Make required payments from the Claims Account;

(j)    Unless otherwise directed, diligently pursue and prosecute Everspan's subrogation and salvage rights under any Policy;

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

(k)    Perform all administrative and clerical work in connection with Claims;

(l)    Provide all Claim-related reports and notices required by this Agreement; and

(m)    Abide by all instructions provided by Everspan with respect to this Agreement.

1.3    Service Standards. Carl Warren will perform the Claims Services in good faith and with the care and skill expected of an experienced claims administrator. Carl Warren will, at its own expense, maintain sufficient staff of licensed, competent, and trained personnel and will maintain the supplies and equipment required to perform Claims Services. Claims Services will be performed in accordance with instructions that may be provided, at any time, by Everspan to Carl Warren.

## ARTICLE 2.

## CARL WARREN'S AUTHORITY

2.1    Discretionary Authority. Carl Warren's authority for each Claim will be the amount set forth on each Program Exhibit ("***Discretionary Authority***"). Carl Warren may adjust, reserve for, settle, or pay any Claim in which the Incurred Value is less than or equal to the Discretionary Authority. Carl Warren may not adjust, reserve for, settle, or pay any Claim where the Incurred Value is greater than the Discretionary Authority without the prior written approval of Everspan. Carl Warren has no financial authority related to extra-contractual or *ex gratia* matters. Everspan may revise, suspend, or revoke Carl Warren's Discretionary Authority, in its sole discretion, upon notice to Carl Warren, including during the pendency of any dispute regarding termination of this Agreement. Neither Carl Warren nor anyone appointed by Carl Warren will have any right or authority to collect any payment from a reinsurer or commit Everspan to any Claim settlement with a reinsurer.

2.2    Approval Process. Any approval requested from Everspan under this Agreement, including for Claims in excess of the Discretionary Authority, shall be submitted to Everspan by Carl Warren in writing; requests sent to the e-mail address(es) listed on the relevant Program Exhibit shall be sufficient for purposes of this Section 2.2. All such requests must be accompanied by a summary of the relevant Claim, a recommended course of action to resolve the Claim, and a recommended ultimate reserve. Carl Warren acknowledges and agrees that Everspan at all times acts in reliance upon the opinions, advice, and facts presented by Carl Warren and that Carl Warren shall not be absolved of any of its duties or obligations under this Agreement, including those pursuant to Article 11, regardless of whether Everspan adopts the recommendations made by Carl Warren. Everspan's act of adopting a recommendation by Carl Warren shall not constitute an affirmative directive or instruction by Everspan.

2.3    Final Authority. Everspan has the right, at any time and in its sole discretion, to direct or assume control of the administration, investigation, and performance of all Claims Services related to any and all Claims, without regard to the Discretionary Authority granted in this Article, including final authority over all decisions related to those Claims.

2.4    Subrogation. Carl Warren will diligently pursue Everspan's salvage and subrogation rights under all Policies. Carl Warren will pursue such rights with the same diligence

2

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

as if they were Carl Warren's own. With respect to any or all Claims, Everspan may, at any time and in its sole discretion, elect to either: (i) pursue its own subrogation rights; or (ii) delegate the pursuit of its subrogation rights to a third party; in which case, Carl Warren will not be entitled to any fees or compensation related to subrogation recoveries.

2.5    Selection of Counsel. Unless otherwise agreed, Defense Counsel engaged by Carl Warren in connection with any Claim will be selected from a list of approved, independent counsel provided by Everspan. Carl Warren may, with the written consent of Everspan, use Defense Counsel not on the list provided by Everspan, but only with respect to Claims or other matters specifically allowed by Everspan. Everspan will direct the engagement of counsel to advise and represent Everspan with respect to coverage-related issues. All invoices from counsel will be processed as directed by Everspan. It is hereby understood and agreed that Carl Warren will not perform, and Everspan will not request, any services which may constitute the unauthorized practice of law or which Carl Warren believes constitutes the unauthorized practice of law.

## ARTICLE 3.

## COMPLIANCE

3.1    Compliance with Legal and Other Requirements. Carl Warren will comply at  all times with all applicable federal, state, and local laws, rules, and regulations, including state laws and regulations governing claims adjusting, licensing, and unfair claims handling practices ("*Law*"). Carl Warren will also comply with Everspan Group's Policies and Procedures Manual, which is incorporated herein by reference.

3.2    Licensing. Carl Warren represents and warrants that it and its employees, adjusters, and investigators have and will maintain all permits, licenses, and regulatory approvals necessary to provide the Claims Services. Carl Warren will promptly notify Everspan if Carl Warren, its employees, adjusters, and investigators no longer have the permits, licenses, or regulatory approvals necessary to provide the Claims Services, in which case Carl Warren's authority hereunder will be automatically suspended and limited to acts necessary for Carl Warren to operate in compliance with applicable Law. Carl Warren shall thereafter promptly take all commercially reasonable action to fully restore its license in that jurisdiction(s), whereupon Everspan may, in its discretion, reinstate Carl Warren's authority perform its obligations hereunder.

3.3    Regulatory Communications and Complaints. Carl Warren will maintain an accurate and complete complaint log in the form required by Everspan.

## ARTICLE 4.

## REPORTING TO EVERSPAN

4.1    Notice of High Potential Claims. Carl Warren will notify Everspan promptly (but in no event later than five (5) Business Days following Carl Warren's discovery) of any High Potential Claim. The format for reporting High Potential Claims will be Everspan's "large loss notice" for the appropriate line of business ("*LLN*"), unless otherwise directed in writing by

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

Everspan. Everspan's LLNs are set forth in <u>Schedule D</u> and may be revised by Everspan, in its discretion, upon notice to Carl Warren.

4.2     <u>Notice of High Incurred Value Claims</u>. Carl Warren will notify Everspan promptly (but in no event later than five (5) Business Days following Carl Warren's discovery) of any Claim with an Incurred Value that exceeds the High Incurred Value Claim threshold listed on each Program Exhibit, as well as any Claim on deductible, self-insured retention, or retrospectively-rated Policies when the probable ultimate outcome exceeds 50% of the deductible or self-insured retention ("***High Incurred Value Claim***"). The format for reporting High Incurred Value Claims will through the LLN, unless otherwise directed in writing by Everspan.

4.3     <u>Notice of Disputed Claims</u>. Carl Warren will notify Everspan of any Disputed Claim within ten (10) Business Days after it becomes aware of the Disputed Claim. Such notice will contain the basis for Carl Warren's recommended decision and/or the complaint registered by the claimant or Insured. All matters involving coverage determinations shall be referred to Everspan, regardless of the Claim's actual or estimated Incurred Value. Carl Warren will provide Everspan with a copy of the Claim File and the Policy, as well as all other information related to the Disputed Claim. Carl Warren will further notify Everspan if litigation has been threatened or instituted.

4.4     <u>Other Notices</u>. Carl Warren will notify Everspan promptly (but in no event later than two (2) Business Days following Carl Warren's discovery) : (i) of any communication from an attorney, state insurance department, or administrative agency with respect to a Disputed Claim; or (ii) when an Insured has filed or threatened to file a complaint with a state insurance department or other governmental or regulatory authority. Such notice will include a summary of the facts and issues, the alleged acts or omissions giving rise to the issues, and copies of any files that Everspan may require for any appropriate response.

4.5     <u>Bordereau</u>. Carl Warren will prepare a monthly accounting of all indemnity and Loss Adjustment Expense payments, as well as all outstanding reserves, per Claim, in a data format acceptable to Everspan ("***Bordereau***"). Bordereau will be cumulative (including all closed Claims) and contain all information set forth in <u>Schedule B</u>. The Bordereau will be delivered to Everspan within ten (10) days of the end of each calendar month.

4.6     <u>Additional Reports</u>. At the request of Everspan, Carl Warren will prepare and submit additional reports as soon as possible, but no later than thirty (30) days after Everspan's request. Everspan may require additional reports to be submitted on a monthly or quarterly basis, as directed or as specified by Everspan.  These reports may include the following:

(a)     Loss analysis by underwriting year and a register providing, per Claim, the date of loss, each amount comprising the Incurred Value (paid and reserve information), the change in Incurred Value, and open and closed Claim counts as required for Schedule P filings; and

(b)     A summary report satisfying any criteria requested by Everspan.

4.7     <u>Financial Statements</u>. Within one hundred twenty (120) days after the end of any fiscal year, and at any time upon request of Everspan, Carl Warren will furnish to Everspan its audited financial statements.  All financial statements furnished will be prepared in    accordance

4

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

with generally accepted accounting principles and accompanied by a copy of all relevant independent auditor reports. If Carl Warren cannot furnish audited financial statements, Everspan may, in its discretion, accept financial statements accompanied by a certification by Carl Warren's Chief Financial Officer or Chief Executive Officer in the form provided by Everspan. Everspan may, in its discretion and in lieu of financial statements, permit Carl Warren to furnish Everspan with the prior year's annual tax returns of Carl Warren.

    4.8    <u>Tax Reporting</u>. Carl Warren shall prepare using Carl Warren's IRS Taxpayer Identification Number, and file all information returns with respect to any payments made by it under this Agreement as may be required under Section 6041 of the Internal Revenue Code of 1986 and the regulations thereunder, including all payments made to third party providers in payment of LAE.

    4.9    <u>Loss Reserve Practices</u>. Carl Warren shall submit to Everspan for review and approval a copy of its written loss reserving policies and practices method. In any event, Carl Warren shall perform a continuous review of outstanding Claim reserves and adjust reserves to reflect exposure.

    4.10    <u>Accuracy of Data and Information</u>. Carl Warren will provide Everspan with accurate and complete information, including financial, statistical, or other data, relating to Claims and otherwise pursuant to this Agreement.

## ARTICLE 5.

## CLAIM FILES

    5.1    <u>Content and Maintenance of Claim Files</u>.  Carl Warren will establish and maintain a file for each reported Claim that will include the information set forth in Schedule C ("**Claim File**"). Carl Warren will forward or make available, at its own expense, copies of individual Claim Files to Everspan at any time upon Everspan's request.

    5.2    <u>Ownership of Files</u>. Claim Files are, and will remain, Everspan's property or the joint property of Everspan. If an order of liquidation is filed against Everspan, Carl Warren will have reasonable access to the Claim Files. All Claims Files, upon an order of liquidation, will be transferred to the liquidator within ten (10) Business Days of the entry of an order of liquidation.

## ARTICLE 6.

## REQUIRED INSURANCE

    6.1    <u>Errors and Omissions Insurance</u>. Carl Warren will acquire and maintain an errors and omissions insurance policy covering Carl Warren's operations, including the obligations of this Agreement, with limits not less than $5,000,000 per claim and a retention no greater than $150,000 per claim.

    6.2    <u>Fidelity and Crime Insurance</u>. Carl Warren will acquire and maintain a fidelity bond or crime insurance policy for the protection of Carl Warren and Everspan with respect to Carl Warren's activities under this Agreement, with limits not less than $2,000,000 per claim and

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

a retention no greater than $100,000 per claim. The bond or policy will cover and indemnify claims against Carl Warren related to employee dishonesty or theft.

6.3     Other Insurance. Carl Warren will acquire and maintain general liability or property insurance with limits that adequately cover Carl Warren's premises. Carl Warren will also acquire and maintain appropriate workers' compensation insurance.

6.4     Required Policies and Terms.

(a)     Carl Warren will acquire and maintain all insurance policies required by this Article ("**Required Policies**") until Carl Warren's obligations under this Agreement are fully extinguished to Everspan's satisfaction, which obligation survives termination of this Agreement. Required Policies will be issued by insurers rated at least "A-" by A.M. Best Company and admitted or authorized to transact business in Carl Warren's domiciliary state, but may not be issued by an insurer affiliated with Everspan;

(b)     No Errors and Omissions policy may have an exclusion or any other limitation on coverage for claims by Everspan as an additional insured party against Carl Warren that would restrict in any way Everspan's right to assert a claim thereunder including an "insured versus insured" exclusion;

(c)     If any Required Policy is a claims-made policy, Carl Warren will purchase the maximum extended reporting period that is available upon termination of such coverage, unless a subsequently acquired policy provides full "prior acts" coverage dating back at least to the effective date of the prior policy; and

(d)     Required Policies will be primary and any insurance maintained by Everspan will be considered excess of and non-contributory to any Required Policy.

6.5     Proof of Insurance or Changes. On or prior to the Effective Date and upon each anniversary of the Effective Date, or at some other time upon the request of Everspan, Carl Warren will (a) provide proof of each Required Policy in a form satisfactory to Everspan and (b) certify to its compliance with the requirements of this Article. Without prejudice to the generality of the foregoing, at each such time, Carl Warren will provide Everspan with Acord Certificate of Insurance naming Everspan as a certificate holder and stating that Everspan will be provided with at least thirty (30) days advance notice of cancellation. Carl Warren will provide prompt notice to Everspan of any cancellation or other change to each Required Policy.

## ARTICLE 7.

## CLAIMS ACCOUNT

7.1     Claims Account. Carl Warren will establish, maintain, and administer one or more separate bank account ("**Claims Account**") in one or more banks agreed upon by Everspan from which Carl Warren may draw in accordance with this Agreement for the purposes of paying indemnity and Loss Adjustment Expenses on Claims in accordance with Everspan's instructions. The interest earned on the Claims Account will accrue to the benefit of the Claims Account. For clarity, Carl Warren shall act as trustee for Everspan on the Claims Account. Carl Warren    shall

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

ensure that Everspan shall has least one (1) authorized signor on the Claims Account and Carl Warren shall provide the required bank forms to Everspan for execution. The initial funding amount for each Claims Account will be specified on each Program Exhibit, and the amount will be maintained in an amount, and with such frequency and in the manner, determined in writing by Everspan.

7.2     Permitted Withdrawals.

(a)     Carl Warren is hereby authorized to withdraw funds from the Claims Account only for the following purposes:

(i)     Payment of LAE and Claims within the Discretionary Authority.

(ii)     Payment of LAE and/or Claims in excess of the Discretionary Authority as authorized in writing by Everspan.

(b)     Carl Warren shall not issue or authorize any check or other withdrawal from the Claims Account unless ready funds are on deposit sufficient to pay or cover such check or withdrawal.

7.3     Internal Controls.

(a)     At least annually, at no additional charge to Everspan, the Carl Warren shall provide to Everspan a copy of a report providing data equivalent to an SSAE 16 SOC I type II report (instead of an SSAE 16 SOC I type II report) pertaining to Carl Warren's provision of the Basic Services and/or services similar to the Basic Services for the twelve (12) months ending December 31st. The Carl Warren shall deliver to Everspan such final report as soon as possible after each December 31st but in any event within ninety (90) days. Such report shall be prepared by a nationally recognized independent firm. The Carl Warren shall confer with Everspan as to the scope, control objective requirements, and timing of each related audit, and accommodate Everspan's reasonable requirements and concerns to the extent practicable. If Carl Warren fails to comply with the requirement in this Section 7.3, Everspan may, in addition to all other rights and remedies under this Agreement, immediately commission a control-based financial, information technology, and systems audit of Carl Warren and the Claims Account ("***Financial Audit***"). All costs and expenses related to the Financial Audit will be fully funded by Carl Warren when incurred by Everspan, and Carl Warren shall cooperate in all respects with such Financial Audit, including making its systems, facilities, books and records, and staff available to Everspan's designated auditors at all reasonable times.

(b)     Carl Warren shall submit to Everspan for review and approval a copy of its written policies and practices method regarding access to and maintenance of the Claims Account

## ARTICLE 8.

## CARL WARREN'S REMUNERATION

8.1     Claims Service Fees. Carl Warren will be entitled to a fee for the Claims Services performed in accordance with this Agreement ("***Claims Service Fees***"), which will be paid by

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

Everspan in accordance with each Program Exhibit. The Claims Service Fees are Carl Warren's full compensation for the Claims Services, whether provided by Carl Warren or a third party appointed by Carl Warren and approved by Everspan.

       8.2    <u>Tax</u>. The Claims Service Fees will include any sales or similar tax, if any, due from Everspan relating to the Claims Services. No additional tax will be charged to Everspan for the Claims Services.

       8.3    <u>Carl Warren's Expenses</u>. Carl Warren will conduct its business at its own and sole cost, credit, risk, and expense. Carl Warren will be responsible for all expenses it incurs in the performance of this Agreement or otherwise in the conduct of its business, including facilities, office upkeep, postage, promotional and advertising expenses, stationary, printing, bank charges, fees to any sub-third party claims administrator or adjuster, bureaus and license expenses, rent, rentals, transportation, salaries of officers, clerks, employees, or other representatives, and all overhead and other expenses of any nature. Additionally, Carl Warren is responsible for all benefits, labor, Social Security obligations, and immigration reporting requirements of its personnel.

## ARTICLE 9.

## <u>TERM AND TERMINATION</u>

       9.1    <u>Term</u>. This Agreement will commence with respect to each program for which Claims Services are provided as of the Effective Date listed in each respective Program Exhibit and will continue until terminated in accordance with this Article or all Claims have been closed.

       9.2    <u>Termination Without Cause</u>. This Agreement may be terminated at any time by either Party by giving at least one hundred and twenty (120) days' prior written notice of termination to the other Party.

       9.3    <u>Termination With Cause by Everspan</u>. This Agreement may be terminated by Everspan immediately upon the occurrence of any of the following:

       (a)    Carl Warren or any parent of Carl Warren is or becomes insolvent, or is the subject of or commences any regulatory, judicial or other proceedings for administrative oversight, conservation, supervision, dissolution, liquidation, bankruptcy, receivership, or the like;

       (b)    Carl Warren experiences a materially adverse change in its financial condition as determined by Everspan;

       (c)    Carl Warren does not fulfill its duties as set forth in this Agreement in strict compliance with its terms or, once having commenced its duties, neglects or fails to carry out such duties and obligations;

       (d)    Carl Warren materially breaches any provision of this Agreement and fails to remedy the breach to Everspan's satisfaction as soon as reasonably practical after it has been notified of the breach. A "material breach" includes (i) failure to maintain qualified staff experienced in the administration of claims to enable Carl Warren to provide the Claim Services;

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

(ii) refusal to permit Everspan to inspect, copy, or audit any records of Claim Files maintained by Carl Warren; (iii) failure to implement any recommendations made by Everspan following an audit of Carl Warren; or (iv) failure to maintain any insurance required under Article 6.

(e)     Carl Warren fails to follow Everspan's reasonable instructions related to this Agreement;

(f)     Carl Warren, any parent company of Carl Warren, or any of their respective employees, officers, directors, or principals is the subject of an indictment, has committed any fraudulent act, or is convicted of a felony, which Everspan in its reasonable discretion determines adversely reflects on the integrity or trustworthiness of such entity or person;

(g)     Carl Warren loses any license required by any state or authority with jurisdiction over its duties;

(h)     Carl Warren undergoes a Change in Control; or

(i)     Carl Warren fails to give any notices required under Article 12.

9.4     Notice of Termination. If either Party elects to terminate this Agreement, it will give notice to the other Party in the manner set forth in Section 15.1. Such notice will state the effective date of the termination ("**Termination Date**"), which may be set by the Party electing to terminate, subject to the terms and limitations of Section 9.2 and Section 9.3.

9.5     Scope of Termination. If either Party elects to terminate this Agreement, the terminating Party may limit the termination to any one specific, or combination of, program(s) for which Claims Services are provided under any Program Exhibit(s). Such termination will not affect the Parties' rights and obligations under this Agreement with respect to any other program for which Claims Services are provided.

## ARTICLE 10.

## RIGHTS AND DUTIES UPON TERMINATION

10.1     Further Claims Services. Upon termination of this Agreement, including any termination limited to any one specific, or combination of, program specified in a Program Exhibit, Everspan may permit Carl Warren to provide continuing Claims Services for some or all open Claims as of the Termination Date. The terms of this Agreement and the applicable Program Exhibit(s) will remain in full force and effect with respect to any such Claims until the last Claim is closed or withdrawn from Carl Warren's control by Everspan; provided, that it is hereby acknowledged and agreed that, Everspan may alternatively elect that Claims Services following such termination are administered by a replacement claims administrator, in which case all amounts in the Claims Account shall be immediately transmitted to Everspan, unless instructed by Everspan.

10.2     Return of Open Claim Files. With respect to any open Claims for which Everspan has not permitted or required Carl Warren to provide continuing Claims Services, Carl Warren

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

will return, at its own cost, all Claim Files to Everspan no later than ten (10) days after the Termination Date.

10.3    <u>Return of Closed Claim Files</u>. Upon termination of this Agreement, Carl Warren will, at its own cost, return to Everspan all closed Claim Files no later than thirty (30) days after the Termination Date.

10.4    <u>Computer Data and Systems</u>. Upon termination of this Agreement and the request of Everspan, Carl Warren, at its own cost, will:

(a)    Provide an electronic submission in a form acceptable to Everspan of all programs and data libraries, including updated source code and data files, used to store Claim Files and otherwise administer the Claims subject to this Agreement; and

(b)    Grant a limited license to Everspan to use Carl Warren's system and/or software in connection with the administration and run-off of the Claims until the last Claim is closed.

10.5    <u>Post-Termination Costs</u>. If and to the extent that the Claims Service Fees for any program compensate Carl Warren, in whole or in part, on a pre-paid or prospective basis and this Agreement (or any Program Exhibit) is terminated, Carl Warren will be responsible for Run-Off Expenses with respect to any Claims for which Everspan has not permitted or required Carl Warren to provide continuing Claims Services and will receive no further compensation, including any compensation that would have become due upon the closing of a Claim File. Everspan will calculate the Run-Off Expenses and submit an invoice to Carl Warren, payment for which is due within thirty (30) days of receipt.

## ARTICLE 11.

## <u>INDEMNIFICATION AND DEFENSE</u>

11.1    <u>Indemnification of Everspan</u>. Carl Warren will indemnify, defend, reimburse, and hold harmless Everspan and its parents, affiliates, subsidiaries, officers, directors, employees, and agents (each an "***Everspan Indemnitee***") from, for, and against any and all claims, liability, loss, cost, and expense arising out of or in any way related to Carl Warren's obligations under the terms of this Agreement including (a) any and all fines or penalties imposed by any applicable regulatory agency or other governmental authority with respect to any Claim handled by Carl Warren (b) all attorneys' fees and costs arising or resulting from any error, omission, intentional tort, willful misconduct, negligence, or gross negligence by Carl Warren and (c) any Loss in Excess of Policy Limits or any extra-contractual obligations.

11.2    <u>Indemnification of Carl Warren</u>. Everspan will indemnify, defend, reimburse, and hold harmless Carl Warren and its direct and indirect parents, affiliates, subsidiaries, and their officers, directors, and employees (each a "***Carl Warren Indemnitee***") from, for, and against any and all claims, liability, cost, expense, attorney's fees, and Losses with respect to any Claim handled by Carl Warren arising or resulting from any negligence, willful misconduct or gross negligence by Everspan.

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

113    Procedure for Indemnification. If any Everspan Indemnitee or Carl Warren Indemnitee (each, an "**Indemnified Party**") receives notice of assertion or commencement of any third-party claim against such Indemnified Party in respect of which a Party liable for such indemnification (the "**Indemnifying Party**") may be obligated to provide indemnification under this Agreement, the Indemnified Party shall give such Indemnifying Party reasonably prompt written notice (but in no event later than fifteen (15) days after becoming aware of such third-party claim) thereof and such notice shall include a reasonable description of the claim based on the facts known at the time and any documents relating to the claim and an estimate of the Indemnifiable Loss (to the extent reasonably quantifiable at that time) and shall reference the specific sections of this Agreement that form the basis of such claim to the extent reasonably ascertainable; provided, that no delay on the part of the Indemnified Party in notifying any Indemnifying Party shall relieve the Indemnifying Party from any obligation hereunder unless (and then solely to the extent that) the Indemnifying Party is actually prejudiced by such delay (except that the Indemnifying Party shall not be liable for any expenses incurred during the period in which the Indemnified Party failed to give such notice). Thereafter, the Indemnified Party shall deliver to the Indemnifying Party, within five (5) Business Days after the Indemnified Party's receipt thereof, copies of all notices and documents (including court papers) received by the Indemnified Party relating to the third-party claim. Each Party will promptly furnish to the other Party copies of all papers and official documents received in respect of any Indemnifiable Loss. The Indemnifying Party shall be entitled to participate in the defense of any third-party claim and, if it so chooses, to assume the defense thereof with counsel selected by the Indemnifying Party. Should the Indemnifying Party so elect to assume the defense of a third-party claim, the Indemnifying Party shall not as long as it conducts such defense be liable to the Indemnified Party for legal expenses incurred by the Indemnified Party in connection with the defense thereof subsequent to the Indemnifying Party notifying the Indemnified Party in writing of its election to assume such defense. If the Indemnifying Party assumes such defense, the Indemnified Party shall have the right to participate in the defense thereof and, in the Indemnified Party's discretion, to either consent to the Indemnifying Party's selection of counsel (which consent shall not be unreasonably withheld or delayed) or, at the Indemnified Party's own expense, employ counsel separate from the counsel employed by the Indemnifying Party, it being understood that the Indemnifying Party shall control such defense. The Indemnifying Party shall be liable for the reasonable fees and expenses of counsel employed by the Indemnified Party for any period during which the Indemnifying Party has not assumed the defense thereof (other than during any period in which the Indemnified Party shall have not yet given notice of the third-party claim as provided above). If the Indemnifying Party chooses to defend any third-party claim, the Indemnified Party shall cooperate in the defense thereof. Such cooperation shall include the retention and (upon the Indemnifying Party's request) the provision to the Indemnifying Party of records and information that are relevant to such third-party claim, and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder; provided, in each case, that such other Party shall not be obligated to provide such records, information or access to Indemnifying Party if doing so would violate Law or jeopardize the protection of an attorney-client privilege. Whether or not the Indemnifying Party shall have assumed the defense of a third-party claim, the Indemnified Party shall not admit any liability with respect to, or pay, settle, compromise or discharge, such third-party claim without the Indemnifying Party's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed).  If the Indemnifying Party has assumed the defense of a third-party claim,

11

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

the Indemnifying Party may only pay, settle, compromise or discharge a third-party claim with the Indemnified Party's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed); <u>provided</u>, that the Indemnifying Party may pay, settle, compromise or discharge such a third-party claim without the written consent of the Indemnified Party if such settlement (i) includes a release of the Indemnified Party from all liability in respect of such third-party claim, (ii) does not subject the Indemnified Party to any injunctive relief or other equitable remedy, (iii) does not include a statement or admission of fault, culpability or failure to act by or on behalf of the Indemnified Party and (iv) does not impose any financial cost or reputational harm on the Indemnified Party. If the Indemnifying Party submits to the Indemnified Party a bona fide settlement offer with respect to a third-party claim that has been accepted by all persons bringing such third-party claim and otherwise satisfies the requirements set forth in the proviso of the immediately preceding sentence and the Indemnified Party refuses to consent to such settlement, then thereafter the Indemnifying Party's liability to the Indemnified Party with respect to such third-party claim shall not exceed the Indemnifying Party's portion of the settlement amount included in such settlement offer. The Indemnifying Party will pay or reimburse the Indemnified Party for any amounts due within ten (10) days of receipt of a written statement from such Indemnified Party reasonably setting forth the amount due.

11.4    <u>Direct Claims</u>. The provisions of this Article will be not construed as limiting a Party's pursuit of a direct action against the Party.

## ARTICLE 12.

## <u>NOTIFICATION REQUIRED OF CARL WARREN</u>

12.1    <u>Notice to Everspan</u>. In addition to the notices and reports required under any other provisions of this Agreement, Carl Warren will notify Everspan by telephone or e-mail within five (5) Business Days, with confirmation in writing to follow promptly, if any of the following events occur:

(a)    Carl Warren discharges or reassigns, within a thirty (30)-day period, two (2) or more persons who are working on matters within the scope of this Agreement;

(b)    Carl Warren becomes aware of any circumstance substantially affecting, or with the potential to substantially affect, Carl Warren's ability to perform its obligations and duties under this Agreement;

(c)    Carl Warren becomes aware of any non-compliance with or violation by Carl Warren or any other entity related to the Services of a Claim of any Law or this Agreement; or

(d)    There is a Change in Control of Carl Warren.

## ARTICLE 13.

## <u>DISPUTE RESOLUTION</u>

13.1    <u>Arbitration</u>. Any dispute arising out of or relating to this Agreement and the performance of the duties and obligations arising under this Agreement will be referred to   an

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

arbitration panel consisting of two (2) Party-appointed arbitrators and an umpire. Arbitration will be initiated by delivery of a written notice of demand for arbitration by one Party to the other. Such notice of demand will set out the reason for the request for arbitration.

13.2    <u>Selection and Qualifications of Arbitrators and Umpire</u>. Each Party will appoint an arbitrator, and the two (2) arbitrators so appointed will appoint an umpire before proceeding. If either Party refuses or neglects to appoint an arbitrator within thirty (30) days after a request by the other to do so, the other Party may appoint both arbitrators. The two (2) arbitrators will then select an umpire. The arbitrators and umpire will be active or retired officers of insurance or reinsurance companies and disinterested in the outcome of the arbitration. Should the two (2) arbitrators fail to choose an umpire within thirty (30) days of the appointment of the second arbitrator, each arbitrator will propose eight (8) umpire candidates. Umpire candidates will complete disclosure statements, which must list any past or present relationship with the parties or their counsel, direct or indirect, whether financial, professional, social, or of any other kind; the umpire ultimately selected must also disclose any such relationship that arises during the course of the arbitration. Of the eight (8) umpire candidates proposed by each arbitrator, the other will strike seven (7), and the decision will be made from the remaining two (2) by drawing lots (e.g., an odd or even digit in the Dow Jones Industrial Average for a particular day).

13.3    <u>Hearing</u>. The arbitration hearings will be held in the County of New York, State of New York, unless otherwise mutually agreed. Each Party will submit its case to the arbitration panel within sixty (60) days of the appointment of the umpire or within such time as may be agreed by the Parties or directed by the arbitration panel.

13.4    <u>Authority of Arbitration Panel</u>. The arbitration panel will have the power to determine all procedural rules for the arbitration, including discretionary power to make orders as to any matters which it may consider proper in the circumstances of the case with regard to pleadings, discovery, inspection of documents, examination of witnesses, and any other matter relating to the conduct of the arbitration. The arbitration panel may require pre-hearing security in its discretion. The arbitration panel may receive and act upon evidence, whether oral or written and whether strictly admissible or not, as it will in its discretion think fit. The arbitration panel will not be obliged to follow judicial formalities or the rules of evidence, may abstain from following the strict rules of law, and will make its decision giving due consideration to the custom and practice of the insurance and reinsurance business. The arbitration panel will not have the power to award punitive, exemplary, or treble damages. The arbitration panel will have the power to award reasonable attorneys' fees to either Party, including fees incurred in connection with the arbitration or any litigation commenced to stay or dismiss arbitration. The decision of the majority of the arbitration panel will be final and binding on both Parties. Judgment upon the award rendered may be entered in any court having jurisdiction.

13.5    <u>Fees and Expenses</u>. Each Party will pay the fees and expenses of its own arbitrator. The Parties will divide equally the fees and expenses of the umpire and other expenses of the arbitration, unless such fees and expenses are otherwise allocated by the arbitration panel.

13.6    <u>Everspan's Option to Bring Plenary Action</u>. Everspan may, in lieu of arbitration, elect to institute a plenary action against Carl Warren in cases where Everspan seeks to recover funds of Everspan or seeks injunctive or other equitable relief.  Any action or proceeding brought

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

under this <u>Section 13.6</u> will be brought in the Supreme Court of the State of New York, County of New York or the United States District Court for the Southern District of New York, and the Parties irrevocably submit to the exclusive jurisdiction of either court for the purpose of any such action or proceeding and will be irrevocably bound by any judgment rendered by any such court with respect to any such action or proceeding. The Parties waive any objection they may now or hereafter have to the venue of any such action or proceeding in such court and any claim that such action or proceeding has been brought in an inconvenient forum. Any order or judgment of either of the foregoing courts may be enforced in any court having jurisdiction of the Parties and/or the subject matter. Process in any action or proceeding in either of the foregoing courts may be served by certified mail, which service will be sufficient to confer personal jurisdiction over the Party so served. In any action or proceeding arising out of or relating to this Agreement, or the enforcement of any provisions thereof, the court is empowered to grant any legal or equitable relief which may be available, including specific performance, injunctive relief and any mandatory injunction it deems appropriate. TO THE FULLEST EXTENT PERMITTED BY LAW, EACH OF THE PARTIES HEREBY WAIVES ITS RESPECTIVE RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING FROM OR RELATING TO THIS AGREEMENT OR ANY DEALINGS BETWEEN THEM ARISING FROM OR RELATING TO THE SUBJECT MATTER OF THE TRANSACTIONS CONTEMPLATED HEREUNDER.

**ARTICLE 14.**

**<u>CONFIDENTIAL INFORMATION; INFORMATION SECURITY; PRIVACY</u>**

14.1    <u>Confidential Information</u>. In connection with this Agreement, each Party (the "***Receiving Party***") may receive Confidential Information from the other Party (the "***Disclosing Party***") belonging to either the Disclosing Party or a third party to whom the Disclosing Party has certain confidentiality obligations. For as long as Confidential Information of the Disclosing Party (including the information belonging to such third parties to whom the Disclosing Party owes confidentiality obligations) is in possession of the Receiving Party, the Receiving Party shall take reasonable steps, at least substantially equivalent to the steps it takes to protect its own proprietary information, to prevent the use, duplication, or disclosure of Confidential Information of the Disclosing Party, other than (i) by or to its representatives who need to know such Confidential Information of the Disclosing Party in order to further the rights and obligations under this Agreement, provided such representative has agreed in writing to maintain in confidence such Confidential Information of the Disclosing Party in accordance with the confidentiality provisions of this Agreement; or (ii) as permitted by any Applicable Law. The Receiving Party shall use Confidential Information of the Disclosing Party only as necessary to perform its obligations under this Agreement or as explicitly directed by the Disclosing Party and for no other purposes. The Receiving Party shall treat any Confidential Information that it receives from the Disclosing Party in a manner that is fully compliant with the Disclosing Party's obligations under applicable Data Protection Laws. Confidential Information belonging to third parties, including insurers, reinsurers, and other sources, may be disclosed hereunder and the terms governing the disclosure of such Confidential Information shall be subject to this Agreement.

14.2    <u>Required Disclosure</u>. If the Receiving Party is required by Applicable Law or requested (by legal process, civil investigative demand, or similar process) to disclose any Confidential Information of the Disclosing Party, the Receiving Party shall: (i) notify the

14

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

Disclosing Party promptly to allow the Disclosing Party to seek an appropriate protective order or waive compliance with the confidentiality covenant of this Agreement; (ii) seek instruction from the Disclosing Party prior to the Receiving Party disclosing such information; and (iii) follow all reasonable instructions from the Disclosing Party regarding such required disclosure.

143     Return or Distribution of Confidential Information. Within five (5) days following a request of a Party, and in any event upon the termination or expiration of this Agreement, except to the extent required by applicable Data Protection Laws, each Party shall, and shall cause its representatives to: (i) return to the requesting Party; or (ii) destroy or securely erase, in accordance with the requirements of this Agreement and in a manner in compliance with the most current version of National Institute of Standards and Technology Special Publication 800-88; and (iii) certify in writing the return or destruction of any and all Confidential Information of the requesting Party, including all derivative works or copies thereof, regardless of which Party creates them.

144     Information Security Program. Carl Warren agrees to establish and maintain a written information security and privacy program (the "***Information Security Program***") that is no less rigorous than accepted industry practices and no less rigorous than those maintained by Carl Warren for its own information of a similar nature, and that complies with this Agreement and all applicable Data Protection Laws. As part of such program, Carl Warren shall implement and maintain commercially reasonable, risk-based physical, technical, and administrative information security safeguards designed to protect the confidentiality, integrity, and availability of Consumer Confidential Information and any Everspan Systems to which Carl Warren has authorized access, as well as the security of any Carl Warren Systems or data, including Personal Data, used to provide the Claims Services (collectively, the "***In-Scope Systems and Data***"), including:

(a)     Implementation of policies, procedures, and controls to manage access to In-Scope Systems and Data, including:

(i)     Restricting access to Personal Data, Consumer Confidential Information, Everspan Confidential Information and Everspan Systems to only those Carl Warren personnel and systems that require such access to perform the Claims Services, or to facilitate the performance of such Claims Services, such as system administrators, consistent with the concepts of least privilege and need-to-know;

(ii)     Restricting access to Carl Warren Systems to only those Carl Warren personnel and systems that require such access for legitimate work-related purposes, or to facilitate the performance of such work-related purposes, such as system administrators, consistent with the concepts of least privilege and need-to-know;

(iii)     Immediately terminating access privileges to In-Scope Systems and Data for any Carl Warren personnel that no longer need such access, and conducting reviews of access lists to ensure that access privileges have been appropriately provisioned and terminated no less than monthly;

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

(iv)    Providing ongoing training and awareness materials on the Information Security Program to all Carl Warren personnel that may have access to In-Scope Systems and Data, including on the topics of phishing and social engineering; and

(v)    Application of the concept of separation of duties for all Carl Warren personnel roles that will have access to In-Scope Systems and Data.

(b)    Performance of commercially reasonable background checks in compliance with all applicable Data Protection Laws on any Carl Warren personnel that will have access to In-Scope Systems and Data, and ensuring that any such Carl Warren personnel do not have a criminal history involving offenses related to theft, fraud, burglary, bribery, property damage, violence, sexual misconduct, or harassment;

(c)    Maintenance of appropriate network security measures, including firewalls to segregate Carl Warren's internal networks from the internet, risk-based network segmentation, and intrusion prevention or detection systems to alert Carl Warren to suspicious network activity;

(d)    Performance of (1) automated regular vulnerability scans and (2) periodic authenticated vulnerability scanning on all systems storing, processing or transmitting Consumer Confidential Information, or that access Everspan Systems, to identify all potential vulnerabilities on such systems;

(e)    Risk-prioritized remediation of identified vulnerabilities in a timely manner, including timely implementation of all manufacturer- and developer-recommended security updates and patches to operating systems and third-party software storing, processing, or transmitting Consumer Confidential Information, or otherwise installed on Carl Warren Systems;

(f)    Performance of an annual penetration test on all Carl Warren Systems;

(g)    Installation and use of anti-virus and malware protection software with up-to-date definitions and signatures on all Carl Warren Systems, if applicable;

(h)    Enforcement of complex password requirements on all Carl Warren Systems;

(i)    Encrypting, or hashing with a salt, all authentication credentials when stored on Carl Warren Systems so as to prevent unauthorized account access;

(j)    Implementation of secure workstation protection policies for Carl Warren Systems, including locking the system after a defined number of incorrect authentication attempts and password-protected screensavers that are activated after a defined period of inactivity;

(k)    Encryption of all Personal Data and Consumer Confidential Information (1) in transit, and (2) at rest, using industry-standard encryption algorithms and in accordance with industry standards for secure key and protocol negotiation and key management;

(l)    Changing all default passwords on Carl Warren Systems before deploying any new hardware or software asset;

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

(m)     Maintaining documented, secure baseline security configuration standards for all Carl Warren System operating systems, software, and hardware (including network devices) consistent with the concept of least functionality and monitoring for unauthorized changes or deviations from these baselines in deployed devices;

(n)     Ensuring that local logging has been enabled on all systems and networking devices to capture detailed information such as event source, date, user, timestamp, source addresses, destination addresses, and other useful elements;

(o)     Ensuring that logs are analyzed for anomalous and suspicious activity to assist in the identification of possible Security Breaches;

(p)     Requiring all remote network access to Carl Warren Systems to use multi-factor authentication and encrypted sessions; and

(q)     Configuring Carl Warren Systems not to write data to external removable media, if there is no business need for supporting such devices, and requiring that all data stored on external removable media must be encrypted while at rest where USB storage devices are required.

14.5    <u>Access to Facilities</u>. Access to Carl Warren's facilities shall be restricted to Carl Warren personnel with authorized access on a need-to-know basis. Restricted areas of Carl Warren facilities, such as server rooms, shall be subject to risk-appropriate access controls, such as by requiring key cards and/or PINs for entry. Carl Warren shall identify and log all visitors to Carl Warren facilities and ensure that visitors to restricted areas are escorted by an Carl Warren personnel at all times. Carl Warren shall implement and enforce "clean desk" (i.e., prohibiting documents with sensitive data from being left on desks, tables, etc. after work hours or for prolonged periods) policies throughout its facilities.

14.6    <u>Approval of Subcontractors</u>. Carl Warren must seek and obtain Everspan's approval prior to engaging a Subcontractor to: (i) perform any of the Claims Services on Carl Warren's behalf; or (ii) access, maintain or process any Personal Data in performing the Claims Services. If Everspan grants such approval, Carl Warren is responsible for each Subcontractor's compliance with this Article and shall be liable for any breach of this Agreement by Subcontractor. If Carl Warren determines that Subcontractor is not complying with this Article, Carl Warren shall take all necessary steps to protect the security, privacy, and confidentiality of Everspan Confidential Information and Everspan Systems that are accessible by such Subcontractor, including by implementing reasonable alternative security controls, suspension of such Subcontractor's access to Everspan Confidential Information or Everspan Systems or termination of the applicable relationship with such Subcontractor.

14.7    <u>Vendor Risk Management Process</u>. Carl Warren must also implement and maintain a documented vendor risk management program to ensure the following:

(a)     Due diligence is conducted on any prospective Subcontractor to ensure that it is capable of meeting the security standards outlined in this Article;

(b)     The Subcontractor is contractually required to comply with terms at least as restrictive as this <u>Article 14</u>;

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

(c)    Carl Warren uses best efforts to monitor each Subcontractor's compliance with the requirements set forth in this Article;

(d)    To confirm compliance with this Article, each Subcontractor shall promptly and accurately complete a written information security questionnaire provided by Everspan, or a third party on Everspan's behalf, regarding the security and privacy practices of the Subcontractor; and

(e)    If Carl Warren has knowledge of or suspects involvement by a Subcontractor in relation to a Security Breach, then, in accordance with the obligations outlined in this Article, Carl Warren shall, at its own expense, immediately contain and remedy the Security Breach, including disabling the Subcontractor's access credentials and facility access rights.

14.8    Testing and Monitoring. Carl Warren shall regularly test and monitor the effectiveness of the security practices and procedures in the Information Security Program, and will evaluate and adjust its Information Security Program and information security safeguards in light of the results of the testing and monitoring, any material changes to its operations or business arrangements, or any other circumstances that Carl Warren knows or reasonably should know may have a material effect on its Information Security Program and information security safeguards.

14.9    Security Audits.

(a)    Carl Warren shall have annual security audits performed by a qualified third party, including a network-level vulnerability assessment, a risk assessment to review all controls in Carl Warren's physical and/or technical environment in relation to all Claims Services being provided to Everspan under this Agreement and a penetration test, and will provide Everspan with a summary of the results of such assessments and/or audits.

(b)    Everspan reserves the right to periodically audit the infrastructure designated by Carl Warren to be used in provision of the Claims Services to ensure compliance with the requirements of this Article. Non-intrusive network audits, such as TCP and UDP port scans, may be performed randomly without prior notice. More intrusive network and physical audits may be conducted by Everspan on site with forty-eight (48) hours' prior notice. Such audits will take place during Carl Warren's ordinary office hours and are subject to Carl Warren's reasonable security restrictions (e.g., sign-in requirements, badge requirements, escort requirements). This type of audit will not be performed more often than once per calendar quarter unless Everspan has reason to suspect specific non-compliance with this Section 14.9(b) on the part of Carl Warren. Carl Warren shall also permit Everspan, following a Security Breach, to conduct penetration and vulnerability testing on Carl Warren Systems and Subcontractors' systems to test the remediation measures implemented by Carl Warren or such Subcontractor after such Security Breach.

14.10    Security Breaches.

(a)    Carl Warren shall notify Everspan promptly, and in no event later than twenty-four (24) hours, after discovering a Security Breach. Carl Warren will take immediate steps, at its sole expense, to investigate, remedy, and mitigate the Security Breach, and shall cooperate in good faith with Everspan so that Everspan may take any action or other steps that it reasonably determines to be necessary or appropriate in light of the Security Breach. Specifically, Carl Warren shall (i) investigate to determine whether a Security Breach has occurred, (ii) assess   the

18

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

nature and scope of the Security Breach, (iii) identify any Everspan Confidential Information that may have been involved in the Security Breach; (iv) perform or oversee reasonable measures to restore the security of the information systems compromised in the Security Breach, as necessary, in order to prevent further unauthorized acquisition, release, or use of Everspan Confidential Information in Carl Warren's possession, custody, or control; (v) reimburse Everspan for its costs of notifying any individuals, government agencies, authorities and/or other affected third parties of such Security Breach if Everspan, in its good faith judgment, considers notification necessary; and (vi) to the extent the Security Breach is within Carl Warren's or Subcontractor's area of control, indemnify Everspan against any Indemnified Damages arising from such Security Breach. Everspan shall retain the right to aid in the investigation of a Security Breach. Carl Warren must provide written updates on the foregoing as requested by Everspan regarding any Carl Warren-led investigation into a Security Breach.

(b)    For Security Breaches affecting Personal Data, Carl Warren shall be responsible for providing notice, credit monitoring services, and call center services to respond to customer inquiries in accordance with Everspan's instructions, if so requested by Everspan. In the event that Everspan is subject to a regulatory inquiry or threatened litigation relating to a Security Breach, Carl Warren shall provide Everspan, with reasonable assistance and support in responding to such investigation.

(c)    Carl Warren agrees that it will not inform any third party of a Security Breach without first obtaining Everspan's prior written consent with the exception of Carl Warren's legal counsel, and insurance broker and carrier representatives for the purpose of filing an insurance claim.

(d)    Carl Warren shall maintain and periodically test its incident response plan to ensure the effectiveness of its response to a Security Breach.

14.11    Notification of Investigations. To the extent permitted by applicable Data Protection Laws, Carl Warren shall immediately notify Everspan of any governmental, regulatory, or self-regulatory organization investigations concerning its information use, privacy, or information security practices, or security incidents.

14.12    Terminated Personnel. Within twenty-four (24) hours of terminating any Carl Warren personnel with access to In-Scope Systems and Data, Carl Warren shall immediately disable the access credentials and facility access rights of the terminated individual.

14.13    Disaster Recovery. Carl Warren will maintain a disaster recovery plan acceptable to and approved by Everspan. Disaster recovery testing will occur at least annually to ensure the ongoing availability of Everspan's data and the Claims Services and test results will be provided to Everspan. In the event of damage to or malfunction of Carl Warren's computer hardware or software, Carl Warren will obtain, at its expense, alternative computer hardware or software to restore the services in a timely manner. If the electronic data is not available, Carl Warren will use best efforts to reconstruct or recover the data from computer data files stored at remote locations and from source records to restore the service to an acceptable level in a timely manner.

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

14.14    <u>Modification</u>. From time to time, Everspan may modify the privacy and security obligations set forth in this <u>Article 14</u> to maintain security and compliance with any changes in Applicable Law, including ensuring that any use of Personal Data complies with Data Protection Laws.

## ARTICLE 15.

### <u>MISCELLANEOUS</u>

15.1    <u>Notices</u>. All written notices required under this Agreement will be deemed given when received by the other Party via a recognized mail or courier service, provided delivery receipt has been confirmed, at the addresses, and to the attention of the individuals, set forth in each Program Exhibit. Each Party will promptly notify the other Party of any change in address in the manner set forth above.  All notices will also be provided, as courtesy, by e-mail to the individuals so designated in the applicable Program Exhibit.

15.2    <u>Entire Agreement</u>. This Agreement embodies the entire agreement and understanding between the Parties with respect to the transactions contemplated hereby and supersedes all prior agreements and understandings, whether or not written.

15.3    <u>Modifications</u>. Except as specifically provided herein, this Agreement may not be modified, amended or supplemented, nor may any provision hereof be waived, except by written amendment signed by both Parties stating the effective date and extent of such amendment, modification, supplement or waiver.

15.4    <u>No Third-Party Beneficiaries</u>. Except as otherwise expressly stated in this Agreement, this Agreement is not intended to confer upon any person other than the Parties any rights or remedies hereunder.

15.5    <u>No Assignment or Delegation; Use of Affiliates</u>. Other than as expressly provided for in this Agreement, a Party may not assign, delegate, or otherwise transfer any of its rights or obligations under this Agreement whether by agreement, operation of Law or otherwise, without the express prior written consent of the other Party (which consent shall not be unreasonably withheld or delayed) and any purported assignment, delegation, or transfer in violation of this provision shall be void and of no force or effect, <u>provided,</u> that any obligations to be performed, or rights which may be exercised by a Party, pursuant to this Agreement may be performed or exercised, as the case may be, by any corporate affiliates of a Party, subject to Law and the licenses and authorities held by such corporate affiliates; <u>provided</u>, <u>further</u>, that such Party shall remain responsible for the full performance of all of its obligations under this Agreement until such obligations have been fully performed by it or such relevant corporate affiliate on its behalf. Each Party shall be solely responsible for its own personnel and shall be fully liable for the acts or omissions of its personnel as if such acts or omissions were committed by itself. Without prejudice to the generality of the foregoing, unless otherwise agreed, Carl Warren may only use vendors or subcontractors approved in writing by Everspan with respect to all third-party services rendered in furtherance of the Claims Services (including medical bill reviews, nurse case management, independent medical examinations, medical reviews, investigative services, appraisal services, legal services, expert witnesses, and court-related services) and all billing rates

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

and fees related to such services, whether related to Loss Adjustment Expenses, must be approved in writing by Everspan before agreed to by Carl Warren and are subject to annual review by Everspan.

15.6    Marketing. Carl Warren will not make reference to Everspan or its parents, affiliates, or subsidiaries, or use any of their service marks in any website, social media, publication, press release, or other marketing materials without Everspan's prior written consent.

15.7    External Carl Warren Data Requirements. To facilitate the timely and correct flow of electronic data in a manner acceptable to Everspan, Everspan may provide Carl Warren with the data requirements and technical specifications of Everspan's automated data interface, when implemented.

15.8    Special Investigation Unit. Everspan has established a fraud detection program known as a Special Investigation Unit ("*SIU*"). Carl Warren will promptly report suspected fraudulent claims to Everspan's SIU according to the procedures outlined in Everspan's Anti-Fraud Plan.

15.9    Access to Records. Everspan and its authorized agents may, at any reasonable time during normal business hours, and with at least five (5) Business Days' notice to Carl Warren, review or audit all Claim Files and other documentation maintained by Carl Warren with respect to the Claims Services.

15.10    Conflicts of Interest. If Carl Warren believes, or reasonably should believe, that it has a conflict of interest because of the differing interests of Everspan and any other entity for which Carl Warren also provides services, it will immediately declare the existence of such conflict to Everspan and will be required to act in respect of such matter in accordance with Everspan's reasonable instructions. Conflicts of interest include where Carl Warren: (i) handles claims related to the same insurance program for both Everspan and any other insurance carrier(s); (ii) handles both primary and excess claims for both Everspan and any other insurance carrier(s); or (iii) Carl Warren has any financial or ownership interest in another entity that may create a conflict of interest in providing the services to Everspan as outlined in this Agreement. Carl Warren must have procedures for identifying and addressing conflicts of interest.

15.11    Authority. Each Party represents and warrants that it has the full right, power, legal capacity, and authority to enter into and perform its obligations under this Agreement and that those obligations will be binding and enforceable without approval from any other person or entity. Each person signing this Agreement on behalf of a Party represents and warrants that he or she has the full right, power, legal capacity, and authority to sign this Agreement on behalf of that Party.

15.12    Independent Contractor. Carl Warren is an independent contractor and has full and exclusive control over its time, affairs, and operations. Everspan will not be responsible to Carl Warren for any claims arising from or relating to these matters. Carl Warren may, from time to time, benefit from the recommendations, suggestions, answers to questions, or work product of Everspan's staff and vendors, including legal, actuarial, consulting, systems, and financial support services. Everspan will have no liability or professional responsibility to, or create any professional relationship with, Carl Warren other than as specifically set forth in this Agreement.

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

15.13    <u>Cooperation</u>. Carl Warren will cooperate and assist Everspan in: (i) the production of disclosures, notices, or other filings required by Law; (ii) providing access to those records and systems necessary in order for Carl Warren to provide the Claims Services hereunder; developing and testing Carl Warren's recovery system and data; (iii) providing information or reports necessary for Everspan to respond timely to regulatory inquiries related to complaints and financial or market conduct examinations; and (iv) any other action that Everspan deems necessary to fulfill Everspan's legal, regulatory, contractual, or business obligations.

15.14    <u>Offset</u>. Carl Warren will not offset funds due from Everspan under this Agreement against any other funds due Carl Warren under this Agreement or any other agreement with Everspan. Everspan may offset any funds due from Carl Warren under this Agreement against any other funds due under this Agreement or any other agreement with Carl Warren.

15.15    <u>Severability</u>. If any portion of this Agreement is found to be invalid or unenforceable, the remainder of this Agreement will be unaffected.

15.16    <u>No Waiver</u>. The failure of either Party to enforce any provision of this Agreement or to declare default will not constitute a waiver by either Party of such provision. The past waiver of a provision by either Party will not constitute a course of conduct or a waiver in the future as to that same provision.

15.17    <u>Choice of Law</u>. The terms and conditions of this Agreement will be governed exclusively by the Law of the State of New York, without regard to conflicts of laws principles other than Section 5-1401 and 5-1402 of the General Obligations Law of the State of New York.

15.18    <u>Jointly Drafted</u>. This Agreement was jointly drafted by the Parties and, in the event of a dispute, any perceived ambiguity will not be construed against either Party.

15.19    <u>Everspan's Third Party Indemnity</u>. Carl Warren acknowledges the potential existence of defense and indemnity obligations of an reinsurer under any reinsurance contract of Everspan covering the Policies. Carl Warren agrees to take no action whatsoever to thwart or frustrate any attempt by Everspan to enforce such obligations.

15.20    <u>Counterparts</u>. This Agreement may be executed in duplicate counterparts, each of which will be an original, but both of which together will constitute one and the same document.

15.21    <u>Interpretation</u>. The term "this Agreement" shall mean this Agreement together with the Schedules, Program Exhibits and other exhibits and attachments hereto, as the same may from time to time be amended, modified, supplemented, or restated in accordance with the terms hereof. Any collective defined term and any defined term used in the plural will be taken to encompass individually and collectively all members of the relevant class. Any defined term used in the singular preceded by "any" will be taken to indicate any number of the members of the relevant class. Any defined term used in the singular and preceded by the word "each" will indicate all members of the relevant class, individually. The use of the word "include" (and all derivations therefrom) in this Agreement is illustrative and not restrictive; any list or example preceded by "include" or "including" is not necessarily exhaustive or complete. Unless otherwise stated, the absence of "include" or "including" preceding (or otherwise qualifying) any list or example will mean that such list or example is restricted to the items listed. All references to articles, sections,

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

subsections, clauses, paragraphs, schedules, and exhibits mean such provisions of this Agreement, except where otherwise stated. The use herein of the masculine, feminine, or neuter forms shall also denote the other forms, as in each case the context may require. The headings in this Agreement are for reference only and will not limit or otherwise affect the meaning or interpretation of this Agreement. Unless otherwise stated, all timeframes in this Agreement refer to calendar days. Deadlines falling on weekends or U.S. bank holidays are extended to the next Business Day. References to "dollars" or "$" shall mean the lawful currency of the United States of America.

15.22   _Definitions_. As used in this Agreement, terms shall have the definitions set forth on _Exhibit A_.

[SIGNATURE BLOCKS ON NEXT PAGE]

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by persons duly authorized as of the date first written above.

CARL WARREN & COMPANY LLC          EVERSPAN INDEMITY INSURANCE CO.

By: _Gordon Pennington_                          By: _Nicholas Scott_

Name: ___Gordon Pennington___               Name:__Nicholas Scott___

Date:____4/30/2021_____               Date:____4/30/2021_____

Title: ____President_____               Title: ____General Counsel_____

*[Signature Page to Claims Administration Agreement]*

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

**SCHEDULE A**

**CERTAIN DEFINITIONS**

A.    <u>Certain Definitions</u>.  In this Agreement, the following terms shall have the indicated meanings:

"**_Business Day_**" means any day other than a Saturday, Sunday or day on which banks in New York City are authorized or required by law to close.

"**_Change in Control_**" means: (i) a sale, transfer, pledge or issuance of 10% or more of the outstanding stock or other equity interest of Carl Warren; (ii) a sale, transfer, or pledge of a substantial portion of the assets of Carl Warren; or (iii) any merger or consolidation Carl Warren with another entity. Change of Control does not include intergroup restructuring among the affiliated entities of Venbrook Group, LLC where the ownership of Venbrook Holdings, LLC does not change.

"**_Confidential Information_**" means all proprietary or confidential information, including Consumer Confidential Information, belonging to or licensed by or otherwise obtained by the Disclosing Party that is of value to such Party, is treated as confidential by the Disclosing Party, is disclosed (whether in writing, orally, visually, electronically, by physical delivery or permitted observation or inspection, or otherwise) by the Disclosing Party to the Receiving Party in connection with this Agreement and is marked as confidential or would be considered by a reasonable person to be confidential, including trade secrets of the Disclosing Party, all materials relating to, reflecting or incorporating materials from the Disclosing Party's Intellectual Property, confidential information of third parties with whom the Disclosing Party has contracted, information relating to the Disclosing Party's planned or existing computer systems, systems architecture, services, designs, technology, processes, technical data, engineering techniques, methodologies, and concepts or information regarding a Party's employees, agents, clients, customers, policyholders, beneficiaries and/or investors, but shall exclude information that falls within the Standard Exceptions.

"**_Consumer_**" means a prospective, current, or former insured and includes a Policy applicant, owner, certificate holder, claimant, beneficiary, or representative of any of the foregoing.

"**_Consumer Confidential Information_**" means all individually identifiable and non-public information about a Consumer (including any Personal Data), obtained, or received or accessed in connection with an application for an insurance policy, or in connection with the issuance and/or administration of an insurance policy. The Standard Exceptions shall not apply to Consumer Confidential Information.

"**_Data Protection Laws_**" means all Applicable Law relating to privacy, data security, communications secrecy, Security Breach notification, or the processing of Personal Data, such as, to the extent applicable, U.S. federal and state information security and privacy statutes, regulations and/or best practices.

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

"**_Disputed Claim_**" means any Claim: (i) for which Carl Warren believes, or reasonably should believe, coverage should be disclaimed, denied, or further considered for coverage issues; (ii) for which coverage is denied and which denial results in an oral or written complaint; or (iii) results in an oral or written complaint by a claimant or Insured to any act or omission by Carl Warren.

"**_Everspan Confidential Information_**" means, collectively, the Confidential Information of Everspan and Consumer Confidential Information.

"**_Everspan Systems_**" means any hardware, software, media, network or other information technology resource, whether physical or virtual, owned, licensed or operated by or on behalf of Everspan, whether on Everspan 's premises or connected to or accessible from its network, other than any that are owned by Carl Warren or its Subcontractors.

"**_High Potential Claim_**" means a Claim involving any one or more of the following:

> Any lawsuit or arbitration demand that names Everspan, or any of its affiliates, as a defendant;
> Any lawsuit or arbitration demand naming Carl Warren as Claim handling agent for Everspan, as defendant;
> Any claim, threat, allegation, or lawsuit alleging bad faith or breach of unfair claims handling statutes;
> Any Claim involving questions of coverage;
> Any loss representing either exposure to or above policy limits, or three times Discretionary Authority, regardless of reserve, liability or coverage;
> Any lawsuit brought in a jurisdiction outside of North America;
> Claims in which claimants have suffered the following injuries or medical conditions:
>> o Death;
>> o Paralysis;
>> o Brain damage affecting mentality, as permanent disorientation, behavior disorder, personality change, seizure, motor deficit, impaired cognition or memory, aphasia, hemiplegia, extended coma or unconsciousness;
>> o Third degree burns covering 10% of the body or more, or second degree burns covering 30% of the body or more;
>> o Amputation of any limb or several fingers or toes;
>> o Impairment of vision or hearing by 50% or more;
>> o Nerve damage causing paralysis or loss of sensation in the arm, hand or leg;
>> o Multiple or serious internal injuries;
>> o Multiple fractures, any fracture involving more than one limb, any malunion (significant shortening of a limb);
>> o Back injury requiring surgery or involving any disc rupture; and
>> o Any disability of more than one (1) year.
> Any claim involving environmental damage, hazardous waste, or any "toxic torts" including DES, asbestosis, Bendectin, or lead;
> Any Claim in which there are allegations of sexual assault or molestation;

A-2

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

Any Claim in which a demand for policy limits is made;

Any Claim which would exceed the primary Policy limits and would affect excess or umbrella policies, when Everspan has issued both the primary and excess or umbrella policies; and

Any consideration of an appeal taken by or against Everspan.

"***Incurred Value***" means the sum of indemnity and Loss Adjustment Expenses (as defined in Schedule A) paid to date, together with any outstanding reserves for future indemnity and Loss Adjustment Expenses.

"***Intellectual Property***" means the worldwide intangible legal rights or interests evidenced by or embodied in: (i) any idea, design, concept, method, process, technique, apparatus, invention, discovery, improvement, or derivative, including any patents, trade secrets, and know-how; (ii) any work of authorship, including any copyrights, moral rights or neighboring rights; (iii) any trademark, service mark, trade dress, trade name, or other indicia of source or origin; and (iv) any other similar rights.

"***Loss Adjustment Expenses***" or "***LAE***" means the expense associated with adjusting and settling a specific claim. LAE includes:

Fees to attorneys for representation related to Claims;

Court costs, court fees and court expenses, including the costs of court reporters (whether at deposition or otherwise);

Pre- and post-judgment interest paid as a result of litigation;

Fees for service of process;

Costs of surveillance, detective, or other investigative services;

Costs of employing experts for the preparation of materials including maps, professional photographs, accountings, scientific analyses, and diagrams;

Costs of employing experts for their advice, opinions, or time spent testifying;

Costs of independent medical examinations and evaluation to determine the extent of Everspan's liability including diagnostic examination and services, laboratory x-rays, and reasonable and necessary transportation expenses;

Costs of medical bill adjudication and outside medical management expenses related to medical costs containment efforts;

Costs of legal transcripts of testimony taken at coroner's inquests, criminal, or civil proceedings;

Costs of copies of any public records and/or medical records;

Costs of depositions and court reported and/or recorded statements;

Fees of appraisers used to establish the amount of damage to vehicles and other property;

Fees of independent adjusters, when required; and

Attendance at administrative hearings in those jurisdictions that permit an adjuster to attend pre-hearing conferences and/or informal hearings, in place of attorneys chosen by Everspan for that purpose.

For clarity, LAE does not include: (i) fees for attorneys who are employed by or on permanent retainer to Carl Warren, unless pre-approved in writing by an authorized Everspan

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

representative, or (ii) salaries of Carl Warren's employees or other overhead. All charges for LAE will not exceed the usual and customary local charges.

"*Loss in Excess of Policy Limits*" means any amount paid as damages or in settlement in excess of the limits on a Policy, but otherwise within the coverage terms of that Policy, arising from an allegation or claim of its insured, its insured's assignee, or other third party, which is caused (in whole or in part) by the negligence or other tortious conduct on the part of Carl Warren in the handling of a Claim, in rejecting a settlement within the relevant Policy limits, in discharging a duty to defend or prepare the defense in the trial of an action against its insured, or in discharging its duty to prepare or prosecute an appeal consequent upon such an action.

"*Personal Data*" means any information relating to an identified or identifiable individual or that is considered "personally identifiable information," "personal information," "personal data," "nonpublic personal information," "protected health information," or similar designation under any Data Protection Laws. The Standard Exceptions shall not apply to Personal Data.

"*Run-Off Expenses*" means Everspan's reasonable estimate of expenses incurred or to be incurred by Everspan or Everspan's designee in order to for a replacement administrator to provide the Claims Services with respect to Claims (including all those open, reopened, or reported in the future).

"*Security Breach*" means any act or attempt, successful or unsuccessful, to gain unauthorized access to, disrupt or misuse a Carl Warren System or Everspan System used by Carl Warren to provide the Claims Services, which (a) results or could reasonably result in unauthorized access to, use, or acquisition, or disclosure of Everspan Confidential Information (including Consumer Confidential Information and Personal Data), or (b) has a reasonable likelihood of materially harming any material part of Everspan 's normal operations, or adversely impact Everspan 's business or security measures.

"*Standard Exceptions*" means information which (a) was in the public domain on or prior to the date of this Agreement; (b) was in the possession of the Receiving Party or its affiliates on or prior to the date of this Agreement and was not acquired or obtained from the Disclosing Party or its affiliates; (c) became part of the public domain, by publication or otherwise, not due to any unauthorized act or omission on the part of the Receiving Party or its affiliates; or (d) is supplied to the Receiving Party by a third party, other than pursuant to this Agreement, and, to the Receiving Party's knowledge, is not in violation of any confidentiality agreement between such third party and the Disclosing Party.

"*Subcontractor*" means any Carl Warren, affiliate or other party retained by Carl Warren to perform any of the services sub-delegated to Carl Warren under this Agreement.

"*Carl Warren personnel*" means Carl Warren's employees, contractors, officers, agents, Subcontractors and Carl Warren's.

"*Carl Warren System*" means Carl Warren's systems, media, or devices, whether physical or virtual, that store, process, or transmit Everspan Confidential Information or are used to access Everspan Systems, whether on Carl Warren's (or its affiliates') premises, connected to or accessible from Carl Warren's (or its affiliates') network(s), or hosted in the cloud.

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

    B.    <u>Other Definitions</u>. The following terms shall have the meanings defined in the Section indicated:

| Term | Section |
|------|---------|
| "*Agreement*" | Preamble |
| "*Bordereau*" | 4.5 |
| "*Claim File*" | 7.1 |
| "*Claims*" | 1.2 |
| "*Claims Account*" | 7.1 |
| "*Claims Service Fees*" | 8.1 |
| "*Claims Services*" | 1.1 |
| "*Defense Counsel*" | 1.2(c) |
| "*Disclosing Party*" | 14.1 |
| "*Discretionary Authority*" | 2.1 |
| "*Everspan*" | Preamble |
| "*Everspan Indemnitee*" | 11.1 |
| "*Financial Audit*" | 7.3 |
| "*High Incurred Value Claim*" | 4.2 |
| "*In-Scope Systems and Data*" | 14.4 |
| "*Information Security Program*" | 14.4 |
| "*Indemnified Party*" | 11.3 |
| "*Indemnifying Party*" | 11.3 |
| "*Insureds*" | 1.2(c) |
| "*Law*" | 3.1 |
| "*LLN*" | 4.1 |
| "*Party*" or "*Parties*" | Preamble |
| "*Policies*" | 1.1 |
| "*Program Exhibit*" | 1.1 |
| "*Receiving Party*" | 14.1 |
| "*Required Policies*" | 6.4(a) |
| "*SIU*" | 15.9 |
| "*Termination Date*" | 9.4 |
| "*Carl Warren*" | Preamble |
| "*Carl Warren Indemnitee*" | 11.2 |

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

**SCHEDULE B**

**BORDEREAU**

       Each Bordereau will be cumulative (including all closed Claims) and will include, at a minimum, the items listed on this Schedule B for each Claim as well as any information required by Everspan. Each Bordereau will be in an electronic format acceptable to Everspan. Carl Warren will list such information as is customary to provide for the particular line(s) of business represented on any Bordereau. Everspan may request any data or information that is routinely captured by Carl Warren to appear on the Bordereau. Carl Warren will be provided with Everspan's preferred method for Bordereau reporting.

- ☐ Claim Number;
- ☐ Program Name;
- ☐ Policy Number;
- ☐ Policy Effective Date;
- ☐ Policy Expiration Date;
- ☐ Date of Loss;
- ☐ Claimant Name;
- ☐ Insured Name;
- ☐ Insured Location / State;
- ☐ Agent Name, if applicable;
- ☐ Description of the Cause of Loss;
- ☐ Policy Year;
- ☐ Underwriting Year;
- ☐ Accident Year;
- ☐ Status of Claim;
- ☐ File Open Date;
- ☐ File Closed Date;
- ☐ File Re-Open Date;
- ☐ Cat Code, if applicable;
- ☐ State of Litigation;
- ☐ Annual Statement Line of Business;
- ☐ Litigated File Indicator;
- ☐ Claim Adjuster Name;
- ☐ Indemnity Paid;
- ☐ LAE Paid;
- ☐ Indemnity Reserve;
- ☐ LAE Reserve;
- ☐ Indemnity Incurred;
- ☐ LAE Incurred;
- ☐ Subrogation / Salvage Received; and
- ☐ Subrogation / Salvage Expected.

Paid Loss Adjustment Expense should include detail for the following categories: legal expenses, claims services fees, and all other LAE.

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

**SCHEDULE C**

**CLAIM FILES**

   Carl Warren will maintain a separate file for each Claim. Claim Files may be maintained electronically and will include, at a minimum, the sections and information below. Claim Files will be kept current and organized in a logical manner. All Claim-related documentation will be maintained in Claim Files and not solely in any general files, personal electronic mail folders, etc.

<u>Coverage</u>

- ☐ Copy of Policy, including all schedules, declarations, endorsements, notices (including non-renewal and cancellation correspondence)
- ☐ Evidence of coverage review by Carl Warren
- ☐ Declination or confirmation of coverage correspondence, and all responses or other documents related thereto
- ☐ Reservation of rights letter
- ☐ Documentation of coverage issues identified and steps taken thereby
- ☐ Reference to corresponding coverage file, if applicable

<u>Correspondence</u>

- ☐ Notice of Claim / first notice of loss information
  Activity Notes or Log of Carl Warren's Claims staff
- ☐ Diary of key dates and Claim milestones
- ☐ LLN forms
- ☐ Carl Warren Notice to Everspan of Claim where required by this Agreement
- ☐ All correspondence or memoranda with adjuster, experts, or any third parties
- ☐ All correspondence or memoranda with Defense Counsel or other legal advisors
- ☐ Up-to-date Defense Counsel budget, including litigation budget if applicable
- ☐ All legal documents, including court documents, pleadings, motions, and so forth
- ☐ All correspondence with and reports sent to Everspan
- ☐ Claim payment information, if applicable, with supporting documentation
- ☐ Vendor billings, if applicable, with supporting documentation
- ☐ Final disposition, if applicable, with supporting documentation
- ☐ Documentation of all required authorities for payments or reserving
- ☐ All other general correspondence

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

**SCHEDULE D**

**LARGE LOSS NOTICES**

TO BE DEVELOPED BY EVERSPAN AND CARL WARREN

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

## PROGRAM EXHIBIT (CARDIGAN NEMT)

**1.     Effective Date**

May 1, 2021.  The "Effective Date" will apply only to the Claims Services provided pursuant to this Program Exhibit.

**2.     Program Name & Information**

Cardigan General Insurance Services, LLC
6320 Canoga Ave., 12th Floor
Woodland Hills, CA 91367

Program: Commercial Trucking & Non-Emergency Medical Transportation

Underwriting Contact: Brenda Sherman (bsherman@cardigangeneral.com)
Cc: Legal Department (Contracts@venbrook.com)

**3.     Carl Warren's Primary Claims Handling Office and Address for Notices**

Carl Warren & Company
6320 Canoga Ave., 12th Floor
Woodland Hills, CA 91367
Attention:     Gordon Pennington
               GPennington@carlwarren.com
Cc: Legal Department (Contracts@venbrook.com)

**4.     Everspan's Address for Notices**

Everspan Indemnity Insurance Company
One World Trade Center, 41st Floor
New York, NY 10007

Attention:     General Counsel
               legal@everspangroup.com

**5.     Initial Claims Account Funding Amount**

As soon as reasonably possible after the Effective Date, but subject to any performance required by Everspan's reinsurers, the Claims Account shall be funded to $50,000.

DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

6.    **Carl Warren's Discretionary Authority**

███████████████████████████████████.

7.    **High Incurred Value Claim**

███████████████████████████████ In accordance with <u>Section 4.2</u>, Everspan will be immediately notified of all Claims that exceed this threshold.

8.    **Claims Service Fees**

Everspan will pay Carl Warren the Claims Services Fees in monthly installments. Carl Warren will submit payment requests in writing to Everspan on a monthly basis, in the form provided by Everspan, identifying all fees and other compensation due to Carl Warren. Everspan will then remit the balance to Carl Warren within ten (10) business days after receipt of the payment requests, unless Everspan disputes the payment requests, in which case the undisputed amounts requested will be paid within ten (10) business days after receipt of the payment request. All payments by Everspan to Carl Warren will be made by wire or electronic transfer unless otherwise agreed.

9.    **Claims Services Fees – Fee Schedule**



DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7



DocuSign Envelope ID: 0DF25565-8647-49B4-A010-7C91DDC1B1E7

IN WITNESS WHEREOF, the Parties have caused this Program Exhibit (Cardigan NEMT) to be executed by persons duly authorized as of the date first written above.

CARL WARREN & COMPANY LLC

By: _____ *Gordon Pennington* _____

Name: _____ Gordon Pennington _____

Date: _____ 4/30/2021 _____

Title: _____ President _____

EVERSPAN INDEMITY INSURANCE CO.

By: _____ *Nicholas Scott* _____

Name: _____ Nicholas Scott _____

Date: _____ 4/30/2021 _____

Title: _____ General Counsel _____

JUDGE VARGAS

25 CV 10463

# EXHIBIT 3



June 20, 2024

Cardigan General Insurance Services, LLC
Attn: Brenda Sherman
6320 Canoga Avenue, Suite 750
Woodland Hills, CA 91367

Dear Brenda,

We write pursuant to the Program Agreement between Everspan and Cardigan, and the associated Reinsurance Agreement between Everspan and General Reinsurance Corporation attached as Exhibit A to the Program Agreement, concerning the ███████████████████████████████████████████ Pursuant to the provisions of the agreements as noted below, and the calculations contained in the attached Exhibit, Cardigan owes Everspan ███████████████████████████████████

As you know, Cardigan's entitlement to a commission is governed by Section 6.1 and the Schedule B of the Program Agreement. Pursuant to ███████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ Section 6.4 of the Reinsurance Agreement ("Sliding Scale Commission") provides for the calculation of an adjusted Provisional Commission pursuant to the formula contained in this Section, to be calculated "for the first time with respect to each Contract Year, within sixty (60) days after the end of the period that is 24-months following the last date of each Contract Year…" as indicated in Section 6.4.3. As the Program Agreement was terminated by mutual consent as of April 30, 2022, the Sliding Scale Commission calculations in the attached Exhibit are determined as of April 20, 2024, i.e., 24-months following the last date of the Program Agreement's only Contract Year. As can be seen on the attached Exhibit, ███████████████████████████████████████████, so the adjusted Provisional Commission has been calculated pursuant to Section 6.4.2(A) of the Reinsurance Agreement.

Accordingly, please remit to Everspan Indemnity Insurance Company, the sum of ██████████ on or before June 30, 2024, as required by Schedule B of the Program Agreement. As you are aware, Everspan has certain payment obligations to General Reinsurance Corporation under the Reinsurance Agreement, which obligations are also coming due. Please let us know if you have any questions, or would like to discuss Cardigan's obligations or the calculations in the attached Exhibit. Nothing contained herein shall be considered a waiver of any rights Everspan has with respect to the subject agreements or our relationship with Cardigan.

Thank you,

Steven Murray
Chief Financial Officer
Everspan Group

Cc:
Nicholas Scott, Everspan Group

2

| Everspan Indemnity Insurance Company | | Exhibit |
|---|---|---|
| Cardigan Program | | |

